# EXHIBIT A

**CALLAGY LAW, P.C.**
Michael J. Smikun, Esq. (Bar No. 02056-2008)
Mack-Cali Centre II
650 From Road – Suite 565
Paramus, NJ 07652
Tel. (201) 261-1700
Fax. (201) 261-8404
Email: msmikun@callagylaw.com
*Attorneys for Plaintiffs*

| | |
|---|---|
| INTEGROUS WEALTH STRATEGIES, LLC, a New Jersey Limited Liability Company<br><br>Plaintiff,<br><br>**v.**<br><br>DAVID L. BAILIN, individually and as Managing Partner and Chief Compliance Officer of INTEGROUS WEALTH STRATEGIES, LLC, and BAILIN WEALTH STRATEGIES, LLC, a Florida Limited Liability Company<br><br>Defendants. | SUPERIOR COURT OF NEW JERSEY CHANCERY DIVISION: BERGEN COUNTY<br><br>**DOCKET NO.:**<br><br>**VERIFIED COMPLAINT** |

Plaintiff Integrous Wealth Strategies, LLC ("IWS"), by and through its undersigned counsel, as and for its Complaint against Defendants David L. Bailin ("Bailin") and Bailin Wealth Strategies, LLC ("BWS"), alleges as follows:

## PRELIMINARY STATEMENT

1. Sean Callagy is not a passive investor. He is one of New Jersey's most accomplished attorneys and entrepreneurs, a founder of Callagy Law, a driving force behind the Unblinded movement, and a builder of multiple successful organizations spanning law, business, and personal development. When Sean Callagy identifies an opportunity and commits his capital, his relationships, and his name to it, it is because he has done the work to make it real. Integrous Wealth Strategies, LLC was his idea.

He conceived it, structured it, funded it, and made it happen. He brought the vision, the institutional relationships, the legal infrastructure, and the money. What he needed was someone who could run the compliance and advisory operations day to day, someone with the licenses, the client book, and the technical expertise to manage a registered investment adviser from the inside.

2. That person was David Bailin. Bailin was operating a modest advisory practice out of Hamilton, New Jersey. The opportunity IWS represented was transformational for him. Callagy did not simply offer Bailin a job. He offered him a platform: a fully scaled, SEC-registered investment adviser, a new broker-dealer relationship through Purshe Kaplan Sterling Investments, and the financial backing to close out his prior operation and build something larger than anything he had ever done on his own. In exchange, Bailin brought his existing client book, agreed to serve as IWS's Managing Partner and Chief Compliance Officer, committed to a minimum two-year tenure, and agreed to help build the enterprise Sean Callagy had envisioned.

3. The critical question in this case is not whether Bailin had some right to his pre-existing clients upon a lawful retirement. The critical question is who controlled the advisory agreements, who authorized the transfer of those agreements out of IWS, and where the resulting revenue went. The answer to each of those questions is the same: Bailin, acting alone, without authorization, without member consent, and in direct violation of the fiduciary duties he owed to the company he was entrusted to manage.

4. Callagy Enterprises, LLC wired $130,000 into IWS on June 30, 2026. Bailin confirmed receipt the same day. **Exhibit C** The company was live. The trust was given. It was not returned.

5. While Sean Callagy and Jazz Vesuvio were building, Bailin was copying. While they were negotiating the operating agreement in good faith, he was stalling, running it

through his attorney, rejecting agreed terms, and buying time. While they were asking for basic financial records of the company they co-owned and co-funded, he was invoking compliance authority to keep them blind. And while he was doing all of that, he was secretly building a competing registered investment adviser, Personal Wealth Strategies, LLC, using the same clients, the same vendors, and the same technology infrastructure he had absorbed as IWS's Managing Partner.

6. On September 23, 2026, Bailin sent a single email announcing that he had already transferred IWS's client base, the advisory agreements he controlled as CCO, the accounts whose revenue flowed through IWS's operations, to Personal Wealth Strategies. He set a negative consent deadline of October 23, 2026. **Exhibit B** He simultaneously locked IWS's investment adviser representative Justin Rice out of every system used to service those clients. On October 14, 2026, he fired Rice entirely.

7. This Complaint asserts sixteen counts against Bailin individually and through his entity Bailin Wealth Strategies, LLC, including breach of the fiduciary duties of loyalty, care, and candor; usurpation of corporate opportunity; breach of oral operating agreement; violation of the Investment Advisers Act of 1940; conversion; violation of member inspection rights; breach of the covenant of good faith and fair dealing; wrongful interference with IWS's employment relationships; unjust enrichment; accounting and constructive trust; violation of the New Jersey Computer Related Offenses Act; promissory estoppel; tortious interference with prospective economic advantage; and fraud.

8. IWS seeks the following relief:

   a) **Emergency injunctive relief** immediately enjoining the October 23, 2026 negative consent client transition and any further transfer of IWS's advisory

relationships, contracts, or assets under management to Personal Wealth Strategies or any other entity;

b) **Immediate restoration** of Justin Rice's access to all IWS operational systems;

c) **Immediate access** to all IWS financial records and a full accounting of the $130,000 advanced by Callagy Enterprises, LLC;

d) **Disgorgement** of all profits derived from Bailin's wrongful diversion of IWS's client relationships and business opportunities;

e) **Imposition of a constructive trust** over all wrongfully diverted assets pending final resolution;

f) **Attorneys' fees and costs**, including fee-shifting for intentional fiduciary misconduct; and

g) **Such other and further relief** as this Court deems just and proper.

9. David Bailin was given everything. This Complaint is the beginning of the process by which he is held accountable for what he did with it.

**PARTIES**

10. Plaintiff Integrous Wealth Strategies, LLC ("IWS") is a limited liability company organized and existing under the laws of the State of New Jersey, with its principal place of business at 2277 Route 33, Suite 415, Hamilton, New Jersey 08690. IWS is registered with the Securities and Exchange Commission as a registered investment adviser and operates a dual-channel business as an independent RIA and through its broker-dealer relationship with Purshe Kaplan Sterling Investments, a FINRA/SIPC member firm. IWS achieved SEC registration effective May 26, 2026.

11. Defendant David L. Bailin ("Bailin") is an individual who, upon information and belief, resides in the State of New JerseyI. At all times relevant to this Complaint, Bailin served as the Managing Partner and Chief Compliance Officer of IWS and held

a twenty percent (20%) membership interest in IWS through his wholly-owned entity, Defendant Bailin Wealth Strategies, LLC. Bailin is a licensed financial adviser holding the designations of Accredited Investment Fiduciary (AIF®), Chartered Financial Consultant (ChFC®), Chartered Life Underwriter (CLU®), and Certified in Long-Term Care (CLTC®).

12. Defendant Bailin Wealth Strategies, LLC ("BWS") is a limited liability company organized and existing under the laws of the State of Florida, owned equally by David L. Bailin and Nancy Bailin. BWS holds the twenty percent (20%) membership interest in IWS attributable to David Bailin. At all times relevant to this Complaint, BWS acted by and through David Bailin, who exercised full operational control over BWS and its membership interest in IWS.

13. Non-party Sean Callagy is an attorney and founding member of IWS. Callagy Enterprises, LLC, an entity through which Mr. Callagy holds his interests, holds a forty percent (40%) membership interest in IWS. Callagy Enterprises, LLC advanced $130,000 to IWS on June 30, 2026, as part of a $200,000 credit facility established to fund IWS operations.

14. Non-party Jazz Vesuvio is a founding member of IWS and holds a forty percent (40%) membership interest in IWS. Jazz Vesuvio is the spouse of Michael Vesuvio, who serves as a principal contact and operational advisor to IWS.

15. Non-party Justin Rice is a licensed investment adviser representative who was employed by IWS as a financial adviser at all times relevant to this Complaint. On October 14, 2026, Bailin terminated Rice's employment. Rice's wrongful lockout and termination are among the acts of misconduct alleged herein.

## JURISDICTION AND VENUE

16. This Court has subject matter jurisdiction over this action pursuant to N.J. Ct. R. 4:3-1, which vests jurisdiction over actions involving the internal affairs of a limited liability company, breaches of fiduciary duty by a managing member, claims for equitable relief including injunction and accounting, and the imposition of constructive trust, in the Chancery Division of the Superior Court of New Jersey.
17. This Court has personal jurisdiction over Defendant David L. Bailin because, at all times relevant to this Complaint, Bailin conducted business in the State of New Jersey, served as the Managing Partner and Chief Compliance Officer of a New Jersey limited liability company with its principal place of business in New Jersey, maintained an office in Hamilton, New Jersey, and directed, supervised, and executed the wrongful conduct alleged herein from within the State of New Jersey.
18. This Court has personal jurisdiction over Defendant Bailin Wealth Strategies, LLC because, at all times relevant to this Complaint, BWS held a membership interest in a New Jersey limited liability company, participated in the management and operation of that company through its principal David L. Bailin, and derived substantial benefit from its activities and investments within the State of New Jersey.
19. Venue is proper in Bergen County pursuant to N.J. Ct. R. 4:3-2 because IWS's principal place of business is located at 2277 Route 33, Suite 415, Hamilton, New Jersey 08690, which is situated within Bergen County, and because a substantial portion of the events and omissions giving rise to this action occurred within Bergen County.
20. This action is properly brought in the Chancery Division because Plaintiff seeks equitable relief, including emergency injunctive relief to prevent the irreversible transfer of IWS's client relationships and business opportunities, an accounting, and the imposition of a constructive trust over assets wrongfully diverted by Defendants.

## STATEMENT OF FACTS

### The Vision – What IWS Was and How It Was Built

21. Integrous Wealth Strategies, LLC was not David Bailin's idea. It was conceived and driven by Sean Callagy, a New Jersey attorney and founding member, in partnership with Michael and Jazz Vesuvio, as a vehicle to build a fully scaled, SEC-registered investment advisory firm with the infrastructure, relationships, and capital that Bailin's boutique practice had never had access to on its own.

22. At the time of IWS's formation, Bailin was operating a small advisory practice known as Personal Wealth Strategies out of Hamilton, New Jersey, run by Bailin and his wife, Nancy Bailin. The practice was modest in scale. The opportunity IWS represented, a new RIA, a new broker-dealer relationship, institutional infrastructure, and the financial backing of the Callagy and Vesuvio organizations, was transformational for Bailin professionally and economically.

23. The initial introduction between the Callagy organization and Bailin occurred in February 2026. From the outset, Bailin understood the nature of the opportunity being extended to him. In a February 12, 2026 email, Bailin identified the key legal issues that needed to be resolved before launch, including the ultimate ownership structure of the RIA, a shareholders' agreement protecting minority interests, and an operating agreement governing his role as Managing Partner. He confirmed May 26, 2026 as the target go-live date. He wrote: "we would not be moving forward if we didn't all trust each other." The trust he invoked was real. He was trusted completely. The money, the infrastructure, and the platform were made available to him in full reliance on that trust. **Exhibit A**

24. The founding members agreed to the following structure: Callagy Enterprises, LLC, Sean Callagy's entity, would hold a forty percent (40%) membership interest; Jazz

Vesuvio would hold a forty percent (40%) membership interest; and Bailin Wealth Strategies, LLC, a Florida limited liability company owned equally by David Bailin and Nancy Bailin, would hold a twenty percent (20%) membership interest.

25. In exchange for his equity position and the platform IWS provided, Bailin agreed to: close his prior practice; bring his existing client book (the "Legacy Book") into IWS; serve as IWS's Managing Partner and Chief Compliance Officer; commit to a minimum two-year tenure before any contemplated retirement; and build IWS's advisory business alongside his co-members.

26. The founding members further agreed verbally that Bailin's pre-existing Legacy Book would remain a personal asset he could sell upon a lawful retirement, at a fair market value to be determined by an independent third party. This arrangement was specific: it applied upon retirement, to identified pre-existing client relationships, and it did not authorize a competing practice, current solicitation of IWS clients, or use of IWS's resources. What remained under active negotiation, and was never resolved, included the Schedule D cost baseline governing Bailin's payout-renegotiation rights, the applicable payout percentage, the precise limits of Bailin's managerial authority, and whether Bailin could maintain a separate practice upon or after retirement.

27. IWS's SEC registration was processed through Dinsmore Compliance Services, with Kevin Woodard serving as compliance consultant. Ownership of IWS was formally disclosed to the SEC effective May 26, 2026, the date on which Bailin, Callagy, and the Vesuvios became the registered owners of record. IWS also established a broker-dealer relationship with Purshe Kaplan Sterling Investments ("PKS"), a FINRA/SIPC member firm, and retained Justin Rice as an investment adviser representative. The 120-day window required for IWS to move $100,000,000 in assets under management to preserve its SEC registration began on June 1, 2026.

28. To make the vision a reality, Callagy Enterprises, LLC established a $200,000 credit facility in favor of IWS and advanced $130,000 to IWS on June 30, 2026. David Bailin confirmed receipt of the wire the same day. The advance was not a casual transfer. It was extended on the understanding that it would be documented as a formal loan instrument with agreed repayment terms, interest, and security provisions. Tyler Callagy, Esq. was engaged to draft the loan agreement and collected intake information for that purpose. As of September 2026, three months after the wire was confirmed received by Bailin, no loan agreement had been executed. Bailin was aware that the instrument was being drafted, was aware of the outstanding balance, and took no steps to formalize or repay the obligation. No accounting of how those funds were applied has been provided to IWS or its members to this date. **Exhibit C**

29. The May 26, 2026 launch was a coordinated, irrevocable event. On that date, all members gave notice at their respective prior firms and executed the ownership transfer documents for IWS through Dinsmore Compliance Services. The Tax ID for IWS was obtained and registered under David Bailin's name and address. Bailin Wealth Strategies, LLC was disclosed to the SEC as the entity holding Bailin's 20% interest, with David and Nancy Bailin listed as its equal owners. Callagy Law was disclosed as an affiliated entity given Sean Callagy's 40% interest. Kevin Woodard of Dinsmore Compliance Services confirmed the SEC registration was effective and all parties were filed. There was no turning back. Everyone had burned their bridge to their prior firms and committed fully to IWS. Everyone, that is, except David Bailin, who, on information and belief, never intended to stay.

30. Critically, Bailin controlled the IWS registration process from the inside. The Tax ID for IWS was obtained under his name. He had access to every disclosure, every filing,

and every operational decision made during the formation period. The same access that allowed him to build IWS was the access he would later use to dismantle it.

31. From the earliest days of the relationship, Bailin positioned himself as the operational center of IWS. In a February 18, 2026 email to Tyler Callagy and Michael Vesuvio, Bailin outlined his expectations for the Managing Partner role in detail, including spending authority up to $20,000 without partner approval, control over hiring and firing of non-producer employees, termination protection for three years, and, critically, his insistence that "ownership of my legacy business will remain mine and not that of the RIA." Bailin also wrote: "we would not be moving forward if we didn't all trust each other."

32. That trust was given. It was not returned.

**<u>The Negotiations – Bailin's Pattern of Bad Faith Emerges</u>**

33. From the moment IWS was formed, Tyler Callagy, Esq., associate attorney at Callagy Law and the primary draftsman of the operating agreement, worked to reduce the members' verbal agreements into a signed written document.

34. What followed was not a good-faith negotiation. It was a sustained, methodical campaign of delay designed to run out the clock while Bailin built his exit.

35. Draft after draft was sent to Bailin and his counsel. Term after term was verbally agreed upon over the phone, only to be rejected in writing by Bailin's attorney. The cycle repeated itself a third time, and then a fourth.

36. Each time, Bailin's position shifted, new demands, new objections, new schedules that needed to be produced before review could proceed, while the operating agreement remained unsigned and IWS continued to operate in a legal vacuum that Bailin alone exploited.

37. In a March 4, 2026 email to Michael Vesuvio, Bailin raised operational matters including broker-dealer selection, technology expenses, and payroll structure for Justin Rice, whose $165,000 annual salary Bailin proposed as a basis for adjusting his own payout from 62% to 53% of Legacy Book revenue. The email reflected a man engaged in the details of building IWS while, on information and belief, simultaneously building its replacement.

38. The March 4, 2026 email also revealed the financial architecture of IWS's client base in detail. The vast majority of Bailin's team's investment advisory business was managed through Focus Partners Advisor Services ("FPAS"), a third-party asset management platform ("TAMP"). Bailin had negotiated a bi-party agreement with FPAS under which the TAMP's fees were billed directly to IWS, not to individual clients, in exchange for breakpoint pricing that became more favorable as IWS's total assets under management grew.

39. Under this arrangement, IWS would raise its client-facing fees to cover the TAMP costs formerly billed to clients, and FPAS would bill IWS directly for its services. The result was that IWS, not Bailin personally, was the contracting party with FPAS, the entity responsible for TAMP fees, and the entity whose growing AUM would generate the breakpoint benefits. The client relationships, the advisory contracts, and the fee revenue flowing from those relationships were IWS's assets. They were not Bailin's personal property to transfer at will.

40. The operating agreement negotiations escalated in July 2026 when Bailin submitted what he characterized as the required "schedules" to the agreement.

41. What he actually submitted for Schedule D, the document that would govern his payout-renegotiation rights for the life of the deal, was not, as required, an itemized breakdown of IWS's costs attributable to servicing the Legacy Book. It was the entire

2025 income statement of Personal Wealth Strategies, his prior practice, reflecting gross revenue of approximately $2,150,000, owner compensation, TAMP fees, and overhead, with an unauthorized inflation adjustment added by Bailin himself.

42. As Tyler Callagy documented in a confidential July 20, 2026 internal briefing: "It's PWS's historical numbers, not Integrous's cost of servicing the book." That briefing further noted that whatever number was locked in for Schedule D would govern "whether David can later force a renegotiation of his payout... for the life of the deal." Bailin knew this. He submitted numbers designed to serve himself.

43. In that same submission, Bailin proposed installing himself as IWS's registered agent, giving him control over all legal service and official notices to the company.

44. As Tyler Callagy's briefing observed, this would hand Bailin "an operational choke point if he's ever removed or in dispute." The proposal was rejected.

45. By late summer 2026, the pattern was unmistakable. Every agreed term became a new dispute when reduced to writing. Every completed draft became the occasion for a new demand. Every schedule submission was an opportunity to extract additional economic advantage. And through it all, on information and belief, Bailin was not negotiating toward a final agreement. He was buying time.

46. Tyler Callagy prepared and transmitted no fewer than four successive drafts of the operating agreement between February and September 2026.

47. Each draft incorporated the terms verbally agreed upon between the members during prior phone calls.

48. Among the terms verbally agreed upon and subsequently repudiated in writing were: the 40/40/20 ownership structure and its governance implications; the two-year commitment before retirement; the mechanism for determining the fair market value of the Legacy Book at retirement; the scope of Bailin's spending authority as

Managing Partner; and the members' rights to financial information and governance participation.

49. Each of these terms appeared in successive drafts in forms Bailin had approved on calls. Each was rejected when reduced to writing.

50. The inference from this pattern is not subtle. A party who verbally agrees to terms and then rejects them in writing, repeatedly, across multiple drafts, over multiple months, without ever providing a substantive counterproposal, is not negotiating. He is creating the appearance of negotiation while preserving the freedom to act without legal constraint. That is precisely what Bailin did.

51. Every week the operating agreement remained unsigned was another week in which Bailin operated with maximum flexibility and minimum accountability while his co-members remained bound by the commitments they had made in good faith.

**<u>The Obstruction – Bailin Weaponizes Compliance</u>**

52. While the operating agreement negotiations ground forward, Bailin used his position as IWS's Chief Compliance Officer to systematically deny his co-members access to the company's financial records.

53. On July 3, 2026, Jazz Vesuvio, acting in her capacity as a 40% member of IWS, sent Bailin a detailed request for financial information, including a grid of expected revenue sources, expense breakdowns, and payroll detail. The request was specific, reasonable, and entirely consistent with the members' rights under both the verbal operating agreement and the New Jersey LLC Act.

54. Bailin did not provide the information. Instead, on July 10, 2026, he sent a written response invoking, in circular and self-serving fashion, the confidentiality provisions of the very operating agreement he had refused to execute: "per our Operating Agreement, we have established a Manager-Managed structure to the corporation...

The Compliance Manual governing the operation of the RIA has very strict guidelines about how financial data is to be utilized... I take the obligation to follow all rules and procedures very seriously, as I alone, carry liability for our actions."

55. On July 8, 2026, Brian Finn, a financial advisor assisting the Vesuvio organization, made an additional specific request: a detailed accounting of two recent disbursements from IWS totaling $80,000. Bailin refused, instructing Finn to refrain from requesting information because he was not a member: "IWS is a company, and therefore has to keep its records confidential." **Exhibit E**

56. **No accounting of the $80,000 disbursements has been provided to date.**

57. Michael Vesuvio, responding through Jazz on July 10, 2026, was direct: "your below position is not correct. It would be correct if we are receiving client account data. We are asking for normal financial information only, not client account data." Bailin did not relent. **Exhibit E**

58. The pattern of obstruction was not limited to a single request. Between July and September 2026, IWS's members made no fewer than three separate, written requests for financial information covering materially different categories of records: revenue projections and actual performance, expense breakdowns and payroll detail, and a specific accounting of identified disbursements. Each request was denied. Each denial was dressed in the language of compliance. None was accompanied by a legitimate regulatory citation or a specific compliance rule justifying the refusal.

59. The financial records Bailin withheld were not peripheral to IWS's operations. They were its core operating data, the records that would have revealed the company's actual revenue performance, the disposition of the $130,000 advanced by Callagy Enterprises, LLC, and, on information and belief, the financial activity Bailin was conducting through IWS's accounts in the months before he announced the client

transfer. IWS expects that discovery of these records will establish that Bailin's obstruction was not coincidental. He was concealing information that would have exposed his competing enterprise and his diversion of company resources.

60. N.J.S.A. 42:2C-40 provides that a member of a New Jersey LLC is entitled to inspect and copy the company's books and records upon demand stating with reasonable particularity the records sought and the purpose, and that the LLC must respond within ten days. Bailin's refusal to honor these requests was not a compliance decision. It was a violation of the statute he claimed to be enforcing.

61. In a July 10, 2026 message to Tyler Callagy, Michael Vesuvio put it plainly: "I am concerned already with David and his difficult new posturing and attitude." The concern was well-founded. Bailin was not following rules. He was using rules as a weapon, concealing the financial condition of a company he was simultaneously preparing to strip.

**The Secret – Bailin Builds A Competing Company (Personal Wealth Strategies)**

62. At a time that has not yet been fully disclosed and which IWS expects to establish through discovery, David Bailin, while serving as IWS's Managing Partner and Chief Compliance Officer, while drawing compensation from IWS, while negotiating the operating agreement in purported good faith, and while blocking his co-members' access to IWS's financial records, secretly formed, registered, and began operating Personal Wealth Strategies, LLC ("PWS"), a directly competing registered investment adviser.

63. On information and belief, Bailin used his position as Managing Partner of IWS to observe, absorb, and replicate the operational infrastructure, vendor relationships, technology stack, and client servicing model that IWS had built. He did so without disclosure to, or authorization from, his co-members.

64. Bailin's intent and preparation are confirmed by the record he himself created. As early as July 8, 2026, while he was simultaneously blocking access to IWS's financial records and stalling the operating agreement negotiations, Bailin's email signature block contained a link to www.personalwealthstrategies.com: the website of the competing firm he was already operating. He was serving as IWS's CCO and Managing Partner while marketing his competing practice in his own email footer. He did not disclose this to any of his co-members.

65. At no point did Bailin inform Sean Callagy, Jazz Vesuvio, or any other member of IWS that he had formed or was operating a competing registered investment adviser. At no point did he seek or obtain authorization under N.J.S.A. 42:2C-39 or otherwise. His co-members learned of the competing firm only when Bailin announced, after the fact, that he had already transferred IWS's clients into it.

66. As IWS's Chief Compliance Officer, Bailin bore specific regulatory obligations that went beyond his duties as a member and Managing Partner. An investment adviser registered with the SEC is a fiduciary to its clients. Its CCO is the person responsible for ensuring the firm's compliance with the Investment Advisers Act of 1940 and all applicable regulations.

67. Bailin held himself out to clients, to regulators, and to his co-members as the person who, in his own words, "alone, carry liability for our actions." He invoked that responsibility repeatedly as a basis for his authority within IWS. He used it to block financial records. He used it to justify operational control. And then, when the time came, he ignored it entirely, executing an unauthorized client transfer without affirmative client consent, in direct violation of Section 205 of the Investment Advisers Act of 1940, 15 U.S.C. § 80b-15, which prohibits the assignment of an investment advisory contract without the client's affirmative consent.

68. The man who claimed sole responsibility for IWS's compliance became its most significant compliance risk.

69. Among a CCO's most fundamental obligations under the Advisers Act is the duty to ensure that the firm's advisory contracts are not assigned without client consent. This obligation exists precisely because advisory relationships are personal, clients choose their adviser and have a right to decide whether to follow that adviser to a new firm.

70. The negative consent process Bailin implemented, announcing a transfer and deeming silent clients to have consented, is not a recognized method of obtaining client consent under the Advisers Act. It is a method of circumventing client consent. Bailin, as CCO, knew this. He executed it anyway.

71. The CCO's compliance authority at IWS was not a shared responsibility. Bailin had established, in his own communications, that he "alone, carry liability for our actions." He used that singular authority to block his co-members' access to financial records. He used it to control the flow of information within the company. And he used it, or rather, he discarded it, when the time came to execute a client transfer that no competent compliance officer could have approved. The man who invoked compliance as a shield against his co-members abandoned it as an inconvenience when it stood between him and his exit.

**<u>The Strike – Bailin Executes The Unauthorized Client Transfer</u>**

72. On September 23, 2026, David Bailin sent an email to Jazz Vesuvio and Sean Callagy, copying Michael Vesuvio, Nancy Bailin, and Mark Kowalsky, Esq. of Taft Stettinius & Hollister LLP, with the subject line "Assignment of Bailin Clients." The email stated, in its entirety on the operative point: "I communicated to Mike and Jazz that we have assigned our client base out of Integrous Wealth Strategies and into a new RIA." **Exhibit B**

73. Bailin, and Bailin alone, controlled the advisory agreements, directed their transfer, and positioned himself to receive the resulting fee revenue through PWS.

74. The transfer was executed in the past tense, already done, without a member vote, without member consent, without authorization from IWS's governance structure, without the affirmative client consent required by Section 205 of the Investment Advisers Act of 1940, 15 U.S.C. § 80b-15, and without any acknowledgment that what had been done was wrong.

75. Nancy Bailin was copied on the September 23, 2026 email. As the co-equal owner of Bailin Wealth Strategies, LLC, the entity holding the Bailins' 20% membership interest in IWS, Nancy Bailin was present for and aware of the transfer at the moment it was announced. Bailin Wealth Strategies, LLC, acting through David Bailin, executed the conduct described herein. Its participation in the diversion of IWS's client relationships and the breach of the obligations owed by its principal renders it jointly and severally liable for the damages alleged herein.

76. Bailin's September 23, 2026 email further announced a negative consent process: any IWS client who did not affirmatively object before October 23, 2026 would be deemed to have consented to the transfer of their advisory relationship from IWS to PWS.

77. The October 23 deadline, thirty days after the announcement of an already-completed transfer, was not a warning. It was a deadline designed to make the theft permanent.

78. Bailin transmitted written notice directly to IWS clients confirming the October 23, 2026 transfer date and the negative consent mechanism. That notice stated, in relevant part: "Your Agreement will be assigned from Integrous Wealth Strategies to Personal Wealth Strategies effective October 23, 2026... On October 23, 2026, your account

will automatically move to Personal Wealth Strategies. There is no action required on your part unless you do not want to have your account assigned." **Exhibit F**

79. Bailin also offered, in the same email, to sell his twenty percent (20%) ownership stake in IWS if the parties could reach an acceptable agreement, and suggested that his counsel Kowalsky handle further discussions. He expressed a willingness to continue in his role as Managing Partner in the interim, a proposal that, given the foregoing, defies comprehension.

80. On the same day, September 23, 2026, Bailin unilaterally revoked Justin Rice's access to every operational system used to service IWS's clients.

81. Without prior notice. Without a documented compliance basis. Without any communication to Rice explaining the action.

82. Rice was left with access to a single system: a Personal Wealth Strategies email account. With that single exception, he was locked out of every platform through which IWS conducted its advisory business. The practical consequence was total:

    a) **Redtail CRM**: Rice could not access any client contact information, relationship history, account notes, or compliance records. He had no way to identify which clients needed attention, which accounts had pending transactions, or which clients had been contacted regarding the proposed transfer.

    b) **Schwab**: Rice could not view, manage, or execute any transactions in client custodial accounts. He could not respond to client inquiries about their portfolios or take any action to protect client assets.

    c) **Envestnet**: Rice could not access or manage the investment management platform through which client assets were allocated and monitored.

d) **Focus Partners Advisor Services**: Rice could not access the TAMP through which the majority of Bailin's team's advisory business was managed, including the bi-party arrangement under which IWS was the contracting party.

e) **Holistiplan and MoneyGuide**: Rice could not prepare or access any client financial plans or tax analyses.

f) **IWS email**: Rice could not communicate with clients, custodians, vendors, or regulators through any official IWS channel.

83. Rice was, in every operational sense, no longer an employee of IWS. He retained the title without any of the access necessary to perform the role. On the same day Bailin announced the completed transfer of IWS's client base to PWS, he ensured that IWS had no one who could respond.

84. Justin Rice was not a peripheral employee. He was IWS's primary investment adviser representative, the person responsible for the day-to-day servicing of the client relationships that constituted IWS's operating business. He maintained client records, managed account activity, communicated with clients regarding their portfolios, and served as the primary point of contact for the advisory relationships Bailin was simultaneously transferring to PWS. His lockout was not a personnel decision. It was a strategic act.

85. With Rice locked out of every system on September 23, 2026, IWS had no operational capacity to contact its clients, access their records, respond to client inquiries, or take any action to retain the client relationships Bailin had announced were being transferred. IWS was, in effect, operationally blind at the precise moment Bailin's transfer announcement began reaching clients. This was not an accident of timing. It was the architecture of the scheme.

86. The harm from Rice's lockout was compounded by the regulatory dimension. Rice, as a licensed investment adviser representative, had regulatory obligations to IWS's clients, obligations that survived his lockout and that he could not discharge without access to the systems Bailin had disabled. Bailin, as IWS's CCO, was responsible for ensuring the firm's investment adviser representatives could meet their regulatory obligations.

87. By locking Rice out, Bailin not only sabotaged IWS's operational capacity, he created a regulatory risk for the clients he was purporting to serve.

88. Thus, on the same day that Bailin announced the completed transfer of IWS's client base to PWS, he ensured that IWS had no operational capacity to respond.

89. The simultaneity of these two acts, the announcement of the completed client transfer and the operational neutralization of the employee most directly responsible for servicing those clients, was not coincidence. It was coordination. It was the final step in a plan that had been months in the making.

90. Upon information and belief, Bailin's efforts to divert IWS's business to his competing enterprise extend beyond its client relationships, advisory agreements, and associated revenue. Plaintiff has reason to believe that Bailin is also attempting to transition certain members of IWS's existing workforce to PWS, including personnel who participated in the establishment and operation of IWS and who possess valuable experience, institutional knowledge, and existing relationships with IWS's clients. These individuals provide essential financial planning, administrative, and client servicing functions necessary to the continued operation of Plaintiff's business.

91. Plaintiff further alleges, upon information and belief, that these anticipated personnel transitions are part of Bailin's broader effort to redirect the operations of IWS to PWS. The loss of such personnel, particularly when considered alongside Bailin's alleged

diversion of advisory relationships, restriction of operational access, and termination of Plaintiff's investment adviser representative, threatens to deprive IWS of the workforce and institutional knowledge necessary to maintain its operations. Such conduct, if established, would further demonstrate Bailin's alleged efforts to benefit his competing enterprise at Plaintiff's expense and would compound the substantial and irreparable harm Plaintiff faces absent immediate judicial intervention.

**The Escalation - October 2026**

92. Following the September 23, 2026 announcement, Bailin did not pause. He escalated.

93. On October 6, 2026, Bailin confronted Justin Rice with an ultimatum: sign two new agreements, an acknowledgment that Rice's 2018 non-solicitation agreement with Bailin personally carried over to Personal Wealth Strategies, LLC, and a new agreement prohibiting Rice from engaging in any outside business activities, or be terminated.

94. Rice, understanding that neither agreement had a valid legal basis and that signing would harm his interests and those of IWS's clients, declined.

95. **On October 14, 2026, the same day IWS's counsel transmitted a formal demand letter to Kowalsky, Bailin fired Justin Rice.**

96. The termination was not for cause. It was retaliation, and it was the final act of a systematic effort to dismantle IWS's operational capacity before the October 23, 2026 client transition deadline.

97. Also on October 14, 2026, Kowalsky transmitted a cease and desist letter to Rice on Bailin's behalf, accusing Rice of changing account credentials to conceal activity and using an unmonitored email address. These allegations are false. **Exhibit D**

98. Rice was locked out of every IWS system on September 23, 2026, the same day Bailin announced the client transfer. Any activity Rice undertook after that date

occurred after Bailin had already revoked his access to IWS's systems. The chronology refutes the accusation.

99. The October 23, 2026 negative consent deadline looms. Every day that passes without judicial intervention is another day in which IWS's clients are moved, without affirmative consent, in violation of federal law, and pursuant to a transfer that was never authorized, into a competing firm that Bailin secretly built while managing the company he was betraying.

**Bailin's Anticipated Defense and Why It Fails**

100. Bailin will likely argue that the verbal understanding regarding the Legacy Book authorized everything he has done. It did not.

101. That arrangement was specific, limited, and conditioned. It applied upon retirement. It applied to identified pre-existing client relationships. It did not authorize a present transfer of those relationships to a competing firm during Bailin's ongoing tenure as Managing Partner and CCO of IWS. It did not authorize the solicitation of IWS clients for PWS while Bailin continued to collect compensation from and exercise control over IWS. It did not authorize the use of IWS's operational infrastructure to execute a transfer. And it plainly did not encompass a single client relationship developed through IWS after May 26, 2026.

102. Even if the Legacy Book arrangement is enforceable exactly as Bailin characterizes it, a proposition IWS does not concede, it resolves nothing about the separate and independent misconduct described in this Complaint. The obstruction of financial transparency. The lockout of Justin Rice. The breach of the duty of candor. The bad faith operating agreement negotiations. The Schedule D manipulation. The use of IWS's resources, time, and infrastructure to build a competing firm. These violations exist and are actionable regardless of how the Legacy Book question is

ultimately resolved. Bailin's anticipated defense to one issue is not a defense to any of the others.

103. Bailin's own words foreclose his primary defense. In his September 23, 2026 email, he stated that he had "assigned our client base out of Integrous Wealth Strategies and into a new RIA." Present tense action. Taken during his ongoing tenure. Not upon retirement. Not through the process the members had agreed upon. Not at fair market value determined by an independent third party. He was not retiring. He was competing. He was not selling the Legacy Book through the mechanism the oral agreement contemplated. He was transferring it unilaterally, without consent, without process, and without any of the conditions under which the Legacy Book arrangement was supposed to operate. The verbal understanding he will invoke as his defense describes a different transaction entirely.

104. Moreover, Bailin cannot escape the consequences of the manner in which he executed his departure.

105. Even a fiduciary who has a legitimate right to compete after departure must transition honestly, transparently, and in accordance with his ongoing obligations to the company and its clients. Bailin did none of these things. He did not give notice. He did not seek consent. He did not follow the process the members had agreed upon. He announced a completed transfer. He locked out his co-members' employee. He invoked counsel. He set a unilateral deadline. Every step of his exit was designed to maximize damage to IWS and minimize his own legal exposure.

106. That is not the exercise of a legitimate contractual right. That is a breach.

**COUNT I**

**BREACH OF FIDUCIARY DUTY OF LOYALTY**
(Against All Defendants)

107. Plaintiff repeats and realleges each of the preceding paragraphs as if fully set forth herein.

108. At all times relevant to this Complaint, IWS was a manager-managed limited liability company organized under the laws of the State of New Jersey. Defendant David L. Bailin served as IWS's Managing Partner and Chief Compliance Officer and held his membership interest through Defendant Bailin Wealth Strategies, LLC.

109. Under the New Jersey Revised Uniform Limited Liability Company Act, N.J.S.A. 42:2C-39(b), a manager of a manager-managed LLC owes a duty of loyalty to the company and its members that includes: (a) accounting for and holding as trustee for the LLC any property, profit, or benefit derived in conducting the LLC's business or from use of the LLC's property, including the appropriation of an LLC opportunity; (b) refraining from dealing with the LLC in the conduct of the LLC's activities and affairs as or on behalf of a person having an interest adverse to the LLC; and (c) refraining from competing with the LLC in the conduct of the LLC's activities and affairs before the dissolution of the LLC.

110. The duty of loyalty imposed by N.J.S.A. 42:2C-39 cannot be eliminated by an operating agreement, signed or unsigned. N.J.S.A. 42:2C-11(g)(1). No waiver of the duty of loyalty is effective absent clear, unequivocal, and decisive language authorizing the specific conflicting conduct. No such authorization was ever given here.

111. Bailin breached his duty of loyalty to IWS in each of the following independently actionable respects:

a) He secretly formed Personal Wealth Strategies, LLC, a directly competing registered investment adviser, while serving as IWS's Managing Partner and CCO, without disclosure to or authorization from IWS or its members;

b) He diverted IWS's client relationships, advisory contracts, assets under management, and business opportunities to PWS — a competing entity he owned and controlled — without authorization, without member consent, and without compensation to IWS;

c) He used his position as Managing Partner to observe, absorb, and replicate IWS's operational infrastructure, vendor relationships, technology stack, and client servicing model for the benefit of PWS;

d) He unilaterally locked Justin Rice out of every IWS operational system on September 23, 2026, disabling IWS's ability to retain and service its client base on the same day he announced the completed transfer of that base to his competing firm; and

e) He used the financial records, client relationships, compliance infrastructure, and institutional resources of IWS, built and funded by his co-members, to establish, operate, and grow a competing enterprise for his own exclusive benefit.

112. Moreover, upon information and belief, Bailin's alleged misconduct extends beyond the diversion of Plaintiff's client relationships, advisory agreements, and business opportunities. Plaintiff has reason to believe that Bailin is also attempting to transition certain members of IWS's existing workforce to his competing enterprise, PWS, including personnel possessing valuable institutional knowledge, client relationships, and experience essential to Plaintiff's operations. When considered alongside Bailin's alleged interference with Plaintiff's operational infrastructure and diversion of its advisory business, these circumstances further support Plaintiff's contention that Bailin is engaged in a broader effort to dismantle IWS and redirect its business operations for his own economic benefit. Such conduct, if established, would

further support Plaintiff's claims of disloyalty and wrongful interference and compound the substantial harm resulting from Defendants' alleged misconduct.

113. As a direct and proximate result of Bailin's breach of his duty of loyalty, IWS has suffered damages including the loss of client relationships, advisory contracts, assets under management, fee revenue, goodwill, and business opportunities, in an amount to be determined at trial but believed to be substantial, together with all profits wrongfully obtained by Defendants through their disloyal conduct, which are subject to disgorgement.

**COUNT II**

**BREACH OF FIDUCIARY DUTY OF CARE**
(Against All Defendants)

114. Plaintiff repeats and realleges each of the preceding paragraphs as if fully set forth herein.

115. Under N.J.S.A. 42:2C-39(a), a manager of a manager-managed LLC owes a duty of care in the conduct and winding up of the LLC's activities and affairs to act in a manner that a person in a like position would reasonably believe appropriate under similar circumstances.

116. As IWS's Managing Partner and Chief Compliance Officer, Bailin owed IWS a duty to manage its operations in the best interest of the company and its members, to protect and preserve its client relationships and business opportunities, to maintain regulatory compliance, to ensure continuity of client service, and to act as a reasonable and prudent fiduciary in every aspect of his management role.

117. Bailin breached his duty of care in each of the following independently actionable respects:

a) He transferred IWS's client relationships to a competing firm without client consent, exposing IWS and its members to regulatory liability under the Investment Advisers Act of 1940;

b) He announced a negative consent process that does not satisfy the affirmative consent requirements of 15 U.S.C. § 80b-15, placing IWS's SEC registration and regulatory standing at risk;

c) Bailin transmitted written notice directly to IWS clients confirming the October 23, 2026 transfer date and the negative consent mechanism. That notice stated, in relevant part: "Your Agreement will be assigned from Integrous Wealth Strategies to Personal Wealth Strategies effective October 23, 2026... On October 23, 2026, your account will automatically move to Personal Wealth Strategies. There is no action required on your part unless you do not want to have your account assigned." **Exhibit F**

Attached is the Assignment Letter I sent to you last week. I have added the effective dates to provide clarity.

The letter states that your Agreement will be assigned from Integrous Wealth Strategies to Personal Wealth Strategies effective October 23, 2026. Until that time, you may continue to see correspondence from us under the Integrous Wealth Strategies name. On October 23, 2026, your account will automatically move to Personal Wealth Strategies. There is no action required on your part unless you do not want to have your account assigned. The @personalwealthstrategies.com email domain is already set up, and you may begin using it immediately.

d) He locked IWS's investment adviser representative out of every client servicing system, leaving IWS operationally unable to respond to the client transfer he had simultaneously announced;

e) He refused to provide financial records to IWS's members despite repeated requests, depriving the company's owners of the information necessary to make informed governance decisions; and

f) He managed IWS's operations not in the company's interest but in service of his own exit strategy, subordinating IWS's regulatory, financial, and operational wellbeing to his personal objectives.

118. Moreover, upon information and belief, Bailin's alleged misconduct extends beyond the diversion of Plaintiff's client relationships, advisory agreements, and business opportunities. Plaintiff has reason to believe that Bailin is also attempting to transition certain members of IWS's existing workforce to his competing enterprise, PWS, including personnel possessing valuable institutional knowledge, client relationships, and experience essential to Plaintiff's operations. When considered alongside Bailin's alleged interference with Plaintiff's operational infrastructure and diversion of its advisory business, these circumstances further support Plaintiff's contention that Bailin is engaged in a broader effort to dismantle IWS and redirect its business operations for his own economic benefit. Such conduct, if established, would further support Plaintiff's claims of disloyalty and wrongful interference and compound the substantial harm resulting from Defendants' alleged misconduct.

119. As a direct and proximate result of Bailin's breach of his duty of care, IWS has suffered damages in an amount to be determined at trial, together with all consequential and incidental damages flowing from his failure to manage IWS's affairs as a reasonable fiduciary.

**COUNT III**

**BREACH OF FIDUCIARY DUTY OF CANDOR**
(Against All Defendants)

120. Plaintiff repeats and realleges each of the preceding paragraphs as if fully set forth herein.

121. A fiduciary owes his principals an affirmative duty of candor, the obligation to communicate all material information fully, fairly, and candidly. This duty is independent of and cumulative to the duties of loyalty and care.

122. As IWS's Managing Partner and CCO, the person whom IWS's other members entrusted with operational control and compliance authority, Bailin owed IWS and its members a duty to disclose all material information bearing on the company's operations, financial condition, and Bailin's own activities and conflicts.

123. Bailin breached his duty of candor in each of the following independently actionable respects:

a) He concealed the formation and operation of Personal Wealth Strategies, LLC from IWS and its members throughout the entire period during which he was simultaneously managing IWS and building its replacement;

b) He failed to disclose his intent to transfer IWS's client relationships to PWS until after the transfer had already been executed;

c) He invoked compliance authority and the confidentiality provisions of an unsigned operating agreement to actively conceal IWS's financial condition from his co-members, rather than to fulfill a legitimate regulatory obligation; and

d) He presented himself to IWS's clients, regulators, co-members, and counterparties as IWS's committed Managing Partner and CCO while concealing a plan of departure and client diversion that he had already set in motion.

124. As a direct and proximate result of Bailin's breach of his duty of candor, IWS was deprived of the information necessary to protect its interests, was unable to take timely defensive action, and suffered damages in an amount to be determined at trial.

**COUNT IV**

**USURPATION OF CORPORATE OPPORTUNITY**
(Against All Defendants)

125. Plaintiff repeats and realleges each of the preceding paragraphs as if fully set forth herein.

126. Under N.J.S.A. 42:2C-39(b)(1)(a) and the common law corporate opportunity doctrine as applied to New Jersey LLCs, a manager may not appropriate for himself a business opportunity that is financially available to the company, in line with its business, and practically advantageous to it.

127. A fiduciary who takes such an opportunity for his own benefit must account for and hold in trust for the company all profits derived therefrom.

128. The advisory relationships, client accounts, assets under management, fee revenue, goodwill, and business opportunities associated with IWS's client base were corporate opportunities of IWS.

129. They were developed within IWS, serviced through IWS's infrastructure, funded through IWS's capital, and managed by IWS's personnel. They belonged to IWS, not to Bailin personally.

130. Bailin, in his capacity as Managing Partner and using the resources, relationships, and information available to him only by virtue of his position, diverted these corporate opportunities to PWS for his own exclusive benefit without disclosure to or authorization from IWS or its members.

131. Bailin further usurped IWS's corporate opportunity to grow its advisory business by replicating IWS's entire operational model in a directly competing enterprise, built on IWS's time, at IWS's expense, and using knowledge available to him only by virtue of his position as Managing Partner.

132. Specifically, on information and belief, Bailin replicated or misappropriated the following IWS assets and opportunities:

a) **Vendor relationships**: including IWS's relationship with Focus Partners Advisor Services and the bi-party TAMP arrangement negotiated on IWS's behalf, which provided breakpoint pricing available only because of IWS's aggregate assets under management;

b) **Technology infrastructure**: including the specific software platforms, integrations, and workflow architecture that IWS had assembled and that Bailin had observed, used, and directed as Managing Partner;

c) **Client servicing architecture**: including the processes, workflows, and compliance procedures developed within IWS for servicing the client relationships Bailin subsequently transferred;

d) **Broker-dealer relationships**: including relationships developed through IWS's connection with Purshe Kaplan Sterling Investments; and

e) **Institutional knowledge**: including pricing, client preferences, account structures, and business development strategies observed and absorbed by Bailin in his capacity as IWS's most senior officer.

133. As a direct and proximate result of Bailin's usurpation of IWS's corporate opportunities, IWS has suffered damages in an amount to be determined at trial and is entitled to an accounting and disgorgement of all profits Defendants derived from the wrongfully appropriated opportunities.

**COUNT V**

**BREACH OF ORAL OPERATING AGREEMENT**
(Against All Defendants)

134. Plaintiff repeats and realleges each of the preceding paragraphs as if fully set forth herein.

135. Under N.J.S.A. 42:2C-2, an operating agreement of a New Jersey LLC may be written, oral, implied, or any combination thereof.

136. Every person who becomes a member is deemed to assent to the operating agreement as it exists at the time of their admission. N.J.S.A. 42:2C-12(b).

137. The founding members of IWS entered into a binding oral operating agreement governing the foundational terms of their relationship, including the 40/40/20 ownership structure, Bailin's role as Managing Partner and CCO, Bailin's two-year commitment to the company, the Legacy Book arrangement applicable upon a lawful retirement only, the credit facility extended by Callagy Enterprises, LLC, and the members' rights to financial information and governance participation.

138. Bailin materially breached the oral operating agreement in each of the following independently actionable respects:

a) He abandoned his commitment to serve as Managing Partner and CCO for a minimum two-year period by initiating a unilateral departure before the expiration of that term;

b) He transferred client relationships out of IWS before any retirement and without the specific conditions of the Legacy Book arrangement having been satisfied;

c) He denied co-members their agreed rights to financial information and governance participation; and

d) He competed directly with IWS during the term of his membership, in direct contravention of the agreement under which he was admitted.

139. Bailin may not selectively invoke the provisions of any draft written operating agreement that favor him while simultaneously rejecting the oral agreements he does not wish to honor.

140. The unsigned written draft does not create a legal vacuum, it creates a negotiating history from which the actual agreement of the parties may be determined.

141. As a direct and proximate result of Bailin's breach of the oral operating agreement, IWS has suffered damages in an amount to be determined at trial.

**COUNT VI**

**VIOLATION OF SECTION 205 OF THE INVESTMENT ADVISERS ACT OF 1940**
(Against All Defendants)

142. Plaintiff repeats and realleges each of the preceding paragraphs as if fully set forth herein.

143. IWS is registered with the Securities and Exchange Commission as a registered investment adviser subject to the Investment Advisers Act of 1940, 15 U.S.C. § 80b-1 et seq. (the "Advisers Act").

144. Section 205 of the Advisers Act, 15 U.S.C. § 80b-15, prohibits the assignment of an investment advisory contract without the consent of the other party to the contract.

145. Assignment includes any transfer of a material interest in an investment advisory agreement. An investment adviser's clients must affirmatively consent to any such assignment, a negative consent process, by which clients who do not object are deemed to have consented, does not satisfy this requirement.

146. As IWS's Chief Compliance Officer, Bailin was solely and personally responsible for ensuring IWS's compliance with the Advisers Act and all applicable regulations. He held himself out in that capacity to IWS's members, clients, and regulators, and invoked his compliance authority repeatedly as a basis for operational control.

147. Bailin violated Section 205 of the Advisers Act by: (a) transferring IWS's client advisory relationships to PWS without obtaining the affirmative consent of

IWS's clients; and (b) implementing a negative consent process that purports to deem client consent established through inaction, in direct violation of the affirmative consent requirement.

148. This violation exposes IWS to regulatory liability, enforcement risk, and reputational harm. It was committed by the very person designated as IWS's compliance officer — the person whose specific duty it was to prevent exactly this conduct.

149. As a direct and proximate result of Bailin's violation of Section 205 of the Advisers Act, IWS has suffered damages in an amount to be determined at trial, including regulatory exposure, reputational harm, and the loss of client relationships transferred in violation of federal law.

**COUNT VII**

**CONVERSION AND MISAPPROPRIATION OF IWS ASSETS**
(Against All Defendants)

150. Plaintiff repeats and realleges each of the preceding paragraphs as if fully set forth herein.

151. IWS's client relationships, advisory contracts, client data, financial records, proprietary workflows, confidential pricing, and institutional goodwill constitute the property of IWS. They were developed within IWS, funded by IWS's members, maintained through IWS's infrastructure, and serviced by IWS's personnel.

152. Conversion under New Jersey law requires an intentional exercise of dominion or control over another's property in a manner inconsistent with the owner's rights.

153. Bailin exercised exactly that dominion: he transferred IWS's client advisory relationships to his competing firm, denied IWS access to its own financial records, locked IWS's personnel out of the systems necessary to service IWS's clients, and asserted personal ownership over assets that belonged to IWS.

154. Specifically, Bailin converted and misappropriated the following IWS assets: a. IWS's client advisory relationships and associated advisory contracts; b. The client data, relationship histories, and account information contained in Redtail CRM and IWS's other operational systems; c. The fee revenue and assets under management associated with IWS's client base; d. IWS's institutional goodwill and advisory business; and e. The operational infrastructure, including vendor relationships, technology arrangements, and platform integrations, developed and maintained by IWS.

155. Bailin's conversion was intentional, deliberate, and executed in concert with Bailin Wealth Strategies, LLC. It was not an error of judgment. It was a plan.

156. As a direct and proximate result of Defendants' conversion and misappropriation of IWS's assets, IWS has suffered damages in an amount to be determined at trial, together with punitive damages warranted by the intentional and egregious nature of Defendants' conduct.

## COUNT VIII

## VIOLATION OF MEMBER INSPECTION RIGHTS N.J.S.A. 42:2C-40
(Against All Defendants)

157. Plaintiff repeats and realleges each of the preceding paragraphs as if fully set forth herein.

158. N.J.S.A. 42:2C-40 grants members of a New Jersey LLC the right to inspect and copy the company's books and records.

159. A member need only make a written demand stating with reasonable particularity the records sought and the purpose. The LLC must respond to that demand within ten (10) days.

160. IWS's members made repeated, specific, written requests for IWS's financial records, including revenue records, expense breakdowns, payroll detail, vendor agreements, and an accounting of specific disbursements, beginning in July 2026.

161. These requests were made in writing and identified the specific information sought with reasonable particularity.

162. Bailin refused every request. He did so by invoking, in circular and self-serving fashion, the confidentiality provisions of an unsigned operating agreement and the compliance manual that he alone controlled, not to protect legitimate confidential information, but to conceal the financial condition of a company he was simultaneously preparing to strip.

163. Bailin's refusal to comply with IWS's members' inspection rights was not a legitimate exercise of compliance authority. It was a deliberate obstruction designed to keep his co-members blind to his misconduct.

164. As a direct and proximate result of Bailin's violation of N.J.S.A. 42:2C-40, IWS's members were deprived of material financial information, were unable to take timely protective action, and IWS suffered damages in an amount to be determined at trial.

## COUNT IX

## BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

(Against All Defendants)

165. Plaintiff repeats and realleges each of the preceding paragraphs as if fully set forth herein.

166. Every contract, including the oral operating agreement governing the relationship between IWS's founding members, contains an implied covenant of good faith and fair dealing. N.J.S.A. 42:2C-11.

167. That covenant requires each party to act in a manner consistent with the reasonable expectations of the other parties and prohibits conduct that, while perhaps technically within the letter of the agreement, frustrates its purpose or destroys the other party's reasonable expectations.

168. Bailin breached the covenant of good faith and fair dealing in each of the following independently actionable respects:

a) He engaged in bad faith negotiations of the operating agreement, verbally agreeing to terms and then rejecting them in writing, cycling through multiple drafts, and creating new obstacles at each stage, not to reach a fair agreement, but to buy time while he built PWS;

b) He submitted Schedule D data designed to manipulate his own payout-renegotiation rights for the life of the deal, substituting PWS's historical income statement for the IWS cost baseline the parties had agreed Schedule D would reflect;

c) He invoked compliance authority and the unsigned operating agreement to deny his co-members' reasonable and legitimate requests for financial information; and

d) He accepted the financial backing, operational support, and institutional resources extended by his co-members in good faith reliance on his commitment to IWS, while simultaneously planning and executing a competing enterprise that would strip IWS of the very value those resources had created.

169. As a direct and proximate result of Bailin's breach of the covenant of good faith and fair dealing, IWS has suffered damages in an amount to be determined at trial.

**COUNT X**

**WRONGFUL INTERFERENCE WITH IWS'S EMPLOYMENT RELATIONSHIPS AND BUSINESS OPERATIONS**
(Against All Defendants)

170. Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs as though fully set forth herein.

171. IWS maintained established employment and business relationships with its personnel, including Justin Rice, who served as a licensed investment adviser representative responsible for servicing IWS's client relationships.

172. Bailin intentionally and without legitimate justification interfered with those relationships and with IWS's business operations in each of the following independently actionable respects:

a) On September 23, 2026, he unilaterally locked Justin Rice out of every IWS operational system, Redtail CRM, Schwab, Envestnet, Focus Partners, Holistiplan, MoneyGuide, and IWS email.

b) He did so without prior notice, without a documented compliance basis, and without any communication to Rice explaining the action.

c) On October 6, 2026, he presented Rice with an ultimatum to sign agreements designed to protect Bailin's competitive exit at IWS's expense, and threatened termination when Rice declined;

d) On October 14, 2026, he fired Rice in retaliation for Rice's refusal to sign those agreements, eliminating IWS's primary client-servicing capacity on the eve of the October 23 client transition deadline; and

e) Through counsel, he transmitted a cease and desist letter to Rice containing allegations that are refuted by the chronology of Bailin's own conduct,

allegations designed to neutralize Rice legally at the same time Bailin was moving IWS's clients out of the company.

173. The coordination of these acts, the lockout, the ultimatum, the termination, and the legal threat, with the September 23 client transfer announcement was not coincidental. It was a deliberate strategy to dismantle IWS's operational capacity and prevent it from retaining its client base.

174. As a direct and proximate result of Bailin's wrongful interference with IWS's employment relationships and business operations, IWS has suffered damages in an amount to be determined at trial, including the loss of Justin Rice's services during the critical period of the client transition and the resulting inability to retain the client relationships Bailin was simultaneously transferring to his competing firm.

**COUNT XI**

**UNJUST ENRICHMENT**
(Against All Defendants)

175. Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs as though fully set forth herein.

176. Defendants have been unjustly enriched at IWS's expense. Bailin received the full benefit of IWS's platform, infrastructure, capital, relationships, and institutional support, all provided in good faith reliance on his commitment to the enterprise — while simultaneously building a competing firm designed to capture those benefits for himself.

177. Specifically, Defendants were unjustly enriched through:

a) The $130,000 advanced by Callagy Enterprises, LLC to IWS on June 30, 2026, the proceeds of which supported the operations and client base Bailin subsequently transferred to PWS;

b) The advisory fee revenue generated through IWS's infrastructure, client relationships, and institutional arrangements — including the FPAS TAMP breakpoint pricing negotiated on IWS's behalf — that Bailin diverted to PWS;

c) The operational infrastructure, vendor relationships, technology arrangements, and client servicing model developed through IWS's resources that Bailin replicated in PWS; and

d) The value of IWS's client relationships and goodwill, built and maintained through the collective efforts and resources of all members, that Bailin appropriated for his exclusive benefit.

178. It would be against equity and good conscience to permit Defendants to retain the benefits of their conduct. IWS is entitled to restitution of all amounts by which Defendants have been unjustly enriched at IWS's expense.

**COUNT XII**

**ACCOUNTING AND IMPOSITION OF CONSTRUCTIVE TRUST**
(Against All Defendants)

179. Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs as though fully set forth herein.

180. IWS is entitled to a full and complete accounting of: (a) all revenues, fees, and proceeds received by Defendants from client relationships transferred from IWS to PWS; (b) all revenues, fees, and assets under management currently held by or attributed to PWS that derived from IWS's client base, advisory contracts, or business opportunities; (c) all advances and disbursements of IWS funds, including the $130,000 advanced by Callagy Enterprises, LLC, and the $80,000 in disbursements for which no accounting has been provided; and (d) all compensation, benefits, or

other value received by Bailin from IWS during the period in which he was secretly building and operating PWS.

181. IWS has no adequate remedy at law without such an accounting because Defendants have sole possession, custody, and control of the financial records reflecting all transactions conducted with IWS's property and client relationships.

182. A constructive trust should be imposed over all assets, revenues, client relationships, advisory contracts, and business opportunities wrongfully diverted by Defendants from IWS, to be held for the benefit of IWS pending final resolution of this action.

183. As IWS's fiduciary, Bailin holds all property, profits, and benefits derived from his breach of duty as constructive trustee for IWS. N.J.S.A. 42:2C-39(b)(1). The Court should order the immediate transfer of all such assets to IWS.

**COUNT XIII**

**VIOLATION OF THE NEW JERSEY COMPUTER RELATED OFFENSES ACT N.J.S.A. 2A:38A-1 et seq.**
(Against All Defendants)

184. Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs as though fully set forth herein.

185. The New Jersey Computer Related Offenses Act, N.J.S.A. 2A:38A-1 et seq., prohibits any person from knowingly and without authorization accessing, altering, destroying, damaging, copying, or interfering with a computer system, computer network, computer software, computer program, or data.

186. IWS maintained protected computer systems, networks, and data, including Redtail CRM, Schwab, Envestnet, Focus Partners, Holistiplan, MoneyGuide, and the IWS email system, containing confidential client records, financial data, proprietary

business information, and compliance records constituting IWS's operational infrastructure.

187. On September 23, 2026, Bailin, acting in his capacity as Managing Partner and CCO but without authorization from IWS or its members, unilaterally revoked Justin Rice's access to every IWS operational system and, on information and belief, accessed, altered, copied, or interfered with IWS's computer systems and data in connection with the unauthorized transfer of IWS's client relationships to PWS.

188. On information and belief, Bailin copied, transferred, or caused to be transferred IWS's client data, account records, and proprietary business information to PWS's systems without authorization from IWS.

189. Bailin's conduct constitutes a violation of N.J.S.A. 2A:38A-1 et seq. and has caused IWS damages in an amount to be determined at trial, together with all remedies available under the Act.

**COUNT XIV**

**PROMISSORY ESTOPPEL**
(Pled in the Alternative to Count V)
(Against All Defendants)

190. Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs as though fully set forth herein.

191. This Count is pled in the alternative to Count V (Breach of Oral Operating Agreement) in the event that the Court determines that the oral agreements between the founding members of IWS do not constitute an enforceable operating agreement.

192. Bailin made clear and definite promises to IWS and its founding members, including: his commitment to serve as Managing Partner and CCO for a minimum two-year period; his commitment to bring his client book into IWS and build the enterprise alongside his co-members; his commitment to operate IWS in compliance

with its governing statutes and regulations; and his commitment to negotiate the operating agreement in good faith.

193. IWS and its founding members reasonably relied on those promises. In reliance on Bailin's commitments, they: closed out his prior practice and transitioned his client book into IWS; installed him as Managing Partner and CCO with full operational authority; extended $130,000 in funding to support IWS's operations; and devoted substantial time, resources, and relationships to building an enterprise around Bailin's participation.

194. Injustice can only be avoided by enforcement of Bailin's promises. His reliance on the absence of a signed written agreement to escape the consequences of commitments that induced his co-members to extend trust, money, and resources to him would be unconscionable.

195. As a direct and proximate result of Bailin's breach of his promises, IWS has suffered damages in an amount to be determined at trial.

**COUNT XV**

**TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**

(Pled in the Alternative to Count V)
(Against All Defendants)

196. Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs as though fully set forth herein.

197. IWS had a reasonable expectation of economic advantage through its client relationships, advisory contracts, assets under management, and the ongoing business of its advisory practice.

198. Bailin, with knowledge of IWS's existing and prospective client relationships and business opportunities, intentionally and without justification interfered with those relationships and opportunities by: transferring IWS's client base to his

competing firm PWS without authorization; implementing a negative consent process designed to make the transfer permanent before IWS could respond; and locking IWS's investment adviser representative out of every system necessary to service and retain those clients.

199. Bailin's interference was intentional, malicious, and without legitimate justification. His actions were not taken in furtherance of any lawful competitive activity — they were taken while he remained IWS's Managing Partner and CCO, in direct breach of the fiduciary obligations that prohibited him from competing with IWS.

200. As a direct and proximate result of Bailin's tortious interference, IWS has suffered damages in an amount to be determined at trial, including the loss of client relationships, advisory contracts, and the going-concern value of its advisory business.

## COUNT XVI

## FRAUD

(Against All Defendants)

201. Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs as though fully set forth herein.

202. Fraud in New Jersey requires: (1) a material misrepresentation of fact; (2) knowledge of its falsity; (3) intent to induce reliance; (4) justifiable reliance; and (5) resulting damages.

203. Bailin made the following material misrepresentations to IWS and its founding members:

a) He represented that he was negotiating the operating agreement in good faith, when in fact he was stalling the negotiations while secretly building a competing firm;

b) He represented that he was operating as IWS's committed Managing Partner and CCO, when in fact he had already decided to depart and transfer IWS's client base to his competing firm;

c) He invoked compliance authority and the confidentiality provisions of the unsigned operating agreement as legitimate regulatory grounds for withholding financial information, when in fact he was concealing the financial condition of a company he was preparing to strip; and

d) He submitted PWS's historical income statement as IWS's Schedule D cost baseline, misrepresenting it as the basis for calculating IWS's costs of servicing the Legacy Book, when in fact it was designed to manipulate his own payout-renegotiation rights.

204. Each of these misrepresentations was made with knowledge of its falsity and with the intent to induce IWS's founding members to continue providing Bailin with access to IWS's resources, client relationships, and institutional infrastructure while he completed his competing enterprise.

205. IWS and its founding members justifiably relied on Bailin's misrepresentations by continuing to fund IWS's operations, continuing to negotiate the operating agreement in good faith, and failing to take timely protective action.

206. As a direct and proximate result of Bailin's fraud, IWS has suffered damages in an amount to be determined at trial, together with punitive damages warranted by the intentional and egregious nature of Bailin's conduct.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment as follows:

A. On Count I, awarding compensatory damages for breach of fiduciary duty of loyalty in an amount to be determined at trial, together with disgorgement of all profits derived from Defendants' disloyal conduct and an award of attorneys' fees and costs;

B. On Count II, awarding compensatory damages for breach of fiduciary duty of care in an amount to be determined at trial;

C. On Count III, awarding compensatory damages for breach of fiduciary duty of candor in an amount to be determined at trial;

D. On Count IV, awarding compensatory damages for usurpation of corporate opportunity in an amount to be determined at trial, together with disgorgement of all profits derived from the wrongfully appropriated opportunities and imposition of a constructive trust over all such profits pending accounting;

E. On Count V, awarding compensatory damages for breach of the oral operating agreement in an amount to be determined at trial;

F. On Count VI, awarding compensatory damages for violation of Section 205 of the Investment Advisers Act of 1940 in an amount to be determined at trial, together with all consequential damages arising from IWS's regulatory exposure;

G. On Count VII, awarding compensatory and punitive damages for conversion and misappropriation of IWS's assets in an amount to be determined at trial;

H. On Count VIII, awarding compensatory damages for violation of N.J.S.A. 42:2C-40 and ordering Defendants to provide immediate access to all IWS financial records;

I. On Count IX, awarding compensatory damages for breach of the covenant of good faith and fair dealing in an amount to be determined at trial;

J. On Count X, awarding compensatory damages for wrongful interference with IWS's employment relationships and business operations in an amount to be determined at trial;

K. On Count XI, ordering disgorgement and restitution of all amounts by which Defendants have been unjustly enriched at IWS's expense;

L. On Count XII, ordering a full accounting of all revenues, fees, assets, and proceeds derived from IWS's client relationships and business opportunities, and imposing a constructive trust over all wrongfully diverted assets pending final resolution of this action;

M. On Count XIII, awarding compensatory damages for violation of the New Jersey Computer Related Offenses Act, N.J.S.A. 2A:38A-1 et seq., in an amount to be determined at trial, together with all remedies available under the Act;

N. On Count XIV, awarding compensatory damages for promissory estoppel in an amount to be determined at trial;

O. On Count XV, awarding compensatory damages for tortious interference with prospective economic advantage in an amount to be determined at trial, including the loss of client relationships, advisory contracts, and the going-concern value of IWS's advisory business; and

P. On Count XVI, awarding compensatory and punitive damages for fraud in an amount to be determined at trial, together with punitive damages warranted by the intentional and egregious nature of Defendants' conduct;

Q. On all counts, granting emergency preliminary and permanent injunctive relief:

   a. immediately enjoining Defendants from transferring, assigning, soliciting, or redirecting any IWS client relationships, advisory contracts, assets under management, fees, or business opportunities to Personal Wealth Strategies, LLC or any other entity;

   b. immediately suspending the October 23, 2026 negative consent client transition process;

c. immediately restoring Justin Rice's full access to all IWS operational systems;

d. immediately compelling production of all IWS financial records; and

e. immediately preserving all documents, communications, and records relating to IWS, PWS, and all matters alleged herein;

R. With respect to the Order to Show Cause, IWS specifically requests that the Court enter a proposed form of order addressing the following:

a. **Forensic Preservation:** Requiring Defendants to immediately preserve all relevant communications, CRM records, account-transition logs, electronic devices, vendor communications, and financial records, without unnecessarily exposing protected client information, and prohibiting the destruction, alteration, or transfer of any such records pending final resolution of this action;

b. **Independent Accounting:** Requiring Defendants to provide a confidential schedule identifying all affected advisory contracts, account transfers, notice dates, consent records, and all fees redirected to or received by Personal Wealth Strategies, LLC in connection with the unauthorized client transfer;

c. **Financial Protections:** Requiring Defendants to preserve specifically identifiable disputed proceeds or provide a full accounting of their disposition, subject to applicable injunction and asset-restraint standards;

d. **Operational Continuity:** Requiring Defendants to restore appropriate company access to IWS's authorized personnel or, in the alternative, appointing a neutral administrator to ensure continuity of client service and regulatory compliance pending resolution;

e. **Status Quo Protections:** Temporarily prohibiting further unauthorized corporate assignments, destruction of records, or transfers of disputed company assets or client relationships;

f. **Expedited Discovery:** Authorizing appropriately limited third-party discovery from custodians, software providers, CRM vendors, and relevant contracting entities including Focus Partners Advisor Services and Purshe Kaplan Sterling Investments; and

g. **Confidentiality Safeguards:** Requiring appropriate restrictions on the disclosure of client financial and personal information in connection with any court-ordered accounting or production.

S. On all counts, awarding IWS its reasonable attorneys' fees and costs, including the fee-shifting remedy available upon proof of intentional fiduciary misconduct; and

T. Granting such other and further relief as this Court deems just and proper.

**CALLAGY LAW, P.C.**

Michael J. Smikun

**Michael J. Smikun, Esq.**
Attorneys for Integrous Wealth Strategies, LLC
Mack-Cali Centre II
650 From Road, Suite 240
Paramus, NJ 07652
Tel. (201) 261-1700
Fax. (201) 261-8404
Email: msmikun@callagylaw.com
*Attorneys for Plaintiff*

# VERIFICATION

STATE OF NEW JERSEY

COUNTY OF BERGEN

I, Sean Callagy, affirm this 22nd day of October, 2026, under penalty of perjury under the laws of the State of New Jersey, that:

1. I am an indirect owner and duly authorized representative of Plaintiff Integrous Wealth Strategies, LLC ("Plaintiff" or "IWS"), a New Jersey limited liability company, and am authorized to make this Verification on its behalf.
2. I have read the foregoing Verified Complaint and am familiar with its contents.
3. The allegations contained in the Verified Complaint are true to the best of my personal knowledge, except as to those matters alleged upon information and belief, and as to those matters, I believe them to be true.
4. I understand that this Verification is being submitted in connection with an action pending before the Superior Court of New Jersey, Chancery Division, Bergen County, and may be relied upon by the Court in connection with Plaintiff's application for an Order to Show Cause with Temporary Restraints.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Signed by:
Sean Callagy
C6D843337279424...

Sean Callagy
Authorized Representative of
Integrous Wealth Strategies, LLC
Dated: October 22, 2026

**CALLAGY LAW, P.C.**
**Michael Smikun (Bar No. 02056-2018)**
**Robert J. Solomon (Bar No. 15927-2016)**
**Mack-Cali Centre II**
**650 From Road – Suite 565**
**Paramus, NJ 07652**
**Tel. (201) 261-1700**
**Fax. (201) 549-6236**
**Email: msmikun@callagylaw.com**
***Attorneys for Plaintiff***

**SUPERIOR COURT OF NEW JERSEY**
**CHANCERY DIVISION: BERGEN COUNTY**

| | |
|---|---|
| **INTEGROUS WEALTH STRATEGIES, LLC, a New Jersey Limited Liability Company**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**DAVID L. BAILIN, individually and as Managing Partner and Chief Compliance Officer of INTEGROUS WEALTH STRATEGIES, LLC, and BAILIN WEALTH STRATEGIES, LLC, a Florida Limited Liability Company**<br><br>Defendants**.** | **DOCKET NO.:**<br><br>**PROPOSED FORM OF ORDER** |

This matter being opened to the Court by Michael J. Smikun, Esq., of Callagy Law, P.C., attorneys for Plaintiff Integrous Wealth Strategies, LLC ("IWS" or "Plaintiff"), seeking an Order to Show Cause with Temporary Restraints pursuant to R. 4:52-1 based upon the Verified Complaint, Brief in Support, and supporting papers filed herewith; the Court having considered the application and the nature of the emergency presented by the proposed October 23, 2026 client-account transition; and for good cause shown:

**IT IS on this ____ day of ____________, 2026, ORDERED that Defendants David L. Bailin and Bailin Wealth Strategies, LLC shall appear and show cause on the ____ day of ____________, 2026, at ________, before the Honorable ___________________________, J.S.C., Superior Court of New Jersey, Chancery Division, Bergen County, at a location or by remote appearance as directed by the Court, why an Order should not be entered as follows:**

**RELIEF TO BE CONSIDERED ON THE RETURN DATE**

A. Preliminarily enjoining Defendants, and all persons acting in concert with them who receive actual notice of this Order, from implementing or completing the October 23, 2026 negative-consent transition of advisory agreements from IWS to Personal Wealth Strategies, LLC ("PWS"), or otherwise initiating or effecting the unauthorized assignment, solicitation for transfer, diversion, or migration of IWS advisory agreements, associated fee rights, and company business opportunities to PWS or another entity, without approval by IWS through its legally authorized governance processes or further Order of the Court;

B. Directing Defendants to maintain and restore, as appropriate, IWS's operational access to client servicing systems, business records, email accounts, vendor platforms, and relevant advisory records, including access by properly authorized representatives, subject to applicable client-confidentiality, cybersecurity, contractual, and securities-regulatory requirements; and directing the parties promptly to propose a neutral or alternative access protocol if the status or authorization of Justin Rice is disputed;

C. Directing Defendants to produce to IWS or its counsel the company's books and records, including bank statements, general ledgers, transaction histories, disbursement records, and documentation reflecting receipt and use of the $130,000 advance from Callagy Enterprises,

LLC and the disposition of approximately $80,000 in questioned company disbursements, and to provide a sworn accounting on a schedule established by the Court;

D. Enjoining Defendants from deleting, concealing, altering, transferring, or destroying relevant documents, electronically stored information, communications, financial records, advisory agreements, client-transition notices, client-consent or objection records, and records reflecting any transfers or revenues related to IWS or PWS;

E. Directing identification and preservation of records tracing any advisory fees or other identifiable proceeds generated from disputed transfers of IWS business to PWS, with an accounting and such constructive-trust or other equitable relief as the Court determines appropriate after further proceedings;

F. Authorizing expedited, appropriately tailored discovery, including production of client-transition records, communications, agreements, and financial information, subject to appropriate protections for client personal information and privileged material; and

G. Granting such other and further relief as the Court deems equitable and just.

**AND IT IS FURTHER ORDERED that, pending the return date or further Order of the Court, the following TEMPORARY RESTRAINTS shall take effect immediately upon entry of this Order:**

**TEMPORARY RESTRAINTS PENDING THE RETURN DATE**

A. Defendants, and persons acting in concert with them who receive actual notice of this Order, shall not implement, consummate, or treat as effective the proposed October 23, 2026 negative-consent bulk assignment of IWS advisory agreements to PWS; and shall not, through company-controlled processes, effect any further transfer of IWS advisory agreements or company-generated advisory fee rights to PWS or another entity without further Order of the Court.

Nothing herein prohibits a client from independently selecting, terminating, or retaining an investment adviser or directs a client to remain with IWS.

B. Defendants shall maintain existing IWS operational records and system data, shall not further disable or interfere with access by persons whose access IWS is legally authorized to maintain, and shall preserve uninterrupted access for properly authorized personnel to the extent necessary to meet continuing client-service and regulatory duties. No provision herein requires access by a person lacking current licensing, appointment, or other legally required authorization.

C. Defendants shall preserve and shall not delete, alter, conceal, destroy, overwrite, or intentionally disable access to any relevant hard-copy or electronic records, including email, text messages, CRM records, custodian and vendor records, advisory agreements, client-transition notices, consents and objections, financial transactions, and correspondence relating to IWS, Bailin, BWS, or PWS.

D. Defendants shall preserve existing IWS financial records and documents sufficient to trace the $130,000 advance, questioned disbursements, and any advisory fees or other proceeds arising from disputed transfers. Defendants shall not dissipate specifically identifiable disputed proceeds outside the ordinary course of business, except for reasonable necessary expenses documented in contemporaneous records, until further Order of the Court.

E. The parties shall preserve the status quo as to disputed company rights while ensuring continuity of service, protection of client information, and compliance with all applicable securities, privacy, and custodial requirements. No restraint herein transfers beneficial ownership of client assets or adjudicates the ultimate rights to any client relationship.

**AND IT IS FURTHER ORDERED that:**

1. Any Defendant or other party entitled to be heard may file and serve answering certifications, a brief, and other opposition papers no later than ____________, 2026, at ________, or such other time as directed by the Court.

2. Plaintiff may file and serve reply papers no later than ____________, 2026, at ________, or such other time as directed by the Court.

3. Plaintiff shall serve this signed Order to Show Cause, the Verified Complaint, the Brief in Support, supporting certifications, and exhibits upon Defendants in accordance with R. 4:52-1 and R. 4:4-3 and R. 4:4-4, unless otherwise directed by the Court, no later than ____________, 2026. In addition, Plaintiff shall promptly transmit courtesy copies by email to Mark Kowalsky, Esq., Taft Law, at mkowalsky@taftlaw.com. Email notice to counsel does not, by itself, constitute a waiver or acceptance of formal service.

4. Parties in interest are hereby advised that a telephone call to Plaintiff, Plaintiff's attorney, the Chancery Division, the Clerk of the Superior Court, or the Court will not protect their rights. Any party wishing to oppose the relief requested must timely file and serve an answer, answering affidavit, motion, or other appropriate response, together with any applicable filing fee, in accordance with the deadlines and requirements set forth in this Order and the New Jersey Rules of Court.

   Any required filing fee shall be paid in accordance with the filing procedures applicable to the Superior Court of New Jersey, Chancery Division, Bergen County.

   Any party who cannot afford an attorney may contact the Legal Services office serving the county in which that party resides to inquire about eligibility for free legal assistance. Any party who does not have an attorney, is not eligible for free legal assistance, or requires assistance with a matter not handled by Legal Services may contact the appropriate Lawyer Referral Service for assistance in locating an attorney.

5. Plaintiff shall file proof of service and any relevant proof of electronic notice no later than ____________, 2026.

6. The Court may entertain oral argument on the return date and may determine whether an evidentiary hearing is required. Any request for testimony or modification of the hearing procedure shall be presented to the Court in advance of the return date.

7. Any party affected by these temporary restraints may apply on appropriate notice for modification, dissolution, or other relief as permitted by R. 4:52-1 and applicable law.

8. The Court fixes security pursuant to R. 4:52-3 in the amount of $__________, [or determines that no security is required for reasons stated on the record].

9. The temporary restraints entered above shall remain effective until the return date or further Order of the Court. Unless otherwise ordered, they do not independently authorize final relief or adjudicate the merits.

__________________________________________

, J.S.C.

**CALLAGY LAW, P.C.**
**Michael Smikun (Bar No. 02056-2018)**
**Robert J. Solomon (Bar No. 15927-2016)**
**Mack-Cali Centre II**
**650 From Road – Suite 565**
**Paramus, NJ 07652**
**Tel. (201) 261-1700**
**Fax. (201) 549-6236**
**Email: msmikun@callagylaw.com**
***Attorneys for Plaintiff***

**SUPERIOR COURT OF NEW JERSEY**
**CHANCERY DIVISION: BERGEN COUNTY**

| | |
|---|---|
| **INTEGROUS WEALTH STRATEGIES, LLC, a New Jersey Limited Liability Company**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**DAVID L. BAILIN, individually and as Managing Partner and Chief Compliance Officer of INTEGROUS WEALTH STRATEGIES, LLC, and BAILIN WEALTH STRATEGIES, LLC, a Florida Limited Liability Company**<br><br>Defendants**.** | **DOCKET NO.:**<br><br>**PROPOSED FORM OF ORDER** |

This matter being opened to the Court by Michael J. Smikun, Esq., of Callagy Law, P.C., attorneys for Plaintiff Integrous Wealth Strategies, LLC ("IWS" or "Plaintiff"), seeking an Order to Show Cause with Temporary Restraints pursuant to R. 4:52-1 based upon the Verified Complaint, Brief in Support, and supporting papers filed herewith; the Court having considered the application and the nature of the emergency presented by the proposed October 23, 2026 client-account transition; and for good cause shown:

**IT IS on this ____ day of ____________, 2026, ORDERED that Defendants David L. Bailin and Bailin Wealth Strategies, LLC shall appear and show cause on the ____ day of ____________, 2026, at ________, before the Honorable __________________________, J.S.C., Superior Court of New Jersey, Chancery Division, Bergen County, at a location or by remote appearance as directed by the Court, why an Order should not be entered as follows:**

**RELIEF TO BE CONSIDERED ON THE RETURN DATE**

A. Preliminarily enjoining Defendants, and all persons acting in concert with them who receive actual notice of this Order, from implementing or completing the October 23, 2026 negative-consent transition of advisory agreements from IWS to Personal Wealth Strategies, LLC ("PWS"), or otherwise initiating or effecting the unauthorized assignment, solicitation for transfer, diversion, or migration of IWS advisory agreements, associated fee rights, and company business opportunities to PWS or another entity, without approval by IWS through its legally authorized governance processes or further Order of the Court;

B. Directing Defendants to maintain and restore, as appropriate, IWS's operational access to client servicing systems, business records, email accounts, vendor platforms, and relevant advisory records, including access by properly authorized representatives, subject to applicable client-confidentiality, cybersecurity, contractual, and securities-regulatory requirements; and directing the parties promptly to propose a neutral or alternative access protocol if the status or authorization of Justin Rice is disputed;

C. Directing Defendants to produce to IWS or its counsel the company's books and records, including bank statements, general ledgers, transaction histories, disbursement records, and documentation reflecting receipt and use of the $130,000 advance from Callagy Enterprises,

LLC and the disposition of approximately $80,000 in questioned company disbursements, and to provide a sworn accounting on a schedule established by the Court;

D. Enjoining Defendants from deleting, concealing, altering, transferring, or destroying relevant documents, electronically stored information, communications, financial records, advisory agreements, client-transition notices, client-consent or objection records, and records reflecting any transfers or revenues related to IWS or PWS;

E. Directing identification and preservation of records tracing any advisory fees or other identifiable proceeds generated from disputed transfers of IWS business to PWS, with an accounting and such constructive-trust or other equitable relief as the Court determines appropriate after further proceedings;

F. Authorizing expedited, appropriately tailored discovery, including production of client-transition records, communications, agreements, and financial information, subject to appropriate protections for client personal information and privileged material; and

G. Granting such other and further relief as the Court deems equitable and just.

**AND IT IS FURTHER ORDERED that, pending the return date or further Order of the Court, the following TEMPORARY RESTRAINTS shall take effect immediately upon entry of this Order:**

**TEMPORARY RESTRAINTS PENDING THE RETURN DATE**

A. Defendants, and persons acting in concert with them who receive actual notice of this Order, shall not implement, consummate, or treat as effective the proposed October 23, 2026 negative-consent bulk assignment of IWS advisory agreements to PWS; and shall not, through company-controlled processes, effect any further transfer of IWS advisory agreements or company-generated advisory fee rights to PWS or another entity without further Order of the Court.

Nothing herein prohibits a client from independently selecting, terminating, or retaining an investment adviser or directs a client to remain with IWS.

B. Defendants shall maintain existing IWS operational records and system data, shall not further disable or interfere with access by persons whose access IWS is legally authorized to maintain, and shall preserve uninterrupted access for properly authorized personnel to the extent necessary to meet continuing client-service and regulatory duties. No provision herein requires access by a person lacking current licensing, appointment, or other legally required authorization.

C. Defendants shall preserve and shall not delete, alter, conceal, destroy, overwrite, or intentionally disable access to any relevant hard-copy or electronic records, including email, text messages, CRM records, custodian and vendor records, advisory agreements, client-transition notices, consents and objections, financial transactions, and correspondence relating to IWS, Bailin, BWS, or PWS.

D. Defendants shall preserve existing IWS financial records and documents sufficient to trace the $130,000 advance, questioned disbursements, and any advisory fees or other proceeds arising from disputed transfers. Defendants shall not dissipate specifically identifiable disputed proceeds outside the ordinary course of business, except for reasonable necessary expenses documented in contemporaneous records, until further Order of the Court.

E. The parties shall preserve the status quo as to disputed company rights while ensuring continuity of service, protection of client information, and compliance with all applicable securities, privacy, and custodial requirements. No restraint herein transfers beneficial ownership of client assets or adjudicates the ultimate rights to any client relationship.

**AND IT IS FURTHER ORDERED that:**

1. Any Defendant or other party entitled to be heard may file and serve answering certifications, a brief, and other opposition papers no later than ____________, 2026, at ________, or such other time as directed by the Court.

2. Plaintiff may file and serve reply papers no later than ____________, 2026, at ________, or such other time as directed by the Court.

3. Plaintiff shall serve this signed Order to Show Cause, the Verified Complaint, the Brief in Support, supporting certifications, and exhibits upon Defendants in accordance with R. 4:52-1 and R. 4:4-3 and R. 4:4-4, unless otherwise directed by the Court, no later than ____________, 2026. In addition, Plaintiff shall promptly transmit courtesy copies by email to Mark Kowalsky, Esq., Taft Law, at mkowalsky@taftlaw.com. Email notice to counsel does not, by itself, constitute a waiver or acceptance of formal service.

4. Parties in interest are hereby advised that a telephone call to Plaintiff, Plaintiff's attorney, the Chancery Division, the Clerk of the Superior Court, or the Court will not protect their rights. Any party wishing to oppose the relief requested must timely file and serve an answer, answering affidavit, motion, or other appropriate response, together with any applicable filing fee, in accordance with the deadlines and requirements set forth in this Order and the New Jersey Rules of Court.

   Any required filing fee shall be paid in accordance with the filing procedures applicable to the Superior Court of New Jersey, Chancery Division, Bergen County.

   Any party who cannot afford an attorney may contact the Legal Services office serving the county in which that party resides to inquire about eligibility for free legal assistance. Any party who does not have an attorney, is not eligible for free legal assistance, or requires assistance with a matter not handled by Legal Services may contact the appropriate Lawyer Referral Service for assistance in locating an attorney.

5. Plaintiff shall file proof of service and any relevant proof of electronic notice no later than ____________, 2026.

6. The Court may entertain oral argument on the return date and may determine whether an evidentiary hearing is required. Any request for testimony or modification of the hearing procedure shall be presented to the Court in advance of the return date.

7. Any party affected by these temporary restraints may apply on appropriate notice for modification, dissolution, or other relief as permitted by R. 4:52-1 and applicable law.

8. The Court fixes security pursuant to R. 4:52-3 in the amount of $__________, [or determines that no security is required for reasons stated on the record].

9. The temporary restraints entered above shall remain effective until the return date or further Order of the Court. Unless otherwise ordered, they do not independently authorize final relief or adjudicate the merits.

_________________________________________

, J.S.C.

**CALLAGY LAW, P.C.**
**Michael Smikun (Bar No. 02056-2018)**
**Robert J. Solomon (Bar No. 15927-2016)**
**Mack-Cali Centre II**
**650 From Road – Suite 565**
**Paramus, NJ 07652**
**Tel. (201) 261-1700**
**Fax. (201) 549-6236**
**Email: msmikun@callagylaw.com**
***Attorneys for Plaintiff***

**SUPERIOR COURT OF NEW JERSEY**
**CHANCERY DIVISION: BERGEN COUNTY**

| | |
|---|---|
| **INTEGROUS WEALTH STRATEGIES, LLC, a New Jersey Limited Liability Company**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**DAVID L. BAILIN, individually and as Managing Partner and Chief Compliance Officer of INTEGROUS WEALTH STRATEGIES, LLC, and BAILIN WEALTH STRATEGIES, LLC, a Florida Limited Liability Company**<br><br>Defendants**.** | **DOCKET NO.:** |

# BRIEF IN SUPPORT OF PLAINTIFF'S ORDER TO SHOW CAUSE

*On the brief:*

*Michael J. Smikun, Esq.*
*Robert J. Solomon, Esq.*

## PRELIMINARY STATEMENT

Plaintiff Integrous Wealth Strategies, LLC ("IWS" or "Plaintiff") brings this emergent application for an Order to Show Cause with Temporary Restraints to prevent the imminent and potentially irreversible destruction of its business at the hands of the very individual entrusted with managing and protecting it.

Sean Callagy is not a passive investor. He is one of New Jersey's most accomplished attorneys and entrepreneurs, a founder of Callagy Law, a driving force behind the Unblinded movement, and a builder of multiple successful organizations spanning law, business, and personal development. When Sean Callagy identifies an opportunity and commits his capital, his relationships, and his name to it, it is because he has done the work to make it real. Integrous Wealth Strategies, LLC was his idea. He conceived it, structured it, funded it, and made it happen. He brought the vision, the institutional relationships, the legal infrastructure, and the money. What he needed was someone who could run the compliance and advisory operations day to day, someone with the licenses, the client book, and the technical expertise to manage a registered investment adviser from the inside.

That person was Defendant David L. Bailin ("Bailin"). Bailin was operating a modest advisory practice out of Hamilton, New Jersey, with his wife. The opportunity IWS represented was transformational for him. Callagy did not simply offer Bailin a job. He offered him a platform: a fully scaled, SEC-registered investment adviser, a new broker-dealer relationship through Purshe Kaplan Sterling Investments, and the financial backing to close out his prior operation and build something larger than anything he had ever done on his own. In exchange, Bailin brought his existing client book, agreed to serve as IWS's Managing Partner and Chief Compliance Officer, committed to a minimum two-year tenure, and agreed to help build the enterprise Sean Callagy

had envisioned.

The critical question in this case is not whether Bailin had some right to his pre-existing clients upon a lawful retirement. The critical question is who controlled the advisory agreements, who authorized the transfer of those agreements out of IWS, and where the resulting revenue went. The answer to each of those questions is the same: Bailin, acting alone, without authorization, without member consent, and in direct violation of the fiduciary duties he owed to the company he was entrusted to manage.

On June 30, 2026, Callagy Enterprises, LLC wired $130,000 into IWS to fund its operations. Bailin confirmed receipt that same day. The company was operational. The financial commitment had been made. The trust was given. It was not returned.

While Sean Callagy and Jazz Vesuvio were building, Bailin was copying. While they were negotiating the operating agreement in good faith, he was stalling, running it through his attorney, rejecting agreed terms, and buying time. While they were asking for basic financial records of the company they co-owned and co-funded, he was invoking compliance authority to keep them blind. And while he was doing all of that, he was secretly building a competing registered investment adviser, Personal Wealth Strategies, LLC ("PWS"), using the same clients, the same vendors, and the same technology infrastructure he had absorbed as IWS's Managing Partner.

**On September 23, 2026, Bailin sent a single email announcing that he had already transferred IWS's client base, the advisory agreements he controlled as Chief Compliance Officer, the accounts whose revenue flowed through IWS's operations, to PWS**. See Verified Complaint, ¶ 72; Exhibit B (September 23, 2026 Email from Bailin). He further announced that any client who did not affirmatively object by October 23, 2026, would be deemed to have consented to the transfer. In other words, unless this Court intervenes, Bailin intends to complete

the transfer of IWS's advisory relationships to his competing enterprise through a unilateral negative consent process that neither IWS nor its other members ever authorized.

As if that were not enough, on the very same day he announced the transfer, Bailin locked IWS's investment adviser representative, Justin Rice, out of virtually every operational system necessary to service those clients. On October 14, 2026, Bailin terminated Rice's employment entirely. Thus, while Bailin was actively transferring IWS's clients to his competing company, he was simultaneously depriving IWS of the personnel and operational infrastructure necessary to communicate with those clients, service their accounts, or protect its own business.

The Verified Complaint accompanying this application asserts sixteen causes of action against Bailin individually and through Defendant Bailin Wealth Strategies, LLC, including breaches of the fiduciary duties of loyalty, care, and candor; usurpation of corporate opportunity; breach of the parties' oral operating agreement; conversion and misappropriation of company assets; breach of the covenant of good faith and fair dealing; and tortious interference with IWS's business relationships, among other claims.

These claims are not merely allegations of a business disagreement between members of a limited liability company. They concern the calculated diversion of an operating business by the very fiduciary charged with protecting it. New Jersey law does not permit a managing fiduciary to exploit the authority entrusted to him to secretly establish a competing enterprise, divert company assets and business opportunities for his personal benefit, and then leave the company without the means to protect itself.

Nor can the harm to IWS be adequately remedied through monetary damages alone. The value of an investment advisory business rests substantially upon its client relationships, its reputation, its goodwill, and its ability to continuously service the accounts entrusted to it. Once

those relationships have been transferred, the revenue redirected, and the company's ability to service its clients dismantled, attempting to reconstruct the business through a subsequent damages award would be extraordinarily difficult, if not impossible.

The October 23, 2026 deadline makes the need for relief particularly urgent. Absent immediate judicial intervention, the very subject matter of this litigation risks being fundamentally altered before the Court has an opportunity to adjudicate the merits of Plaintiff's claims. IWS does not seek, through this application, to permanently determine the ownership of every client relationship or deprive any client of the right to select an investment adviser of their choosing. Rather, Plaintiff seeks to preserve the status quo and prevent Bailin from unilaterally accomplishing, through his own alleged misconduct, the very result that this litigation challenges.

Accordingly, IWS respectfully requests that this Court enter an Order to Show Cause with Temporary Restraints:

a. **Immediately enjoining** the October 23, 2026 negative consent client transition and prohibiting any further unauthorized transfer or diversion of IWS's advisory relationships, contracts, assets under management, or business opportunities to Personal Wealth Strategies, LLC or any other entity;

b. **Restoring appropriate operational access** to IWS's authorized personnel, including Justin Rice, or otherwise ensuring that IWS retains the ability to service its clients and maintain its regulatory obligations;

c. **Compelling immediate access** to IWS's financial records, including an accounting of the $130,000 advanced by Callagy Enterprises, LLC and the disposition of company funds;

d. **Preserving all relevant documents, electronic records, communications,**

**client-transition information, and financial records** pending resolution of this matter;

e. **Requiring an accounting and appropriate preservation of identifiable proceeds** derived from the alleged diversion of IWS's client relationships and business opportunities, with the imposition of a constructive trust where warranted;

f. **Authorizing appropriately tailored expedited discovery** necessary to determine the extent of Defendants' alleged misconduct and preserve the integrity of the proceedings; and

g. **Granting such other and further relief** as this Court deems equitable and just.

David Bailin was entrusted with the authority to manage and protect IWS. Instead, as detailed in the Verified Complaint and as Plaintiff will demonstrate in this application, he used that authority to dismantle the very business he was obligated to serve.

Plaintiff does not ask this Court to resolve every disputed factual question today. It asks only that Defendants not be permitted to complete the destruction of IWS's business before those questions can be answered.

For the reasons set forth herein, Plaintiff respectfully requests that this Court exercise its equitable authority to preserve the status quo and grant the requested temporary restraints and preliminary injunctive relief.

## STATEMENT OF FACTS

Plaintiff relies on the Verified Complaint and Exhibits attached thereto in support of this application.

## LEGAL ARGUMENT

## I. <u>AN INTERIM ORDER IS NECESSARY TO PREVENT THE DESTRUCTION OF PLAINTIFF'S BUSINESS</u>

It is beyond dispute that if Defendants are permitted to complete the unauthorized transfer of Plaintiff Integrous Wealth Strategies, LLC's ("IWS" or "Plaintiff") client relationships, advisory agreements, and assets under management to Defendant David Bailin's competing enterprise, Personal Wealth Strategies, LLC ("PWS"), it could result in the complete financial ruin and destruction of Plaintiff's business.

It goes without saying that, for an investment advisory firm to operate, it must have clients to advise, advisory agreements under which to provide services, and access to the operational infrastructure necessary to service those relationships. Defendants' actions in depriving Plaintiff of these essential aspects of its business, through alleged breaches of fiduciary duty, the misappropriation of corporate opportunities, and the unauthorized diversion of its client relationships, are precisely the type of conduct that Courts of Equity are designed to prevent. *Ferraiuolo v. Manno*, 1 N.J. 105, 108 (1948).

*Crowe v. De Gioia*, 90 N.J. 126 (1982), is the seminal case setting forth the equitable factors New Jersey courts consider in determining whether to authorize emergent preliminary or temporary injunctive relief. The factors are: (A) whether the legal rights underlying Plaintiff's claims are settled; (B) whether Plaintiff has a reasonable probability of succeeding on the merits of its claims; (C) whether the balance of hardships weighs in Plaintiff's favor; and (D) whether Plaintiff will suffer irreparable injury in the absence of such relief. The purpose of a preliminary injunction is to permit the Court to investigate and determine the merits of a matter while maintaining the status quo. *Id.*; see also *Subcarrier Communications, Inc. v. Day*, 299 N.J. Super. 634 (App. Div. 1997).

Each of these factors overwhelmingly favors granting Plaintiff the equitable relief

necessary to maintain the status quo.

**First**, the legal rights underlying Plaintiff's claims for breach of fiduciary duty and usurpation of corporate opportunity are firmly established under New Jersey statutory and common law. **Second**, Plaintiff has a substantial, and certainly reasonable, probability of success on the merits because, *inter alia*, Bailin, while serving as Plaintiff's Managing Partner and Chief Compliance Officer, allegedly established a competing investment advisory firm, diverted Plaintiff's client relationships and business opportunities to that firm, and deprived Plaintiff of access to the very records and operational systems necessary to protect its business. **Third**, the balancing of equities clearly favors Plaintiff's application because Plaintiff seeks to preserve the status quo by preventing further unauthorized transfers of its advisory relationships, maintaining its ability to service existing clients, and preserving its financial and operational records pending resolution of this matter. **Fourth**, and lastly, without immediate equitable relief, Plaintiff faces irreparable harm through the potential destruction of its business, loss of client relationships, goodwill, and future revenue. Indeed, New Jersey law expressly recognizes that acts destroying a business, its custom, and its profits constitute irreparable injury warranting preliminary injunctive relief. *Ferraiuolo*, 1 N.J. at 108.

For the reasons set forth more fully below, Plaintiff respectfully submits that all four factors under *Crowe* weigh decisively in favor of granting the requested temporary restraints and preliminary injunctive relief.

### A. THE LEGAL RIGHTS UNDERLYING PLAINTIFF'S APPLICATIONS AGAINST THE DEFENDANTS ARE WELL SETTLED.

The legal rights underlying Plaintiff's application to this Court, including, inter alia, breach of fiduciary duties and usurpation of corporate opportunity, are so firmly established under New Jersey statutory and common law that there can be no legitimate dispute as to their existence.

Here, Plaintiff's claims involve neither novel legal questions nor unsettled principles of law. To the contrary, New Jersey has long recognized that individuals entrusted with the management and operation of a business owe fiduciary duties to that enterprise, including the obligation to act loyally, refrain from self-dealing, and avoid appropriating business opportunities for their personal benefit. These duties are especially well established in the context of limited liability companies, where the New Jersey Revised Uniform Limited Liability Company Act ("RULLCA"), N.J.S.A. 42:2C-1 *et seq.*, expressly governs the conduct of managers and members.

**First,** New Jersey expressly recognizes a cause of action for breach of fiduciary duty by a manager of a limited liability company. N.J.S.A. 42:2C-39 identifies the fiduciary duties of loyalty and care owed in the management of an LLC. Particularly relevant here, the statute requires a fiduciary to account to the company for benefits derived from its business or property, refrain from acting on behalf of interests adverse to the company, and refrain from competing with the company during its operations. N.J.S.A. 42:2C-39(b). Moreover, N.J.S.A. 42:2C-39(i) expressly extends these fiduciary obligations to managers of manager-managed limited liability companies.

New Jersey courts have likewise recognized the application of these statutory obligations to the management of limited liability companies. See *Decandia v. Rinaldi*, 2020 N.J. Super. Unpub. LEXIS 1876 (App. Div. 2020) (addressing the fiduciary obligations applicable to managers under RULLCA). Accordingly, the legal obligation of an LLC manager to refrain from competing with the company, engaging in self-dealing, or appropriating company property for personal benefit is not subject to any legitimate dispute.

Nor does the absence of a fully executed written operating agreement eliminate the fiduciary obligations imposed by New Jersey law. Indeed, RULLCA expressly recognizes that an operating agreement may be written, oral, implied, or any combination thereof. N.J.S.A. 42:2C-2.

In *Premier Physician Network, LLC v. Maro*, 468 N.J. Super. 182 (App. Div. 2021), the Appellate Division recognized that the parties' operating agreement need not necessarily be reduced to a signed writing and that an unaccepted draft does not automatically establish the governing contractual terms. Thus, the absence of a finalized written operating agreement does not, standing alone, create a legal vacuum in which an LLC manager may disregard otherwise applicable statutory fiduciary duties.

**Second,** New Jersey has long recognized a cause of action for usurpation of corporate opportunity. This doctrine prohibits a fiduciary from appropriating for personal benefit a business opportunity that properly belongs to the enterprise to which fiduciary obligations are owed. Indeed, N.J.S.A. 42:2C-39(b)(1) expressly includes within the duty of loyalty the obligation to account for and hold in trust any property, profit, or benefit derived from the appropriation of a company opportunity.

The Supreme Court of New Jersey has expressly recognized this doctrine and the equitable remedies available when a fiduciary wrongfully appropriates a corporate opportunity. In *Packard-Bamberger & Co. v. Collier*, 167 N.J. 427 (2001), the Supreme Court addressed the misappropriation of a corporate opportunity by individuals owing fiduciary obligations to a business enterprise and upheld equitable relief requiring the transfer of wrongfully acquired property to the corporation. The decision reinforces the settled principle that a fiduciary may not exploit a position of trust to acquire for personal benefit a business opportunity belonging to the entity the fiduciary is obligated to serve.

The corporate opportunity doctrine is therefore not a novel theory of liability. Rather, it is an established application of the fundamental duty of loyalty, expressly reflected in New Jersey's LLC statute and recognized by the Supreme Court of New Jersey.

In sum, Plaintiff's application rests upon two closely related, but independently cognizable legal theories: the statutory and common law prohibition against a fiduciary's disloyal conduct, and the equally established prohibition against the usurpation of a company's business opportunities.

Whether Defendants' particular conduct violated these obligations is addressed in the sections that follow. For purposes of the present *Crowe* factor, however, there can be no serious dispute that the legal rights Plaintiff seeks to enforce are sufficiently settled under New Jersey law.

Accordingly, Plaintiff has satisfied this requirement for preliminary injunctive relief.

**B. <u>PLAINTIFF HAS A SUBSTANTIAL, AND CERTAINLY REASONABLE, PROBABILITY OF SUCCESS ON ITS CLAIMS.</u>**

Plaintiff has, at minimum, a reasonable probability of success on the merits of its claims against Defendants for breach of fiduciary duty and usurpation of corporate opportunity. Indeed, the substantial legal authority supporting Plaintiff's position, when considered alongside the facts alleged in the Verified Complaint and Defendants' own communications, establishes that Plaintiff's likelihood of success is significant.

As discussed above, Defendant David L. Bailin ("Bailin") was not merely an employee or minority member of Plaintiff Integrous Wealth Strategies, LLC ("IWS" or "Plaintiff"). Rather, Bailin served as Plaintiff's Managing Partner and Chief Compliance Officer, positions that entrusted him with substantial control over Plaintiff's operations, client relationships, advisory agreements, financial information, and regulatory compliance. In accepting these responsibilities, Bailin assumed fiduciary obligations requiring him to act in the best interests of Plaintiff and refrain from exploiting his position for personal benefit.

Notwithstanding these obligations, Bailin allegedly engaged in a deliberate course of conduct designed to divert Plaintiff's business to his own competing enterprise, Personal Wealth

Strategies, LLC ("PWS"). Specifically, Bailin established and operated a competing investment advisory firm while continuing to serve as Plaintiff's Managing Partner, concealed material information from Plaintiff's other members, refused repeated requests for company financial records, and ultimately announced that he had transferred Plaintiff's client relationships and advisory agreements to PWS without authorization.

Importantly, Plaintiff's claims are not based merely upon speculation concerning Bailin's intentions. In his September 23, 2026 email, Bailin expressly acknowledged that he had already "assigned our client base out of Integrous Wealth Strategies and into a new RIA." Thus, the central conduct giving rise to Plaintiff's claims was expressly acknowledged by Bailin himself. Whether he possessed the legal authority to undertake that transfer, particularly while continuing to serve as Plaintiff's Managing Partner and Chief Compliance Officer, is at the heart of this litigation.

As demonstrated below, Plaintiff has a substantial probability of success on its claim for breach of fiduciary duty because Bailin's alleged conduct directly contravenes the obligations of loyalty imposed upon managers of limited liability companies under New Jersey law. Similarly, Plaintiff has a substantial probability of success on its claim for usurpation of corporate opportunity because Bailin allegedly appropriated Plaintiff's advisory relationships, associated revenue, and business opportunities for the benefit of his own competing enterprise, without obtaining the authorization of Plaintiff or its members.

For these reasons, and as discussed more fully below, Plaintiff has more than satisfied the reasonable probability of success requirement under *Crowe v. De Gioia*, 90 N.J. 126 (1982).

**i. DEFENDANTS BREACHED THEIR FIDUCIARY OBLIGATIONS TO PLAINTIFF.**

Plaintiff has a substantial probability of success on its claims for breach of fiduciary duty because the facts alleged in the Verified Complaint, supported by Defendants' own

communications and the accompanying documentary evidence, establish each of the essential elements of such a claim. Specifically, (1) Defendant David L. Bailin ("Bailin"), by virtue of his position as Plaintiff's Managing Partner and Chief Compliance Officer, owed Plaintiff fiduciary duties under New Jersey law; (2) Bailin breached those duties by, *inter alia*, secretly establishing a competing investment advisory business, diverting Plaintiff's client relationships and business opportunities to that enterprise, withholding material financial information from Plaintiff's other members, and interfering with Plaintiff's ability to service its own clients; and (3) as a direct and proximate result of that misconduct, Plaintiff has suffered harm and faces substantial additional damages, including the potential destruction of its business, if Bailin's conduct is permitted to continue unchecked.

Under the New Jersey Revised Uniform Limited Liability Company Act ("RULLCA"), N.J.S.A. 42:2C-1 *et seq.*, managers of manager-managed limited liability companies owe fiduciary duties to the companies they manage. N.J.S.A. 42:2C-39(i). These duties include the duty of loyalty, which expressly requires a fiduciary to:

> (a) Account to the company and hold as trustee any property, profit, or benefit derived from conducting the company's business, utilizing its property, or appropriating a company opportunity;
>
> (b) Refrain from dealing with the company on behalf of a person or entity whose interests are adverse to the company; and
>
> (c) Refrain from competing with the company during the conduct of its business.
>
> N.J.S.A. 42:2C-39(b)(1)–(3).

These are not merely aspirational principles of corporate governance. They are affirmative statutory obligations imposed upon those entrusted with managing the business and affairs of a limited liability company.

Moreover, these obligations do not disappear simply because the members have not executed a final written operating agreement. In *Premier Physician Network, LLC v. Maro*, 468 N.J. Super. 182 (App. Div. 2021), the Appellate Division considered whether members of a limited liability company were bound by a proposed operating agreement that they had not executed. The trial court had concluded that the defendants were bound by the agreement based upon their membership in the LLC, notwithstanding a disputed factual record concerning their assent. The Appellate Division reversed that determination, explaining that an operating agreement must reflect the agreement of all members and that a proposed draft does not automatically become binding merely because it has been circulated. *Id.* at 194–95.

Importantly, the Appellate Division further recognized that New Jersey law does not require an operating agreement to be reduced to writing or formally executed. Indeed, pursuant to N.J.S.A. 42:2C-2, an operating agreement may be oral, written, implied, or any combination thereof. *Id.* at 195. Accordingly, whether the members agreed to particular contractual provisions must be determined from the evidence of their assent, rather than the mere existence or absence of signatures on a proposed document.

The distinction is particularly important here. As set forth in the Verified Complaint, the members of Integrous Wealth Strategies, LLC ("IWS" or "Plaintiff") had agreed upon the essential structure of their business relationship, including the forty percent (40%) membership interests held by Callagy Enterprises, LLC and Jazz Vesuvio, the twenty percent (20%) membership interest held through Defendant Bailin Wealth Strategies, LLC ("BWS"), and Bailin's role as Managing Partner and Chief Compliance Officer. See Verified Complaint, ¶¶ 23–26, 31.

Indeed, as early as February 12, 2026, Bailin acknowledged the proposed ownership structure, the necessity of an operating agreement, and the contemplated May 26, 2026 launch date. See Verified Complaint, ¶ 23; Exhibit A (February 12, 2026 Email from Bailin).

Although the parties continued negotiating additional provisions of a written operating agreement, there was no corresponding agreement authorizing Bailin to secretly establish a competing enterprise, transfer IWS's advisory relationships to that enterprise, or appropriate company property and business opportunities for his exclusive benefit.

Nor does the absence of a finalized written agreement create a legal vacuum in which Bailin was free to disregard the statutory fiduciary obligations applicable to his role.

In fact, a recent Chancery Division decision addressed a remarkably analogous dispute involving the absence of a written operating agreement and the alleged appropriation of company property and opportunities by a member of an LLC.

In *Cheshun v. Sikand*, No. MON-C-66-23 (Ch. Div. Mar. 31, 2025) (unpublished opinion), the parties were equal members and co-managers of a limited liability company established to conduct clinical drug trials. Although the parties had agreed to share expenses and profits, they had never executed an operating agreement. Their business relationship subsequently deteriorated, resulting in disputes concerning the operation of the enterprise and allegations that one member had improperly deprived the other of access to the business and appropriated opportunities belonging to the company.

The defendant sought summary judgment dismissing the fiduciary duty claims, arguing, among other things, that the parties' business relationship had effectively ended.

The Chancery Division rejected the proposition that the deterioration or termination of the parties' relationship permitted either member to simply appropriate the company's assets and

opportunities. Rather, the Court recognized that the parties' rights and obligations remained governed by RULLCA, including the statutory fiduciary duties imposed by N.J.S.A. 42:2C-39. The Court further emphasized that the termination of a business relationship does not eliminate the obligation to properly account for and address company property and opportunities through an orderly process. Accordingly, the Court determined that material factual disputes concerning the alleged breaches of fiduciary duty precluded summary judgment.

Although *Cheshun* is an unpublished decision, its reasoning is particularly instructive here.

Like the parties in *Cheshun*, Plaintiff and Bailin never completed a comprehensive written operating agreement. Like the defendant in *Cheshun*, Bailin allegedly exercised substantial control over the company's operations while taking actions that deprived the enterprise of the assets and opportunities necessary to continue operating. And, as in *Cheshun*, the deterioration of the parties' relationship cannot itself justify the unilateral appropriation of company property or business opportunities without regard to the fiduciary obligations imposed by RULLCA.

Indeed, the circumstances here are arguably more egregious. Bailin did not simply announce his desire to terminate a business relationship or seek dissolution of the enterprise. Rather, while continuing to serve as Plaintiff's Managing Partner and Chief Compliance Officer, he allegedly established a competing business, directed the transfer of Plaintiff's advisory relationships to that enterprise, and deprived Plaintiff of the operational access necessary to protect its interests.

Importantly, Bailin expressly acknowledged his managerial authority and responsibilities. In a July 10, 2026 communication concerning requests for Plaintiff's financial information, Bailin invoked IWS's purported manager-managed structure and his compliance responsibilities, stating,

among other things, that he alone carried responsibility for the company's regulatory obligations. See Verified Complaint, ¶ 54; Exhibit E (July 10, 2026 Email from Bailin).

Thus, Bailin cannot simultaneously invoke his managerial and compliance authority as justification for exercising exclusive control over Plaintiff's business while denying the fiduciary obligations that accompany such authority.

Accordingly, there can be no legitimate dispute that the first element of Plaintiff's breach of fiduciary duty claim is satisfied. Bailin served as Plaintiff's Managing Partner and Chief Compliance Officer, exercised substantial control over its financial operations, client relationships, advisory agreements, and regulatory compliance, and expressly acknowledged the manager-managed structure of the enterprise.

By accepting and exercising this authority, Bailin assumed fiduciary obligations to Plaintiff that existed independently of any additional contractual obligations the members may have undertaken.

Turning to the second element, Plaintiff has a substantial probability of establishing that Bailin breached those fiduciary obligations. Indeed, Plaintiff need not rely upon a single isolated act of misconduct to demonstrate a breach. Rather, Bailin engaged in a series of related actions which, when considered collectively, demonstrate a sustained course of conduct fundamentally inconsistent with the duties of loyalty imposed upon him as Plaintiff's Managing Partner.

Specifically, the evidence establishes that Bailin: (1) established and operated a competing investment advisory enterprise while managing Plaintiff; (2) unilaterally diverted Plaintiff's advisory relationships and business opportunities to that enterprise; (3) concealed material financial information from Plaintiff's other members; and (4) interfered with Plaintiff's operational capabilities to prevent it from protecting and servicing its existing clients.

**First, Bailin directly competed with Plaintiff while simultaneously serving as its Managing Partner and Chief Compliance Officer.**

According to the Verified Complaint, Bailin established Personal Wealth Strategies, LLC ("PWS"), a directly competing registered investment advisory firm, while he continued to manage IWS. The two businesses were not engaged in unrelated industries or serving entirely different commercial purposes. Both operated in the investment advisory industry, and PWS was positioned to service the very advisory relationships being maintained through Plaintiff's business.

Moreover, Bailin did not disclose the formation and operation of this competing enterprise to Plaintiff's other members or obtain their authorization. Rather, the Verified Complaint alleges that he continued exercising operational control over IWS while simultaneously developing the infrastructure necessary to transfer its advisory relationships into PWS.

Significantly, Bailin's own communications provide evidence of the competing business. As early as July 8, 2026, while serving as IWS's Managing Partner and Chief Compliance Officer, Bailin's email signature contained a link to www.personalwealthstrategies.com, the website associated with his competing advisory firm. See Verified Complaint, ¶ 64; Exhibit C (July 8, 2026 Email from Bailin).

Thus, months before announcing the transfer of Plaintiff's advisory relationships, Bailin was already referencing the competing enterprise in his professional communications, without having disclosed its existence or operation to Plaintiff's other members.

This conduct goes directly to the prohibition against competition contained in N.J.S.A. 42:2C-39(b)(3). The statute does not require Plaintiff to establish that Bailin entered into a separate written noncompetition agreement before imposing a duty of loyalty upon him. Rather, the obligation arises from his position as a manager of the company.

To be clear, Plaintiff does not contend that Bailin could never operate another investment advisory business or that he was necessarily prohibited from competing with IWS following a lawful departure. The misconduct at issue concerns his alleged competition with IWS while he continued to occupy the position of Managing Partner and Chief Compliance Officer, with access to and control over Plaintiff's clients, confidential information, business relationships, and operational infrastructure.

**Second, Bailin utilized his fiduciary position to divert Plaintiff's business to his own competing enterprise.**

On September 23, 2026, Bailin transmitted an email to Plaintiff's other members expressly acknowledging that he had already "assigned our client base out of Integrous Wealth Strategies and into a new RIA." See Verified Complaint, ¶ 72; Exhibit B (September 23, 2026 Email from Bailin, Subject: "Assignment of Bailin Clients").

The significance of this communication cannot be overstated.

Bailin did not request authorization from Plaintiff's members to transfer the company's advisory relationships. He did not propose a transaction for their consideration or submit the proposed transfer for an appropriate governance determination. Instead, he announced that the transfer had already occurred.

Further, Bailin established October 23, 2026 as the deadline under which clients who failed to affirmatively object would be treated as having consented to the assignment of their advisory relationships to PWS.

Indeed, Bailin transmitted a written notice directly to IWS's clients stating, in pertinent part:

"Your Agreement will be assigned from Integrous Wealth Strategies to Personal Wealth Strategies effective October 23, 2026... On October 23, 2026, your account will automatically move to Personal Wealth Strategies. There is no action required on your part unless you do not want to have your account assigned."

See Verified Complaint, ¶¶ 76–78; Exhibit F (Client Notice Concerning October 23, 2026 Assignment).

Thus, while continuing to serve as Plaintiff's Managing Partner, Bailin expressly acknowledged that he was directing the transfer of advisory relationships from IWS to an enterprise in which he maintained a personal and adverse economic interest.

This is precisely the type of conduct prohibited by N.J.S.A. 42:2C-39(b)(1) and (2), which require fiduciaries to account for benefits derived through the use of company property and refrain from dealing with the company in a manner adverse to its interests.

Moreover, the fact that Bailin established a subsequent negative consent deadline does not resolve the separate question of whether he possessed the corporate authority to initiate the transfer in the first place. Whatever rights individual clients may possess to select their own investment adviser, those rights do not independently authorize a managing fiduciary to divert company business for his personal economic benefit.

**Third, Bailin concealed material information concerning Plaintiff's financial condition and his competing business.**

The Verified Complaint further establishes that Bailin repeatedly refused to provide Plaintiff's other members with basic financial information concerning the company they owned and funded.

On July 3, 2026, Jazz Vesuvio requested information concerning Plaintiff's revenues, expenses, and payroll. See Verified Complaint, ¶ 53; Exhibit C (July 3, 2026 Financial Information Request).

On July 8, 2026, Brian Finn, a financial adviser assisting the Vesuvio organization, made an additional request seeking an accounting of approximately $80,000 in company disbursements. Rather than provide this information, Bailin instructed Finn to refrain from requesting company information, stating that "IWS is a company, and therefore has to keep its records confidential." See Verified Complaint, ¶ 55; Exhibit E (July 8, 2026 Email Exchange Concerning IWS Disbursements).

Subsequently, on July 10, 2026, Bailin responded to requests for financial information by invoking the confidentiality provisions of the operating agreement and Plaintiff's compliance manual, asserting, among other things, that he alone carried responsibility for the company's regulatory obligations. See Verified Complaint, ¶ 54; Exhibit E (July 10, 2026 Email from Bailin).

These were not requests for unrelated personal information or an effort to interfere with legitimate client confidentiality. They concerned the financial condition and operation of IWS itself, including the use of capital advanced to fund its business.

Indeed, on June 30, 2026, Callagy Enterprises, LLC advanced $130,000 to IWS as part of a $200,000 credit facility, and Bailin confirmed receipt of those funds that same day. See Verified Complaint, ¶ 28; Exhibit C (June 30, 2026 Wire Confirmation and Bailin's Acknowledgment).

Notwithstanding this substantial financial commitment, Plaintiff alleges that its other members have been unable to obtain a complete accounting of the company's financial activities, including the disposition of the $130,000 advance and the approximately $80,000 in identified disbursements.

Viewed together with Bailin's alleged undisclosed operation of PWS and his subsequent announcement that IWS's client relationships had been transferred to that entity, his refusal to provide this information strongly supports Plaintiff's claims that he failed to discharge his fiduciary obligations of loyalty and candor.

**Fourth, Bailin deliberately interfered with Plaintiff's ability to operate and protect its business.**

On the same day that Bailin announced the transfer of Plaintiff's client relationships to PWS, September 23, 2026, he allegedly revoked investment adviser representative Justin Rice's access to virtually every system necessary to service those clients. See Verified Complaint, ¶¶ 80–85.

These systems included Redtail CRM, Schwab, Envestnet, Focus Partners Advisor Services, Holistiplan, MoneyGuide, and Plaintiff's email infrastructure. Without access to these systems, Rice could not effectively communicate with clients, review account information, manage advisory relationships, or perform the functions necessary to maintain Plaintiff's business.

The timing of these actions is particularly compelling.

On the same day Bailin announced that Plaintiff's advisory relationships had been assigned to his competing enterprise, he deprived Plaintiff's investment adviser representative of the tools necessary to service those relationships or respond to the announced transfer.

Moreover, on October 6, 2026, Bailin allegedly presented Rice with an ultimatum to sign new agreements concerning restrictive covenants and outside business activities or face termination. On October 14, 2026, Bailin terminated Rice's employment. See Verified Complaint, ¶¶ 91–95.

Plaintiff submits that these actions, considered collectively, were not ordinary management decisions made in furtherance of the company's interests. Rather, they were part of a coordinated course of conduct designed to facilitate the diversion of Plaintiff's business while impairing its ability to respond.

Moreover, upon information and belief, Bailin's alleged misconduct extends beyond the diversion of Plaintiff's client relationships, advisory agreements, and business opportunities. Plaintiff has reason to believe that Bailin is also attempting to transition certain members of IWS's existing workforce to his competing enterprise, PWS, including personnel possessing valuable institutional knowledge, client relationships, and experience essential to Plaintiff's operations. When considered alongside Bailin's alleged interference with Plaintiff's operational infrastructure and diversion of its advisory business, these circumstances further support Plaintiff's contention that Bailin is engaged in a broader effort to dismantle IWS and redirect its business operations for his own economic benefit. Such conduct, if established, would further support Plaintiff's claims of disloyalty and compound the substantial harm resulting from Defendants' alleged misconduct.

Importantly, Plaintiff need not establish at this preliminary stage the full extent of the revenues diverted to PWS, the ultimate disposition of every advisory relationship, or the precise financial benefit realized by Bailin. Those matters can be addressed through expedited discovery and an accounting.

For present purposes, the evidence supporting Plaintiff's application establishes a reasonable probability that Bailin, while owing fiduciary obligations to IWS, acted in direct competition with the company, utilized his position to benefit a competing enterprise, withheld material information, and interfered with Plaintiff's business operations.

Nor does the parties' prior understanding concerning Bailin's preexisting client relationships provide a complete defense to this conduct.

As detailed in the Verified Complaint, the parties contemplated that Bailin would retain certain rights concerning his preexisting client book upon a lawful retirement, subject to an agreed process for determining its value. See Verified Complaint, ¶¶ 25–26, 98–101.

That understanding did not, according to Plaintiff, authorize Bailin to unilaterally transfer advisory relationships to a competing business while continuing to serve as IWS's Managing Partner, nor did it authorize him to disable Plaintiff's operational capabilities or conceal material company information.

The legal distinction is critical. Whatever rights Bailin may ultimately establish concerning his preexisting client relationships, those rights do not automatically absolve him of the fiduciary obligations arising from his simultaneous management of IWS.

**Finally, Plaintiff has satisfied the third element of its breach of fiduciary duty claim because Bailin's misconduct has caused, and threatens to continue causing, substantial harm to Plaintiff.**

The injury resulting from Bailin's conduct is neither hypothetical nor speculative. As detailed above, Bailin has already announced the assignment of Plaintiff's advisory relationships to PWS, deprived Plaintiff's investment adviser representative of access to critical operational systems, and withheld material financial information necessary for Plaintiff to understand and protect its business. See Verified Complaint, ¶¶ 52–61, 72–95.

Each of these actions has impaired Plaintiff's ability to conduct its ordinary operations, preserve its advisory relationships, and protect its economic interests.

Moreover, the financial consequences of Bailin's conduct extend well beyond the immediate loss of particular advisory accounts. Plaintiff's business derives its value from its client relationships, recurring advisory fees, assets under management, institutional relationships, goodwill, and ability to provide continuing financial advisory services.

By transferring those relationships to PWS, Bailin threatens to deprive Plaintiff of the very revenue-producing relationships upon which its business depends.

The causal relationship between Bailin's alleged breaches and Plaintiff's threatened damages is direct. But for Bailin's unauthorized efforts to transfer Plaintiff's advisory relationships to his competing enterprise, Plaintiff would retain the opportunity to continue servicing those relationships and generating the corresponding revenue. Similarly, but for Bailin's revocation of access to Plaintiff's operational systems, Plaintiff would have maintained the ability to communicate with and service its clients during the disputed transition.

Most importantly, if Bailin is permitted to complete the October 23, 2026 client transition, the threatened harm will become substantially more difficult to remedy. Plaintiff stands to lose advisory relationships, recurring revenue, and goodwill developed through its investment advisory operations.

The precise amount of those damages may ultimately require an accounting and discovery, particularly because Bailin has allegedly retained control over material financial and operational records. However, the present inability to quantify every dollar of loss does not negate the substantial evidence of existing injury and imminent additional harm.

Indeed, the equitable remedies available for breaches of fiduciary duty are particularly important where, as here, the fiduciary allegedly derives personal economic benefits through the unauthorized use of the company's business opportunities and relationships.

N.J.S.A. 42:2C-39(b)(1) expressly requires a fiduciary to account to the company and hold as trustee benefits derived from the conduct of the company's business or appropriation of its opportunities. Thus, the applicable statute itself recognizes that the appropriate relief may extend beyond traditional compensatory damages to an accounting and recovery of benefits wrongfully obtained by the fiduciary.

In sum, Plaintiff has established a substantial, and certainly reasonable, probability of success on each element of its breach of fiduciary duty claim.

Bailin owed Plaintiff well-established fiduciary obligations by virtue of his position as Managing Partner and Chief Compliance Officer. He breached those obligations by establishing a competing enterprise, diverting Plaintiff's advisory relationships and business opportunities, concealing material financial information, and interfering with Plaintiff's ability to operate its business.

As a direct and proximate result of this misconduct, Plaintiff has suffered harm and faces the imminent loss of additional client relationships, revenue, goodwill, and potentially its entire business.

Under these circumstances, Plaintiff should not be required to stand idly by while the very fiduciary entrusted with protecting its business completes the alleged diversion of its most valuable commercial relationships.

**ii. DEFENDANTS USURPED PLAINTIFF’S CORPORATE OPPORTUNITIES**

Separate and apart from Plaintiff's claims for breach of fiduciary duty, Plaintiff has a substantial, and certainly reasonable, probability of success on its independently pleaded cause of action for usurpation of corporate opportunity. Although closely related to the fiduciary duty of loyalty, the corporate opportunity doctrine addresses a distinct form of misconduct: the

appropriation by a fiduciary of a business opportunity that properly belongs to the enterprise he is entrusted to serve.

The distinction is particularly important here. As established extensively above, Defendant David L. Bailin ("Bailin") engaged in a broader course of conduct that Plaintiff contends violated his fiduciary obligations, including the concealment of material financial information, the establishment of a competing enterprise, and interference with Plaintiff's operational capabilities. However, Plaintiff's claim for usurpation of corporate opportunity is more specific. It concerns **what Bailin appropriated from Plaintiff, why those business opportunities properly belonged to Plaintiff, and how Bailin positioned his competing enterprise to receive the economic benefits that otherwise would have accrued to Plaintiff.**

Simply stated, Plaintiff's claim is not merely that Bailin acted disloyally. It is that Bailin took the very business Plaintiff was established to operate and directed its economic value to a competing enterprise for his own personal benefit. Specifically, Bailin allegedly appropriated Plaintiff's existing advisory agreements, client relationships, associated assets under management, recurring advisory fee revenue, institutional relationships, and business opportunities, and redirected those benefits to Personal Wealth Strategies, LLC ("PWS"), an enterprise he established and controlled while continuing to serve as Plaintiff's Managing Partner and Chief Compliance Officer.

Thus, although the same underlying conduct supports both causes of action, the present claim addresses the separate and additional injury resulting from the appropriation of identifiable company opportunities and the diversion of their economic benefits. As demonstrated below, that conduct independently supports Plaintiff's reasonable probability of success and warrants the equitable protection of the business opportunities at issue.

New Jersey has long recognized the corporate opportunity doctrine as an established application of the fiduciary duty of loyalty. In *Valle v. North Jersey Automobile Club*, 141 N.J. Super. 568, 573–74 (App. Div. 1976), aff'd as modified, 74 N.J. 109 (1977), the Appellate Division explained that the corporate opportunity doctrine arises from the fundamental principle that a fiduciary's loyalty to the enterprise cannot be divided between the interests of the company and the fiduciary's personal economic interests.

In determining whether a fiduciary has wrongfully appropriated a corporate opportunity, courts consider whether: (1) the company was financially capable of pursuing the opportunity; (2) the opportunity fell within the company's line of business and would provide it with a practical advantage; (3) the company had an existing interest or reasonable expectancy in the opportunity; and (4) the fiduciary's personal pursuit of the opportunity placed his interests in conflict with those of the company. *Id.* at 573–74.

Indeed, the facts of *Valle* are particularly instructive. There, directors of an automobile club acquired and operated an insurance agency for their own personal benefit, notwithstanding the relationship between the insurance business and the club's existing operations. The directors utilized the club's institutional relationships, business opportunities, and resources while directing the economic benefits of the insurance agency to an entity they personally owned.

The Appellate Division affirmed the determination that the directors had breached their fiduciary obligations by diverting a corporate opportunity for their own benefit. Particularly relevant here, the Court recognized the continuing nature of the misconduct where the diverted opportunity continued generating economic benefits for the fiduciaries rather than the enterprise to which those benefits properly belonged.

Similarly, the New Jersey Legislature expressly incorporated the prohibition against usurpation of company opportunities into the fiduciary obligations imposed upon managers of limited liability companies. N.J.S.A. 42:2C-39(b)(1) requires a fiduciary to account to the company and hold as trustee any property, profit, or benefit derived from the appropriation of a company opportunity.

The Supreme Court of New Jersey further addressed the corporate opportunity doctrine and its equitable remedies in *Packard-Bamberger & Co. v. Collier*, 167 N.J. 427 (2001). There, individuals occupying fiduciary positions in a business enterprise acquired for their personal benefit an ownership interest in property that presented an opportunity to the company. Rather than disclose the opportunity and permit the company to determine whether to pursue it, the defendants acquired the interest for themselves.

The trial court determined that the defendants had usurped a corporate opportunity and required the wrongfully acquired interest to be transferred to the company without cost. Significantly, equitable relief was awarded notwithstanding the trial court's determination that the plaintiffs had failed to establish compensable monetary damages. *Id.*

The significance of *Packard-Bamberger* is that a fiduciary cannot appropriate an opportunity properly belonging to the enterprise and then retain the benefits of that misconduct simply because the resulting monetary damages are difficult to quantify. Rather, the equitable principles underlying the corporate opportunity doctrine protect the enterprise's interest in the opportunity itself, including the benefits wrongfully obtained through its appropriation.

These principles apply directly to the circumstances presented here, and each of the considerations identified in *Valle* overwhelmingly favors Plaintiff.

**First**, the opportunities allegedly appropriated by Bailin fell squarely within Plaintiff's established line of business. Integrous Wealth Strategies, LLC ("IWS" or "Plaintiff") was formed and operated as an SEC-registered investment adviser, and its business consisted of maintaining advisory relationships, servicing client accounts, managing assets under management, and generating advisory fee revenue. The client relationships and associated business opportunities diverted to PWS were therefore not speculative opportunities unrelated to Plaintiff's operations. Rather, they were central to the very business Plaintiff was established to conduct. See Verified Complaint, ¶¶ 21–29, 38–39.

Indeed, the alleged appropriation was particularly egregious because Bailin was not pursuing an entirely separate investment opportunity that Plaintiff had merely declined to undertake. He was directing existing advisory relationships away from Plaintiff's operating business and into his own competing enterprise.

**Second**, Plaintiff had an existing economic interest and reasonable expectancy in those opportunities. Plaintiff was not merely a prospective investment advisory firm contemplating whether to enter the market. It had already obtained SEC registration, established institutional relationships with Purshe Kaplan Sterling Investments and Focus Partners Advisor Services, engaged personnel to service its advisory relationships, and received $130,000 in funding from Callagy Enterprises, LLC to support its operations. See Verified Complaint, ¶¶ 27–29, 38–39; Exhibit C (June 30, 2026 Wire Confirmation and Bailin's Acknowledgment).

More importantly, the advisory relationships at issue were already being maintained and serviced through Plaintiff's business. Thus, this is not a circumstance in which Plaintiff must establish that it possessed the financial capability to pursue an entirely new or speculative business

opportunity. Plaintiff was already conducting the very business from which Bailin allegedly diverted those relationships and their corresponding economic benefits.

Moreover, Plaintiff had established a contractual arrangement with Focus Partners Advisor Services under which certain investment management fees were billed directly to IWS, with pricing benefits tied to the company's aggregate assets under management. See Verified Complaint, ¶¶ 38–39. These institutional arrangements further demonstrate that Plaintiff possessed more than a generalized interest in the advisory relationships at issue. Plaintiff had existing contractual arrangements, financial obligations, and a reasonable expectation of continuing to generate economic benefits from those relationships.

**Third**, Bailin's personal economic interests were directly adverse to Plaintiff's interests, and PWS stood to benefit from the very opportunities being diverted away from IWS.

Every advisory relationship transferred from IWS to PWS represented a relationship that Plaintiff stood to lose and that Bailin's competing enterprise stood to acquire. Similarly, the transfer of associated advisory fees and future business opportunities would economically benefit PWS while depriving Plaintiff of revenue it otherwise could reasonably expect to generate.

Indeed, Bailin expressly acknowledged in his September 23, 2026 communication that he had already "assigned our client base out of Integrous Wealth Strategies and into a new RIA." See Verified Complaint, ¶ 72; Exhibit B (September 23, 2026 Email from Bailin).

This communication is particularly significant because it demonstrates that Bailin was not simply considering whether to pursue a future business opportunity independently. Rather, he had already undertaken steps to redirect existing advisory relationships away from the enterprise he was entrusted to manage.

Nor was the anticipated economic benefit to PWS incidental. By acquiring advisory relationships previously maintained through IWS, PWS stood to receive the ongoing advisory fees, business opportunities, and economic advantages associated with those relationships. Conversely, IWS stood to lose the corresponding revenue-producing relationships and goodwill developed through its operations.

Thus, Bailin's conduct placed his personal economic interests in direct conflict with the interests of Plaintiff. The business opportunity was not merely similar to Plaintiff's business. It was the business Plaintiff was already conducting.

**Fourth**, Bailin undertook this conduct without obtaining authorization from Plaintiff or its other members. As established above, the parties' limited understanding concerning Bailin's preexisting client book (the “Legacy Book”) contemplated certain rights upon a lawful retirement, subject to an agreed valuation process. It did not authorize Bailin to unilaterally transfer Plaintiff's advisory relationships to a competing enterprise while continuing to serve as its Managing Partner and Chief Compliance Officer. See Verified Complaint, ¶¶ 25–26, 98–103.

Indeed, Bailin's anticipated reliance upon his purported ownership of the Legacy Book does not defeat Plaintiff's claim for usurpation of corporate opportunity.

Even assuming Bailin retained certain contractual rights concerning his preexisting client relationships, those rights must be distinguished from the separate advisory agreements, institutional relationships, economic benefits, and business opportunities developed or maintained through IWS's operations.

The parties' understanding concerning the Legacy Book did not confer upon Bailin an unrestricted right to utilize Plaintiff's capital, operational infrastructure, vendor relationships, and

institutional resources to establish a competing enterprise and unilaterally divert the business being conducted through IWS.

Nor could the Legacy Book arrangement reasonably encompass advisory relationships developed after IWS commenced operations, or new business opportunities created through Plaintiff's institutional relationships and investment advisory platform.

The distinction is critical. Plaintiff does not contend that every client who previously maintained a relationship with Bailin necessarily became his permanent captive or that any such client could be prohibited from independently selecting another investment adviser. Rather, Plaintiff contends that Bailin, while owing fiduciary obligations to IWS, could not unilaterally appropriate the company's contractual relationships, business opportunities, and associated economic benefits for his own competing enterprise in violation of those obligations.

Simply stated, the existence of a potentially legitimate contractual right concerning Bailin's Legacy Book is not a blanket authorization to appropriate Plaintiff's business opportunities. Whatever rights Bailin may ultimately establish concerning those preexisting relationships, those rights do not automatically absolve him of the duties he owed while managing IWS.

Thus, each of the considerations identified in *Valle* strongly favors Plaintiff's claim. The opportunities were within Plaintiff's established line of business, Plaintiff possessed an existing interest and reasonable expectancy in their continued economic benefits, and Bailin allegedly appropriated those opportunities while occupying a fiduciary position that prohibited him from subordinating Plaintiff's interests to his own.

Moreover, the equitable principles recognized in *Packard-Bamberger* are particularly applicable to the relief Plaintiff seeks. Plaintiff has not yet been afforded access to the financial and operational records necessary to determine the full extent of the advisory relationships,

revenues, and other economic benefits transferred to PWS. Indeed, as discussed extensively above, Bailin allegedly refused repeated requests for Plaintiff's financial records while simultaneously establishing and operating his competing enterprise.

The resulting uncertainty concerning the precise amount of revenue diverted or the full economic benefit realized by Defendants should not operate to their advantage. As *Packard-Bamberger* illustrates, equitable relief may be appropriate where a fiduciary has wrongfully appropriated a corporate opportunity, notwithstanding difficulties in establishing the resulting monetary damages.

Accordingly, the relief requested here, including preservation of the disputed advisory relationships and business opportunities, an accounting of the economic benefits derived from their alleged diversion, and appropriate protection of identifiable proceeds pending final adjudication, is consistent with the equitable principles underlying the corporate opportunity doctrine.

Furthermore, upon information and belief, Bailin's efforts to divert Plaintiff's business to PWS extend to certain members of IWS's workforce who possess the institutional knowledge and experience necessary to service the very advisory relationships being transferred. Although Plaintiff does not contend that its employees constitute corporate property or that they may be prohibited from pursuing lawful employment opportunities, the alleged effort to transition Plaintiff's personnel alongside its advisory relationships further supports Plaintiff's contention that Bailin sought to appropriate the economic opportunities and operational advantages developed through IWS for the benefit of his competing enterprise.

In sum, Plaintiff has demonstrated a substantial, and certainly reasonable, probability of success on its claim for usurpation of corporate opportunity. The advisory relationships and associated economic opportunities at issue were being maintained and serviced through Plaintiff's

business, supported by Plaintiff's capital and institutional infrastructure, and capable of generating continuing economic benefits for IWS. Bailin, while entrusted with managing and protecting those interests, instead directed their transfer to his competing enterprise without obtaining the authorization of Plaintiff or its other members.

As established above, whatever rights Bailin may have retained concerning his preexisting Legacy Book did not confer an unrestricted right to appropriate Plaintiff's business opportunities or exploit his fiduciary position for personal economic gain. To permit Bailin to complete these transfers before the Court can determine the parties' respective rights would risk allowing him to accomplish the very usurpation this litigation seeks to prevent.

For these reasons, Plaintiff has more than satisfied the reasonable probability of success requirement under *Crowe v. De Gioia*, 90 N.J. 126 (1982), independently supporting the requested temporary restraints and preliminary injunctive relief.

## C. <u>THE BALANCING OF HARDSHIPS FAVORS PLAINTIFF</u>

The balancing of equities overwhelmingly favors Plaintiff's application for equitable relief. As discussed above, Plaintiff is essentially seeking to maintain the status quo. All Plaintiff seeks is to preserve its existing client relationships, advisory agreements, assets under management, and operational infrastructure while this Court determines the respective rights and obligations of the parties. Plaintiff is not asking this Court to permanently deprive Defendant David Bailin ("Bailin") of his right to operate an investment advisory business, nor is Plaintiff seeking to prevent any client from independently choosing whom they wish to retain as their financial adviser. Rather, Plaintiff simply seeks to prevent Bailin from unilaterally transferring Plaintiff's business to his competing enterprise through a process that Plaintiff never authorized and that Plaintiff contends violates Bailin's fiduciary obligations.

If this relief is denied, however, the consequences to Plaintiff could be catastrophic. The October 23, 2026 deadline established by Bailin threatens to transfer Plaintiff's advisory relationships, client accounts, and associated revenue to Personal Wealth Strategies, LLC ("PWS"), thereby depriving Plaintiff of the very foundation upon which its business operates. Compounding this harm, Bailin has already deprived Plaintiff of access to critical financial records and operational systems, while terminating Justin Rice, the investment adviser representative responsible for servicing those clients. Thus, without judicial intervention, Plaintiff faces not only the loss of its existing business relationships and future revenue, but also the potential destruction of its goodwill, operational capabilities, and going-concern value.

On the other side of the equation, Defendants would suffer comparatively little prejudice if the requested temporary restraints are granted. Bailin would not be permanently prohibited from operating PWS, nor would he be foreclosed from asserting whatever legitimate rights he may have concerning his preexisting client relationships under the parties' oral agreements. He would merely be required to refrain from completing further unauthorized transfers of Plaintiff's advisory relationships, preserve relevant company records, and permit appropriate operational access while this Court determines the merits of the dispute. Indeed, Defendants cannot reasonably claim that they will suffer an inequitable hardship simply because they are temporarily prevented from engaging in conduct that Plaintiff alleges constitutes a breach of their fiduciary obligations.

Moreover, granting the requested relief would protect the interests of third parties, including IWS's clients, by preserving continuity of advisory services and preventing unnecessary disruption to their accounts while the parties' rights are adjudicated. Conversely, denying relief would risk allowing the transfer of those advisory relationships to proceed without Plaintiff having a meaningful opportunity to protect its business or ensure an orderly, authorized transition.

Simply stated, the relative hardships are not comparable. Plaintiff faces the potential destruction of its business, while Defendants face only a temporary restriction on their ability to complete a disputed transfer pending judicial review. The equities therefore weigh decisively in favor of preserving the status quo and granting the requested injunctive relief.

This prong clearly favors Plaintiff.

**D. <u>PLAINTIFF WILL SUFFER IMMEDIATE AND IRREPARABLE INJURY</u>**

The final requirement for emergent injunctive relief under *Crowe v. De Gioia*, 90 N.J. 126 (1982), is whether Plaintiff will suffer immediate and irreparable injury in the absence of judicial intervention. This requirement is overwhelmingly satisfied here. Indeed, the threatened injury is not merely the loss of a particular contract, the diversion of a discrete amount of revenue, or an ordinary commercial dispute capable of resolution through a subsequent monetary judgment. Rather, Plaintiff faces the imminent destruction of its investment advisory business, including the loss of its existing client relationships, recurring revenue, institutional goodwill, and ability to operate as a going concern.

Most importantly, the threatened injury is tied to a specific and imminent deadline: October 23, 2026. Defendant David L. Bailin ("Bailin") has expressly advised Plaintiff's clients that their advisory relationships will automatically transition from Integrous Wealth Strategies, LLC ("IWS" or "Plaintiff") to his competing enterprise, Personal Wealth Strategies, LLC ("PWS"), on that date unless they affirmatively object. Thus, absent immediate judicial intervention, the very business relationships that form the subject matter of this litigation may be transferred before this Court has a meaningful opportunity to determine whether Bailin possessed the authority to initiate that transition.

Under New Jersey law, an injury is irreparable where monetary damages cannot adequately

compensate the injured party. *Crowe*, 90 N.J. at 133. Moreover, the Supreme Court of New Jersey has long recognized that the threatened destruction of an operating business, including its customers, goodwill, and profits, constitutes the type of irreparable injury warranting preliminary injunctive relief. *Ferraiuolo v. Manno*, 1 N.J. 105, 108 (1948).

In *Ferraiuolo*, the defendant landlord interfered with the plaintiffs' ability to operate their vegetable market, including obstructing their use of the business premises. The Supreme Court affirmed preliminary injunctive relief, recognizing that the threatened destruction of the plaintiffs' business constituted irreparable injury not adequately compensable through monetary damages. As the Court explained:

"Acts destroying a complainant's business, custom and profits do an irreparable injury and authorize the issue of a preliminary injunction."

*Id.* at 108.

The reasoning of *Ferraiuolo* is particularly instructive here. Much like the landlord in that case, who interfered with the plaintiffs' ability to operate their established business, Bailin has allegedly interfered with IWS's access to the clients, records, systems, and infrastructure necessary to conduct its investment advisory operations. However, the circumstances here present an additional and troubling dimension: Bailin is not merely an outside party interfering with Plaintiff's business. He is the very fiduciary entrusted with managing and protecting that business, who allegedly used his position to divert its advisory relationships to his own competing enterprise.

Moreover, the Supreme Court of New Jersey has recognized that equity need not wait until the threatened injury has occurred before intervening. *Board of Education of the Borough of Union Beach v. New Jersey Education Association*, 53 N.J. 29, 44 (1968). Thus, Plaintiff need not await the completion of the disputed transfer, and the resulting harm to its business, before seeking this

Court's protection.

Here, the threatened injury is concrete, imminent, and supported by Bailin's own written communications.

On September 23, 2026, Bailin expressly announced that he had already "assigned our client base out of Integrous Wealth Strategies and into a new RIA." See Verified Complaint, ¶ 72; Exhibit B (September 23, 2026 Email from Bailin).

In furtherance of that announced assignment, Bailin transmitted notices to IWS's clients establishing October 23, 2026 as the effective date of their proposed transition to PWS. Specifically, the notices advised:

"Your Agreement will be assigned from Integrous Wealth Strategies to Personal Wealth Strategies effective October 23, 2026... On October 23, 2026, your account will automatically move to Personal Wealth Strategies. There is no action required on your part unless you do not want to have your account assigned."

See Verified Complaint, ¶¶ 76–78; Exhibit F (Client Notice Concerning October 23, 2026 Assignment).

The significance of this deadline cannot be overstated. October 23, 2026 is not a speculative date on which Bailin might someday elect to compete with Plaintiff. It is the specific effective date he communicated directly to Plaintiff's clients for the transition of their advisory relationships to his competing enterprise. Although Bailin's September 23 email described the client base as already assigned, the subsequent client notices identify October 23 as the contemplated effective date. Regardless of whether particular steps in that process have already occurred, Bailin has initiated an affirmative process intended to transition advisory relationships from IWS to PWS.

The resulting harm threatens the very foundation of Plaintiff's business.

IWS is an SEC-registered investment adviser whose operations depend upon its ability to maintain advisory relationships, manage client accounts, provide continuing investment advisory services, and generate recurring fees from those relationships. Unlike a business that might suffer the temporary loss of inventory or a discrete commercial contract, an investment advisory firm's essential value is substantially derived from its existing client relationships, recurring advisory fee revenue, institutional relationships, and goodwill.

These relationships are not peripheral to Plaintiff's operations. They are the foundation upon which its business exists.

If Bailin is permitted to complete the disputed transition, Plaintiff faces the prospect of losing the relationships necessary to sustain its operations. The resulting harm would extend beyond the loss of particular advisory fees and threaten Plaintiff's ability to maintain an economically viable enterprise, support its institutional relationships, retain personnel, and continue servicing clients.

Indeed, as established above, Plaintiff invested substantial resources in creating and developing IWS. The company obtained SEC registration, established relationships with Purshe Kaplan Sterling Investments and Focus Partners Advisor Services, developed the infrastructure necessary to conduct its advisory operations, and received a $130,000 advance from Callagy Enterprises, LLC to support the enterprise. See Verified Complaint, ¶¶ 21–29, 38–39.

Those investments were made to establish an operating investment advisory business, not an empty corporate entity devoid of revenue-producing relationships. Permitting Bailin to redirect the disputed advisory relationships to PWS threatens to strip IWS of the economic foundation upon which those investments were made. A subsequent judgment awarding damages for diverted fees

may not be capable of restoring Plaintiff's viability as an ongoing business.

This is precisely the type of threatened destruction that *Ferraiuolo* recognizes as irreparable injury warranting equitable intervention.

Moreover, the loss of Plaintiff's client relationships, goodwill, and business reputation cannot be adequately measured or remedied through monetary damages alone.

Investment advisory relationships are inherently dependent upon trust, continuing communication, familiarity with clients' financial objectives, and confidence in the adviser entrusted with managing their assets. Once those relationships have transitioned to another advisory firm, reconstructing them presents difficulties beyond calculating the amount of fees that might otherwise have been earned.

A client who transitions to another adviser may establish new relationships, execute new advisory agreements, and make subsequent investment decisions based upon the new relationship. Even if Plaintiff ultimately prevails in this litigation, there can be no assurance that those clients will elect to return to IWS or that their former relationships can be restored.

Importantly, Plaintiff does not suggest that clients may be compelled to retain IWS or prevented from independently selecting their investment adviser. Rather, the injury arises from Bailin's alleged use of his fiduciary position to facilitate an unauthorized transfer of Plaintiff's existing advisory relationships before the parties' legal rights have been determined. Plaintiff seeks to prevent the allegedly unauthorized diversion of its business, not to restrict the independent choices of its clients.

Furthermore, any subsequent effort to calculate Plaintiff's monetary damages would involve numerous uncertain considerations, including the future advisory fees associated with each transferred relationship, the duration for which those relationships otherwise would have remained

with IWS, changes in assets under management, market performance, the economic effect of lost pricing advantages under Plaintiff's institutional arrangements, and the diminution of Plaintiff's goodwill and going-concern value.

While certain diverted revenues may ultimately be ascertainable through an accounting, the broader loss of an operating enterprise, its client relationships, and its goodwill presents an injury of a different character.

The irreparable nature of Plaintiff's threatened injury is further compounded by Bailin's alleged interference with its operational capabilities.

As established extensively above, on September 23, 2026, the same day Bailin announced the assignment of IWS's advisory relationships to PWS, he allegedly revoked investment adviser representative Justin Rice's access to virtually every operational system necessary to service Plaintiff's clients. See Verified Complaint, ¶¶ 80–85.

These systems included Redtail CRM, Schwab, Envestnet, Focus Partners Advisor Services, Holistiplan, MoneyGuide, and Plaintiff's email infrastructure.

The loss of access to these systems had significant consequences for Plaintiff's ability to conduct its ordinary business. Without access to its customer relationship management platform, Plaintiff's representative was unable to meaningfully review client information, contact histories, account notes, and other information necessary to maintain advisory relationships. Without access to relevant custodial and investment management platforms, the ability to review, monitor, and service client accounts was substantially impaired. And without access to Plaintiff's ordinary email infrastructure, communication with clients, custodians, vendors, and other business partners became more difficult.

Thus, while Bailin was initiating the disputed transfer of Plaintiff's advisory relationships,

he was simultaneously restricting Plaintiff's ability to communicate with and service those same relationships.

The timing of these actions is particularly compelling. The September 23 announcement coincided with the alleged removal of operational access necessary for IWS to respond to the announced client transition. Subsequently, on October 6, 2026, Bailin allegedly presented Rice with an ultimatum concerning new restrictive covenants and outside business activities. The Verified Complaint further alleges that Rice's employment ended on or about October 14, 2026. See Verified Complaint, ¶¶ 91–95.

The combined effect of these actions has placed IWS in an untenable position. The company faces an imminent transition of its advisory relationships to a competing enterprise while allegedly lacking meaningful access to the operational systems, financial records, and personnel resources necessary to protect and maintain those relationships.

The threatened injury is further compounded by Plaintiff's concern that Bailin is attempting to transition certain members of IWS's workforce to PWS. These personnel possess institutional knowledge, client relationships, and specialized experience necessary to maintain Plaintiff's advisory operations. The potential loss of these employees, together with the threatened diversion of client relationships and Plaintiff's existing operational impairments, would further jeopardize IWS's ability to function as a going concern. Unlike discrete financial losses, the simultaneous disruption of a company's clients, personnel, and operational infrastructure cannot necessarily be remedied through a subsequent monetary award.

This presents a compelling basis for emergency relief. The threatened harm is not merely that Plaintiff may lose clients. It is that Plaintiff may lose those clients while being substantially deprived of the ordinary means necessary to communicate with them, continue servicing their

accounts, evaluate the proposed transition, and protect its business. Once the disputed transition has occurred, restoring Plaintiff's systems or providing an accounting months later may do little to recreate relationships that have already been disrupted or transferred.

Moreover, the harm to Plaintiff is compounded by significant regulatory and compliance concerns arising from the proposed assignment of its advisory relationships.

As an SEC-registered investment adviser, IWS operates in a highly regulated industry in which the proper maintenance of books and records, safeguarding of confidential client information, continuity of advisory services, and compliance with applicable advisory agreements are fundamental responsibilities.

Section 205 of the Investment Advisers Act of 1940, 15 U.S.C. § 80b-15, prohibits the assignment of an investment advisory contract without the client's consent. Whether the negative-consent procedure initiated by Bailin satisfies the applicable contractual and regulatory requirements depends upon the governing advisory agreements, the disclosures provided to clients, and the circumstances of the proposed assignment.

However, regardless of whether the proposed assignment process independently constitutes a violation of federal securities law, Plaintiff faces substantial compliance concerns arising from Bailin's alleged unilateral actions and Plaintiff's corresponding inability to access the records and systems necessary to evaluate and address them.

Indeed, Plaintiff alleges that Bailin initiated the disputed client transition without authorization from IWS's other members while simultaneously restricting its access to operational and financial records. These circumstances create uncertainty concerning Plaintiff's ability to fulfill its ongoing obligations, maintain appropriate records, safeguard client information, and ensure continuity of advisory services.

These concerns are particularly significant because Bailin served as Plaintiff's Chief Compliance Officer, the individual responsible for overseeing its regulatory compliance obligations. By allegedly initiating a disputed client transition while restricting Plaintiff's operational oversight, Bailin placed Plaintiff at risk of regulatory and reputational harm that may be difficult to remedy through a subsequent damages award.

The requested temporary restraints would help preserve Plaintiff's ability to evaluate the proposed transition, maintain appropriate compliance oversight, protect confidential client information, and ensure the orderly continuation of advisory services while the Court considers the parties' respective rights.

Finally, the impending October 23, 2026 deadline demonstrates why immediate judicial intervention is necessary.

Plaintiff does not seek to permanently prevent Bailin from operating his own advisory firm, determine the ownership of every disputed advisory relationship, or restrict any client's independent right to select an investment adviser. Rather, Plaintiff seeks temporary protection against the allegedly unauthorized transition of its advisory relationships, preservation of relevant records and identifiable proceeds, appropriate access to its operational infrastructure, and expedited consideration of the parties' respective rights.

These measures are intended to prevent the subject matter of this litigation from being materially altered before the Court can determine whether Bailin was legally authorized to undertake the challenged conduct.

Although monetary damages may ultimately compensate Plaintiff for certain identifiable financial losses, no subsequent award can adequately restore the client relationships, institutional goodwill, and operational infrastructure upon which IWS's business depends. Once those

relationships have been diverted and the company's ability to operate has been dismantled, the resulting destruction of its going-concern value cannot simply be reversed through the payment of money.

As the Supreme Court recognized in *Ferraiuolo*, the threatened destruction of a business, its customers, goodwill, and profits presents a classic basis for equitable intervention. Likewise, *Union Beach* recognizes that courts need not wait until threatened injury has actually occurred where monetary damages would be inadequate.

**Without immediate intervention, the Court risks being presented not with an operating investment advisory business whose rights remain to be determined, but with an enterprise whose core relationships and economic value have already been diverted.** That is precisely the result preliminary injunctive relief is designed to prevent.

Accordingly, Plaintiff has more than satisfied the irreparable-harm requirement under *Crowe*, and this factor strongly favors the entry of Plaintiff's requested Order to Show Cause with Temporary Restraints.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court enter the proposed Order to Show Cause with Temporary Restraints.

**Respectfully submitted,**

**CALLAGY LAW, P.C.**

**By: /s/ Michael J. Smikun**
**Michael J. Smikun, Esq. (Bar No. 02056-2018)**
**650 From Road, Suite 565**
**Mack-Cali Centre II**
**Paramus, New Jersey 07652**
**Phone: 201-261-1700**
**Attorneys for Plaintiff**

**Dated: October 22, 2026**

**From:** **David Bailin** david.bailin@infinancial.com
**Subject:** RE: Wire Processed
**Date:** July 8, 2026 at 4:15 PM
**To:** Michael Vesuvio michael@michaelvesuvio.com, bfinn908@gmail.com, Jazz Vesuvio thelexusgirl@yahoo.com, Tyler Callagy tcallagy@callagylaw.com
**Cc:** Nancy Bailin estie0849@gmail.com

---

COO was a typo. That should have read CCO or Chief Compliance officer.

**Schedule Your Next Appointment Here**

***David L. Bailin, AIF®, ChFC®, CLU®, CLTC®***

*Your Dreams are Our Goals*

*Financial Advisor**
*Integrous Wealth Strategies*
*2277 Route 33, Suite 415*
*Hamilton, NJ 08690*
*Phone: (609) 586-9308*
*Fax: (609) 586-9316*
*CA License #0F69908*
*david.bailin@infinancial.com*
*www.personalwealthstrategies.com*

*Please do not send trade instructions to this email account. Orders received on this email cannot be honored or executed.*

Securities Offered through Pursh Kaplan Sterling Investments, Member FINRA/SIPC. Headquartered at 80 State Street, Albany, NY 12207. Purshe Kaplan Sterling Investments and Integrous Wealth Strategies are not affiliated companies.
Services offered through Integrous Wealth Strategies, a Registered Investment Adviser. SEC registration does not constitute an endorsement by the SEC nor does it indicate a particular level of skill or ability. This message and any attachments contain information which may be confidential and/or privileged and is intended for use only by the addressee(s) named on this transmission. If you are not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are notified that any review, copying, distribution or use of this transmission is strictly prohibited. If you have received this transmission in error, please (i) notify the sender immediately by e-mail or by telephone and (ii) destroy all copies of this message.
Qualifying membership in the Million Dollar Roundtable (MDRT) is based on minimum sales production requirements and gross business generated within a year. MDRT members must also adhere to strict ethical standards.

---

**From:** Michael Vesuvio <michael@michaelvesuvio.com>
**Sent:** Wednesday, July 8, 2026 2:18 PM
**To:** bfinn908@gmail.com; Jazz Vesuvio <thelexusgirl@yahoo.com>; Tyler Callagy <tcallagy@callagylaw.com>
**Cc:** David Bailin <david.bailin@infinancial.com>; Nancy Bailin <estie0849@gmail.com>
**Subject:** Fwd: Wire Processed

Tyler,
Can you address the schedule A,B,C, D
Brian, can you get the contact info from the TPA to dialogue and better understand?
Also, was not aware that we have a COO?
Thank You,
Jazz V
Sent from my IPad

Begin forwarded message:

**From:** David Bailin <david.bailin@infinancial.com>
**Date:** July 5, 2026 at 12:08:00 PM EDT
**To:** Michael Vesuvio <michael@michaelvesuvio.com>, Pace David <vesuvioservicesdp@yahoo.com>
**Cc:** Nancy Bailin <nancy.bailin@infinancial.com>, Vesuvio Jazz <thelexusgirl@yahoo.com>, Callagy Tyler <tcallagy@callagylaw.com>
**Subject: Re: Wire Processed**

Mike,

I will try to get you this information later this week. Tomorrow, I must focus on calculating the billing for about 500 accounts. Next, I need to finish cleaning up the accounting for June so I can report the financials to the Members.

Hopefully, by then Jazz will be able to respond with the ownership information for herself and you and get a response from Sean so we can finally finish the transition of the 401K. That info is critically important to avoid any other business entities losing qualification of their medical or retirement plans.

This week Nancy and I hope to get together with our attorney to discuss the reworked Operating Agreement. You may be aware that Tyler keeps sending an incomplete document, withholding Schedules A, B, C and D. I know our attorney has requested this information previously and I fail to understand why Tyler and his team are looking for us to review a partial document.

I can probably address the question of what additional charges a new Advisor would present to the firm once June's accounting is complete. In terms of future revenues and expenses, there are still many non-IA accounts that need to be transitioned. We also have a meeting with our COO and then with PKS to discuss the best way to use non-RIA revenue to cover expenses and ultimately to distribute profits to Members.

Sent via the Samsung Galaxy S21 5G, an AT&T 5G smartphone

Get Outlook for Android

---

**From:** Michael Vesuvio <michael@michaelvesuvio.com>
**Sent:** Friday, 03 July 2026 11:01:19
**To:** David Bailin <david.bailin@infinancial.com>; Pace David <vesuvioservicesdp@yahoo.com>
**Cc:** Nancy Bailin <nancy.bailin@infinancial.com>; Vesuvio Jazz <thelexusgirl@yahoo.com>; Callagy Tyler <tcallagy@callagylaw.com>
**Subject:** Re: Wire Processed

Hello David and Nancy,
Can we please get a well thought out document that reviews all expected revenue sources like RIA, Broker Dealer and traditional fixed insurance products, expected revenue streams by source including dates, account to be deposited and how that information will be shared directly etc. Let's create a grid with a proforma with a low, mid and high estimate. This will help us better understand and anticipate revenue that is critical to achieve expense levels needed as well as critical levels of net profit or capital for further growth.
On the expense side if you can also create the breakout grid of fixed expenses as well as variable expenses for Q3 & Q4. Please provide and include full detail on payroll breakout. What are the CURRENT guiding principals on what is the dividing line between what the advisors should pay vs the Firm? This is incredible important as we bring on advisors and create our grid.
Thank You,
Jazz Vesuvio
Sent from my IPad

On Jun 30, 2026, at 1:05 PM, David Bailin <david.bailin@infinancial.com> wrote:

Yes, we have received the wire. Thank you very much.
**Schedule Your Next Appointment Here**
***David L. Bailin, AIF®, ChFC®, CLU®, CLTC®***
*Your Dreams are Our Goals*
<image001.png>
<image002.png>
*Financial Advisor**
*Integrous Wealth Strategies*
*2277 Route 33, Suite 415*
*Hamilton, NJ 08690*
*Phone: (609) 586-9308*
*Fax: (609) 586-9316*
*CA License #0F69908*
*david.bailin@infinancial.com*
*www.personalwealthstrategies.com*

*Please do not send trade instructions to this email account. Orders received on this email cannot be honored or executed.*

Securities Offered through Pursh Kaplan Sterling Investments, Member FINRA/SIPC. Headquartered at 80 State Street, Albany, NY 12207. Purshe Kaplan Sterling Investments and Integrous Wealth Strategies are not affiliated companies.
Services offered through Integrous Wealth Strategies, a Registered Investment Adviser. SEC registration does not constitute an endorsement by the SEC nor does it indicate a particular level of skill or ability. This message and any attachments contain information which may be confidential and/or privileged and is intended for use only by the addressee(s) named on this transmission. If you are not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are notified that any review, copying, distribution or use of this transmission is strictly prohibited. If you have received this transmission in error, please (i) notify the sender immediately by e-mail or by telephone and (ii) destroy all copies of this message.
Qualifying membership in the Million Dollar Roundtable (MDRT) is based on minimum sales production requirements and gross business generated within a year. MDRT members must also adhere to strict ethical standards.

---

**From:** David Pace <vesuvioservicesdp@yahoo.com>
**Sent:** Tuesday, June 30, 2026 9:54 AM
**To:** David Bailin <david.bailin@infinancial.com>; Michael Vesuvio <michael@michaelvesuvio.com>; Nancy Bailin <nancy.bailin@infinancial.com>
**Subject:** Wire Processed

Hello David,

I just confirmed wire with Unity bank, you should have funds this morning.

Please confirm receipt.

Thanks
Dave Pace

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

**From:** David Bailin <david.bailin@infinancial.com>
**Date:** September 23, 2026 at 5:15:24 PM EDT
**To:** Jazz Vesuvio <jazzvesuvio@infinancial.com>, Vesuvio J <thelexusgirl@yahoo.com>, scallagy@callagylaw.com
**Cc:** Michael Vesuvio <mvesuvio@infinancial.com>, Vesuvio Michael <michael@michaelvesuvio.com>, "Kowalsky, Mark" <mkowalsky@taftlaw.com>, Nancy Bailin <nancy.bailin@infinancial.com>
**Subject: Assignment of Bailin Clients**

Jazz and Sean,

I communicated to Mike and Jazz that we have assigned our client base out of Integrous Wealth Strategies and into a new RIA. While I will continue in my function as Managing Partner of Integrous Wealth Strategies, I assume it is your preference to replace me in that role. Additionally, Nancy and I would be amenable to selling our share in Integrous Wealth Strategies if we can reach an acceptable agreement.

I have asked out attorney, Mark Kowalsky, to handle this portion of the discussion. Would you prefer he contact you directly or speak to your attorney? If it is the later, would Tyler Callagy be the appropriate contact?
**Schedule Your Next Appointment Here**
***David L. Bailin, AIF®, ChFC®, CLU®, CLTC®***
*Your Dreams are Our Goals*
<image001.png>
<image002.png>

*Financial Advisor**
*Integrous Wealth Strategies*
*2277 Route 33, Suite 415*
*Hamilton, NJ 08690*
*Phone: (609) 586-9308*
*Fax: (609) 586-9316*
*CA License #0F69908*
*david.bailin@infinancial.com*
*www.personalwealthstrategies.com*

*Please do not send trade instructions to this email account. Orders received on this email cannot be honored or executed.*

Securities Offered through Pursh Kaplan Sterling Investments, Member FINRA/SIPC. Headquartered at 80 State Street, Albany, NY 12207. Purshe Kaplan Sterling Investments and

> > Integrous Wealth Strategies are not affiliated companies.
> > Services offered through Integrous Wealth Strategies, a Registered Investment Adviser. SEC registration does not constitute an endorsement by the SEC nor does it indicate a particular level of skill or ability. This message and any attachments contain information which may be confidential and/or privileged and is intended for use only by the addressee(s) named on this transmission. If you are not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are notified that any review, copying, distribution or use of this transmission is strictly prohibited. If you have received this transmission in error, please (i) notify the sender immediately by e-mail or by telephone and (ii) destroy all copies of this message.
> > Qualifying membership in the Million Dollar Roundtable (MDRT) is based on minimum sales production requirements and gross business generated within a year. MDRT members must also adhere to strict ethical standards.

# EHXIBIT C

# CONFIDENTIAL DOCUMENT

# WILL CONFER WITH COURT ON PROPER FILING

**From:** dbailin@optonline.net
**Subject:** Re: Re: Introduction
**Date:** February 17, 2026 at 8:37 PM
**To:** Michael Vesuvio michael@michaelvesuvio.com, tcallagy@callagylaw.com
**Cc:** Bailin Nancy estie0849@gmail.com

---

Tyler and Mike,

I reviewed some of the agreements I've seen in the past and put some thoughts together. I think most of this belongs in the Operating Agreement, but some will pertain to the Shareholder's Agreement. Tyler, I will look toward your expertise to craft these to our specific circumstances.

I am working under an assumption that I will have a title of Managing Partner. If that is not correct, please replace that reference to whatever title you think better fits.

In reviewing this list please realize that we would not be moving forward if we didn't all trust each other. Nonetheless, we all know the importance of reducing our thoughts in writing to protect all owners.

- As a minority shareholder with only a 20% ownership I want to be protected on issues that normally require a supermajority to decide. I don't want a situation where the other partners can amend governing documents, incur debt in our name or issue new equity without our approval. Therefore, I believe we will need to be unanimous on these decisions. Likewise, there should be an anti-dilution provision protecting the value of our ownership.

- I believe all partners should have free access to all financial statements for the RIA.

- Distributions should be mandated once a set metric has been achieved, perhaps 2x monthly expenses in our bank.

- If the RIA is eventually sold, merged or otherwise modified, we should all have tag-along rights.

- As Managing Partner I want the authority to make spending decisions below a certain threshold without seeking approval of my partners, perhaps $20,000? Additionally, unless addressed elsewhere, I want authority to make decisions affecting day-to-day operations. This should specifically include hiring/firing of non-producer employees, once the expenditure for a new hire has been approved by a supermajority.

- There should be a termination protection for 3 years either specified in the Operating Agreement or a separate Employment Agreement. None

the Operating Agreement or a separate Employment Agreement. None of us will be drawing a salary so it is important our interests in the ownership be protected. Of course, anyone of us can be removed for cause.

- Mike and I have already agreed that I will receive 62% of whatever revenue is produced off of my legacy book of business. The RIA will absorb all of our expenses other than my personal compensation. Existing expenses include Advertising & Marketing, Employee Salary and Benefits, Business Insurances, Accounting and Payroll Expenses, Office Expenses including Rent, Corporate Taxes and Software Leases and Technology. I will receive 35% of any revenue from business referred to me from Unblinded/Integrous. These terms can not be modified without my consent.
- Ownership of my legacy business will remain mine and not that of the RIA. Upon my retirement the RIA and/or its shareholders will have a requirement to purchase the business at a value established by an independent 3rd party. We should probably include terms such as whether the purchase will be made as a lump sum or over time and the tax allocation for the purchase. I am open to discussion on how to best structure these terms. Should I leave the RIA but remain active in the industry I can take my book of business without interference from the RIA or its staff.

In addition to identifying my responsibilities and authority regarding operations as Managing Partner I think we should identify responsibility for other key functions. Specifically, we should identify the responsible party to lead Marketing, Technology, and Finance, as well as a Chief Investment Officer, and a CEO. I think Justin Rice can serve in the role as head of our Investment Committee and can fill the role of Chief Investment Officer if you are OK with a non-owner in that role. We should also identify Julie Wagner of Dinsmore Compliance as our Chief Compliance Officer, although both she and Dinsmore can be removed at our discretion.

Please feel free to reply with your thoughts or questions. Nancy and I look forward to meeting with you on Friday at noon.

------ Original Message ------
From: michael@michaelvesuvio.com
To: dbailin@optonline.net; tcallagy@callagylaw.com Cc: estie0849@gmail.com
Sent: Thursday, February 12th 2026, 01:53 PM
Subject: Re: Introduction
Great job David. Please proceed with the meeting, team. Technically there is no majority partner. Sean will be 40%, David will be 20 % and I will be 40%. David, can you respond in some examples of what protection we should afford to each of the three partners whom individually are less than 51%?

Thank You,

Michael Vesuvio
Sent from my IPad

On Feb 12, 2026, at 11:13 AM, dbailin@optonline.net wrote:

Tyler,

It is nice to meet you.  Please let me know how I can be of assistance to you.  It might make sense to have a full phone call next week to talk about the outstanding issues.  We are available either 2/17 from 2:00-4:00pm or 2/20 from 12:00-3:00pm.  Do either of those work for you?

Topics that I know need to be addressed from a legal standpoint include:

1. Ultimate ownership of RIA once we go live.  During the filing process we will be in a "stealth" mode and only Dinsmore's name will appear, but we do need to disclose to the SEC at the time of our filing who will be the eventual owners.  Dinsmore clarified for me today that is an owner will be a trust, only the trustee needs to be disclosed at this time.  The list of people to become owners on 6/1/2026 is not made public until that date, but if a change of ownership is made from our filing we could have to seek client approval.
2. Shareholder's Agreement.  Since Nancy and I will be minority shareholders, we need to see that our interests are protected.
3. Operating Agreement which addresses my role as the Managing Partner, a delineation of my authorities and the limits on those powers.  We need to address what can I decide and what seeks a majority of ownership.

#1 above needs to be resolved before Dinsmore makes are filing with the SEC on or about April 1.  #2 and #3 should be at least substantially completed as well by April 1st so we can all feel comfortable written

documents will be in place by the go live date of 6/1/2026.

In the event you were not aware our Convenience Date of 6/1/2026 starts a 120 day clock where the RIA must move in $100,000,000 of assets or risk losing our filing with the SEC. For that reason we must have all our pieces in place when the SEC starts their clock. (I don't anticipate we will have difficulty meeting either the minimum amount or the timeframe, but there is no reason to put those in jeopardy).

Please let me know if your schedule permits us to meet next week.

**From:** **Michael Vesuvio** mvesuvio@infinancial.com
**Subject:** Re: Confidentiality
**Date:** July 10, 2026 at 8:53 PM
**To:** Callagy Tyler tcallagy@callagylaw.com, Jazz Vesuvio jazzvesuvio@infinancial.com

---

Hello Tyler,
I am concerned already with David and his difficult new posturing and attitude. We now need to make sure that the, not yet executed, operating agreement that David quotes, affords us all the access and protections that we need and want. We want live 24 hour access to all financials by our appointed person etc, We need to review the compliance manual section that he is referring to. Request it. We will request a change to it if needed. Also, I can not be involved directly and David knows it….
Even when I say this is Jazz on Mike email he ignores this. Last, if he is only “following rules” as he states please confirm that he is in full alignment with the concept and we will amend the rules??
Thank You,
Michael Vesuvio
Sent from my IPad

> On Jul 10, 2026, at 5:21 PM, David Bailin <david.bailin@infinancial.com> wrote:
>
> Michael,
>
> I can appreciate your desire to track the financial performance of the RIA. However, per our Operating Agreement, we have established a Manager-Managed structure to the corporation. Further, the Compliance Manual governing the operation of the RIA has very strict guidelines about how financial data is to be utilized. I take the obligation to follow all rules and procedures very seriously, as I alone, carry liability for our actions.
>
> The Members of the LLC will all sign the Operating Agreement which includes a clause regarding Confidentiality. For a Member to violate this clause would be a breach of our contract. Non-members, including Brian, have no duty of Confidentiality, and therefore, all business information including financial and client data cannot be shared.
>
> If I am not understanding how Brain’s access to confidential information would serve a benefit to the RIA, please elaborate.
> **Schedule Your Next Appointment Here**
> ***David L. Bailin, AIF®, ChFC®, CLU®, CLTC®***
> *Your Dreams are Our Goals*
>
> *Financial Advisor**
> *Integrous Wealth Strategies*
> *2277 Route 33, Suite 415*
> *Hamilton, NJ 08690*
> *Phone: (609) 586-9308*
> *Fax: (609) 586-9316*
> *CA License #0F69908*
> *david.bailin@infinancial.com*
> *www.personalwealthstrategies.com*

*Please do not send trade instructions to this email account. Orders received on this email cannot be honored or executed.*

Securities Offered through Pursh Kaplan Sterling Investments, Member FINRA/SIPC. Headquartered at 80 State Street, Albany, NY 12207. Purshe Kaplan Sterling Investments and Integrous Wealth Strategies are not affiliated companies.
Services offered through Integrous Wealth Strategies, a Registered Investment Adviser. SEC registration does not constitute an endorsement by the SEC nor does it indicate a particular level of skill or ability. This message and any attachments contain information which may be confidential and/or privileged and is intended for use only by the addressee(s) named on this transmission. If you are not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are notified that any review, copying, distribution or use of this transmission is strictly prohibited. If you have received this transmission in error, please (i) notify the sender immediately by e-mail or by telephone and (ii) destroy all copies of this message.
Qualifying membership in the Million Dollar Roundtable (MDRT) is based on minimum sales production requirements and gross business generated within a year. MDRT members must also adhere to strict ethical standards.

---

**From:** Michael Vesuvio <michael@michaelvesuvio.com>
**Sent:** Thursday, July 9, 2026 10:04 PM
**To:** Finn Brian <bfinn908@gmail.com>; David Bailin <david.bailin@infinancial.com>; Vesuvio Jazz <thelexusgirl@yahoo.com>
**Cc:** Callagy Tyler <tcallagy@callagylaw.com>
**Subject:** Re: Plan Establishment Kit

Hello David. your below position is not correct. It would be correct if we are receiving client account data. We are asking for normal financial information only, not client account data. Perhaps you misunderstood the request. By the way this is Jazz speaking not Mike per all of our discussions.
Thank You,
Jazz Vesuvio
Sent from my IPad

> On Jul 8, 2026, at 6:57 PM, Brian Finn <bfinn908@gmail.com> wrote:
>
> Hello David,
> Understood and thank you for your reply. Jazz will be looking forward to the information.
>
> Take care.
>
> Brian J. Finn
> 908-451-3243

On Jul 8, 2026, at 6:19 PM, David Bailin <david.bailin@infinancial.com> wrote:

Brian,

Accounting records are confidential within the RIA and only available to Members.  Jazz Vesuvio will be getting her monthly update on the company finances, hopefully by the end of the week.

Mike,

Since you are copied on this email, please refrain from requesting information be shared with people outside the RIA structure.  I do not have a problem sharing financial information with those with entitlements.  I understand you have a trust relationship with Brian, but IWS is a company, and therefore has to keep its records confidential.

**Schedule Your Next Appointment Here**

***David L. Bailin, AIF®, ChFC®, CLU®, CLTC®***
*Your Dreams are Our Goals*

*Financial Advisor**
*Integrous Wealth Strategies*
*2277 Route 33, Suite 415*
*Hamilton, NJ 08690*
*Phone: (609) 586-9308*
*Fax: (609) 586-9316*
*CA License #0F69908*
*david.bailin@infinancial.com*
*www.personalwealthstrategies.com*

*Please do not send trade instructions to this email account. Orders received on this email cannot be honored or executed.*

Securities Offered through Pursh Kaplan Sterling Investments, Member FINRA/SIPC. Headquartered at 80 State Street, Albany, NY 12207. Purshe Kaplan Sterling Investments and Integrous Wealth Strategies are not affiliated companies.
Services offered through Integrous Wealth Strategies, a Registered Investment Adviser. SEC registration does not constitute an endorsement by the SEC nor does it indicate a particular level of skill or ability. This message and any attachments contain information which may be confidential and/or privileged and is intended for use only by the addressee(s) named on this transmission. If you are not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are notified that any review, copying, distribution or use of this transmission is strictly prohibited. If you have received this transmission in error, please (i) notify the sender immediately by e-mail or by telephone and (ii) destroy all copies of this message.
Qualifying membership in the Million Dollar Roundtable (MDRT) is based on minimum sales production requirements and gross business generated within a year. MDRT members must also adhere to strict ethical standards.

---

**From:** Brian Finn <bfinn908@gmail.com>
**Sent:** Wednesday, July 8, 2026 4:57 PM
**To:** David Bailin <david.bailin@infinancial.com>; michael@michaelvesuvio.com
**Subject:** Re: Plan Establishment Kit

Hello David,

Thanks for your reply.

One additional request: would you please provide the details/accounting regarding how two recent disbursements totaling $80,000 were utilized?

Thank you

Brian J. Finn
email: bfinn908@gmail.com
ph: 908-451-3243

On Wed, Jul 8, 2026 at 4:44 PM David Bailin <david.bailin@infinancial.com> wrote:

> I think Mike was referring to your TPA. The new 401k plan has not had an actuary assigned to it since the initial Plan Establishment Kit has not been returned.

Establishment Kit has not been returned.

Here is the question that needs to be answered:

Does any owner listed above (or any owner's spouse) have an ownership interest in another company? If yes, please complete the following section. This information will be used to help determine your company's Controlled Group status:*

| Name | Company Name | % Owned |
|---|---|---|
| David Bailin | Personal Wealth Strategies LLC | 50 |
| Nancy Bailin | Personal Wealth Strategies LLC | 50 |
| | | |
| | | |
| | | |

*A Controlled Group is a group of business entities that have certain forms of common ownership. This can include sole proprietorships, partnerships, LLCs or other corporations. When a Controlled Group exists, all employees of all entities are treated as employed by a single employer for plan qualification purposes.

I have already added Nancy and my info, but still need Jazz (and Mike) and Sean's info.

**Schedule Your Next Appointment Here**

**David L. Bailin, AIF®, ChFC®, CLU®, CLTC®**
*Your Dreams are Our Goals*

*Financial Advisor* Integrous Wealth Strategies*

*2277 Route 33, Suite 415*
*Hamilton, NJ 08690 Phone:*
*(609) 586-9308 Fax:*
*(609) 586-9316 CA License #0F69908*
*david.bailin@infinancial.com*
*www.personalwealthstrategies.com*

*Please do not send trade instructions to this email account. Orders received on this email cannot be honored or executed.*

Securities Offered through Pursh Kaplan Sterling Investments, Member FINRA/SIPC. Headquartered at 80 State Street, Albany, NY 12207. Purshe Kaplan Sterling Investments and Integrous Wealth Strategies are not affiliated companies.
Services offered through Integrous Wealth Strategies, a Registered Investment Adviser. SEC registration does not constitute an endorsement by the SEC nor does it indicate a particular level of skill or

endorsement by the SEC nor does it indicate a particular level of skill or ability. This message and any attachments contain information which may be confidential and/or privileged and is intended for use only by the addressee(s) named on this transmission. If you are not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are notified that any review, copying, distribution or use of this transmission is strictly prohibited. If you have received this transmission in error, please (i) notify the sender immediately by e-mail or by telephone and (ii) destroy all copies of this message.
Qualifying membership in the Million Dollar Roundtable (MDRT) is based on minimum sales production requirements and gross business generated within a year. MDRT members must also adhere to strict ethical standards.

---

**From:** Brian Finn <bfinn908@gmail.com>
**Sent:** Wednesday, July 8, 2026 4:28 PM
**To:** David Bailin <david.bailin@infinancial.com>
**Subject:** Re: Wire Processed

Hello David,

I hope all is well. Do you have the contact information for the TPA?

Thanks

Brian J. Finn
email: bfinn908@gmail.com
ph: 908-451-3243

On Wed, Jul 8, 2026 at 4:15 PM David Bailin <david.bailin@infinancial.com> wrote:

> COO was a typo. That should have read CCO or Chief Compliance officer.
> **Schedule Your Next Appointment Here**
> **David L. Bailin, AIF®, ChFC®, CLU®, CLTC®**
> *Your Dreams are Our Goals*
> AIF · Top of the Table Member MDRT®

*Financial Advisor* Integrous Wealth Strategies*

*2277 Route 33, Suite 415*
*Hamilton, NJ 08690 Phone:*
*(609) 586-9308 Fax:*
*(609) 586-9316 CA License #0F69908*
*david.bailin@infinancial.com*
*www.personalwealthstrategies.com*

*Please do not send trade instructions to this email account. Orders received on this email cannot be honored or executed.*

Securities Offered through Pursh Kaplan Sterling Investments, Member FINRA/SIPC. Headquartered at 80 State Street, Albany, NY 12207. Purshe Kaplan Sterling Investments and Integrous Wealth Strategies are not affiliated companies.
Services offered through Integrous Wealth Strategies, a Registered Investment Adviser. SEC registration does not constitute an endorsement by the SEC nor does it indicate a particular level of skill or ability. This message and any attachments contain information which may be confidential and/or privileged and is intended for use only by the addressee(s) named on this transmission. If you are not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are notified that any review, copying, distribution or use of this transmission is strictly prohibited. If you have received this transmission in error, please (i) notify the sender immediately by e-mail or by telephone and (ii) destroy all copies of this message.
Qualifying membership in the Million Dollar Roundtable (MDRT) is based on minimum sales production requirements and gross business generated within a year. MDRT members must also adhere to strict ethical standards.

---

**From:** Michael Vesuvio <michael@michaelvesuvio.com>
**Sent:** Wednesday, July 8, 2026 2:18 PM
**To:** bfinn908@gmail.com; Jazz Vesuvio <thelexusgirl@yahoo.com>; Tyler Callagy <tcallagy@callagylaw.com>
**Cc:** David Bailin <david.bailin@infinancial.com>; Nancy Bailin <estie0849@gmail.com>
**Subject:** Fwd: Wire Processed

Tyler,
Can you address the schedule A,B,C, D
Brian, can you get the contact info from the TPA to dialogue and better understand? Also, was not aware that we have a COO?
Thank You,
Jazz V
Sent from my IPad

Begin forwarded message:

**From:** David Bailin <david.bailin@infinancial.com>
**Date:** July 5, 2026 at 12:08:00 PM EDT
**To:** Michael Vesuvio <michael@michaelvesuvio.com>, Pace David <vesuvioservicesdp@yahoo.com>
**Cc:** Nancy Bailin <nancy.bailin@infinancial.com>, Vesuvio Jazz <thelexusgirl@yahoo.com>, Callagy Tyler <tcallagy@callagylaw.com>
**Subject: Re: Wire Processed**

Mike,

I will try to get you this information later this week. Tomorrow, I must focus on calculating the billing for about 500 accounts. Next, I need to finish cleaning up the accounting for June so I can report the financials to the Members.

Hopefully, by then Jazz will be able to respond with the ownership information for herself and you and get a response from Sean so we can finally finish the transition of the 401K. That info is critically important to avoid any other business entities losing qualification of their medical or retirement plans.

This week Nancy and I hope to get together with our attorney to discuss the reworked Operating Agreement. You may be aware that Tyler keeps sending an incomplete document, withholding Schedules A, B, C and D. I know our attorney has requested this information previously and I fail to understand

information previously and I fail to understand why Tyler and his team are looking for us to review a partial document.

I can probably address the question of what additional charges a new Advisor would present to the firm once June's accounting is complete. In terms of future revenues and expenses, there are still many non-IA accounts that need to be transitioned. We also have a meeting with our COO and then with PKS to discuss the best way to use non-RIA revenue to cover expenses and ultimately to distribute profits to Members.

Sent via the Samsung Galaxy S21 5G, an AT&T 5G smartphone
Get Outlook for Android

---

**From:** Michael Vesuvio <michael@michaelvesuvio.com>
**Sent:** Friday, 03 July 2026 11:01:19
**To:** David Bailin <david.bailin@infinancial.com>; Pace David <vesuvioservicesdp@yahoo.com>
**Cc:** Nancy Bailin <nancy.bailin@infinancial.com>; Vesuvio Jazz <thelexusgirl@yahoo.com>; Callagy Tyler <tcallagy@callagylaw.com>
**Subject:** Re: Wire Processed

Hello David and Nancy,
Can we please get a well thought out document that reviews all expected revenue sources like RIA, Broker Dealer and traditional fixed insurance products, expected revenue streams by source including dates, account to be deposited and how that information will be shared directly etc. Let's create a grid with a proforma with a low, mid and high estimate. This will help us better understand and anticipate revenue that is critical to achieve expense levels needed as well as critical levels of net profit or capital for further growth.
On the expense side if you can also create the breakout grid of fixed expenses as well as variable expenses for Q3 & Q4. Please provide and include full detail on payroll breakout. What are the CURRENT guiding principals on what is the dividing line between

what the advisors should pay vs the Firm?
This is incredible important as we bring on advisors and create our grid.
Thank You,
Jazz Vesuvio
Sent from my IPad

On Jun 30, 2026, at 1:05 PM, David Bailin <david.bailin@infinancial.com> wrote:

Yes, we have received the wire. Thank you very much.

**Schedule Your Next Appointment Here**

***David L. Bailin, AIF®, ChFC®, CLU®, CLTC®***
*Your Dreams are Our Goals*

<image001.png>
<image002.png>

*Financial Advisor**
*Integrous Wealth Strategies*
*2277 Route 33, Suite 415*
*Hamilton, NJ 08690*
*Phone: (609) 586-9308*
*Fax: (609) 586-9316*
*CA License #0F69908*

*david.bailin@infinancial.com*
*www.personalwealthstrategies.com*

*Please do not send trade instructions to this email account. Orders received on this email cannot be honored or executed.*

Securities Offered through Pursh Kaplan Sterling Investments, Member FINRA/SIPC. Headquartered at 80 State Street, Albany, NY 12207. Purshe Kaplan Sterling Investments and Integrous Wealth Strategies are not affiliated companies.

Services offered through Integrous Wealth Strategies, a Registered Investment Adviser. SEC registration does not constitute an endorsement by the SEC nor does it indicate a particular level of skill or ability. This message and any attachments contain information which may be confidential and/or privileged and is intended for use only by the addressee(s) named on this transmission. If you are not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are notified that any review, copying, distribution or use of this transmission is strictly prohibited. If you have received this transmission in error, please (i) notify the sender immediately by e-mail or by telephone and (ii) destroy all copies of this message.

Qualifying membership in the Million Dollar Roundtable (MDRT) is based on minimum sales production requirements and gross business generated within a year. MDRT members must also adhere to strict ethical standards.

---

**From:** David Pace <vesuvioservicesdp@yahoo.com>
**Sent:** Tuesday, June 30, 2026 9:54 AM
**To:** David Bailin <david.bailin@infinancial.com>; Michael Vesuvio <michael@michaelvesuvio.com>; Nancy Bailin <nancy.bailin@infinancial.com>
**Subject:** Wire Processed

Hello David,

I just confirmed wire with Unity bank, you should have funds this morning.

Please confirm receipt.

Thanks

Dave Pace

INTEGROUS
WEALTH STRATEGIES

September 23, 2026

Re: Notice of Assignment of Investment Advisory Agreement
:
We are writing to inform you that Integrous Wealth Strategies LLC (the "Current Adviser") intends to assign your Investment Advisory Agreement (the "Agreement") to Personal Wealth Strategies LLC (the "Assignee"), effective October 23, 2026.

This assignment is being made in connection with our transition to Personal Wealth Strategies LLC. Following the effective date, the Assignee will assume all rights and obligations of the Current Adviser under your Agreement and provide investment advisory services to you pursuant to the terms of the Agreement.

Impact on Your Account

Services and Fees: The terms of your Agreement, including your fee schedule, investment strategies, and portfolio management services, will remain unchanged.

Account Management: Your portfolio will continue to be managed in accordance with your existing investment objectives and risk guidelines.

Your Right to Object (Negative Consent Process)
Under the terms of your Agreement, the Current Adviser may assign the Agreement upon written notice to you, with your consent deemed granted unless you object in writing. If you agree to the proposed assignment, no action is required on your part. Your consent will be automatically deemed granted as of October 23, 2026.

If you do not consent to the assignment, you have the right to object. To exercise your right to object, please send written notice no later than October 22, 2026, via one of the following methods:
By Email: david.bailin@personalwealthstraegies.com
By Mail: Personal Wealth Strategies LLC, 2277 Route 33, Suite 415, Hamilton, NJ 08690

If you object to the assignment prior to October 22, 2026, your Agreement will not be transferred to the Assignee, and we will contact you to assist with closing or transitioning your account.
If you have any questions regarding this transfer or would like additional information, please Contact me at (609) 586-9308. We appreciate your continued confidence and look forward to serving your investment needs.

CALLAGY LAW, P.C.
Michael Smikun (Bar No. 02056-2018)
Robert J. Solomon (Bar No. 15927-2016)
Mack-Cali Centre II
650 From Road – Suite 565
Paramus, NJ 07652
Tel. (201) 261-1700
Fax. (201) 549-6236
Email: msmikun@callagylaw.com
*Attorneys for Plaintiff*

**SUPERIOR COURT OF NEW JERSEY**
**CHANCERY DIVISION: BERGEN COUNTY**

| | |
|---|---|
| INTEGROUS WEALTH STRATEGIES, LLC, a New Jersey Limited Liability Company<br><br>Plaintiff,<br><br>**v.**<br><br>DAVID L. BAILIN, individually and as Managing Partner and Chief Compliance Officer of INTEGROUS WEALTH STRATEGIES, LLC, and BAILIN WEALTH STRATEGIES, LLC, a Florida Limited Liability Company<br><br>Defendants. | **DOCKET NO.:**<br><br>**CERTIFICATE OF SERVICE** |

I, Michael J. Smikun, Esq., do hereby certify the following under penalty of perjury:

1. I am an attorney with Callagy Law, P.C., counsel for Plaintiff Integrous Wealth Strategies, LLC ("IWS" or "Plaintiff"), in the above-captioned action against Defendants David L. Bailin ("Bailin") and Bailin Wealth Strategies, LLC (collectively, "Defendants").

2. On October 22, 2026, Plaintiff filed with the Superior Court of New Jersey, Chancery Division, Bergen County, a Verified Complaint, proposed Order to Show Cause with Temporary Restraints, Brief in Support of Plaintiff's Order to Show Cause, and accompanying supporting documents and exhibits (collectively, the "OTSC Application").

3. On October 22, 2026, I caused true and correct copies of the OTSC Application to be transmitted via electronic mail to Mark Kowalsky, Esq., of Taft Law, counsel for Defendants, at mkowalsky@taftlaw.com.

4. Said electronic transmission was made to provide Defendants, through their counsel, with notice of Plaintiff's emergent application and the temporary restraints sought therein, particularly in light of the impending October 23, 2026 deadline for the proposed transfer of IWS's advisory relationships to Personal Wealth Strategies, LLC.

5. Accordingly, I hereby certify that Plaintiff provided Defendants' counsel with notice of the OTSC Application by electronic mail on October 21, 2026, in the manner described above.

Respectfully submitted,

CALLAGY LAW, P.C.

By: /s/ Michael J. Smikun
Michael J. Smikun, Esq. (Bar No. 02056-2018)
650 From Road, Suite 565
Mack-Cali Centre II
Paramus, New Jersey 07652
Phone: 201-261-1700
Attorneys for Plaintiff

Dated: October 22, 2026