**CALLAGY LAW, P.C.**
Michael J. Smikun, Esq. (Bar No. 02056-2008)
Mack-Cali Centre II
650 From Road – Suite 565
Paramus, NJ 07652
Tel. (201) 261-1700
Fax. (201) 261-8404
Email: msmikun@callagylaw.com
*Attorney for Plaintiffs*

| | |
|---|---|
| INTEGROUS WEALTH STRATEGIES, LLC, a New Jersey Limited Liability Company<br><br>Plaintiff,<br><br>**v.**<br><br>DAVID L. BAILIN, individually and as Managing Partner and Chief Compliance Officer of INTEGROUS WEALTH STRATEGIES, LLC, and BAILIN WEALTH STRATEGIES, LLC, a Florida Limited Liability Company<br><br>Defendants**.** | UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY<br><br>**DOCKET NO.: 26-CV-14630**<br><br>**FIRST AMENDED VERIFIED**<br><br>**COMPLAINT** |

Plaintiff Integrous Wealth Strategies, LLC ("IWS"), by and through its undersigned counsel, as and for its Complaint against Defendants David L. Bailin ("Bailin") and Bailin Wealth Strategies, LLC ("BWS"), alleges as follows:

## PRELIMINARY STATEMENT

1. Sean Callagy is not a passive investor. He is one of New Jersey's most accomplished attorneys and entrepreneurs, a founder of Callagy Law, a driving force behind the Unblinded movement, and a builder of multiple successful organizations spanning law, business, and personal development. When Sean Callagy identifies an opportunity and commits his capital, his relationships, and his name to it, it is because he has done the work to make it real. Integrous Wealth Strategies, LLC was his idea.

He conceived it, structured it, funded it, and made it happen. He brought the vision, the institutional relationships, the legal infrastructure, and the money. What he needed was someone who could run the compliance and advisory operations day to day, someone with the licenses, the client book, and the technical expertise to manage a registered investment adviser from the inside.

2. That person was David Bailin. Bailin was operating a modest advisory practice out of Hamilton, New Jersey. The opportunity IWS represented was transformational for him. Callagy did not simply offer Bailin a job. He offered him a platform: a fully scaled, SEC-registered investment adviser, a new broker-dealer relationship through Purshe Kaplan Sterling Investments, and the financial backing to close out his prior operation and build something larger than anything he had ever done on his own. In exchange, Bailin brought his existing client book, agreed to serve as IWS's Managing Partner[1] and Chief Compliance Officer, committed to a minimum two-year tenure, and agreed to help build the enterprise Sean Callagy had envisioned.

3. The critical question in this case is not whether Bailin had some right to his pre-existing clients upon a lawful retirement. The critical question is who controlled the advisory agreements, who authorized the transfer of those agreements out of IWS, and where the resulting revenue went. The answer to each of those questions is the same: Bailin, acting alone, without authorization, without member consent, and in direct violation of the fiduciary duties he owed to the company he was entrusted to manage.

---

[1] For purposes of this Amended Complaint, the term "Managing Partner" refers to services by Defendant Bailin on behalf of IWS, who was expected to perform management-level services, exercise leadership responsibilities, and actively participate in the management and operations of the business, as distinguished from other members whose roles involved different services or activities, or who were not expected to actively participate in the managerial, operational, or administrative affairs of IWS.

4. Callagy Enterprises, LLC wired $130,000 into IWS on June 30, 2026. Bailin confirmed receipt the same day. **Exhibit C** The company was live. The trust was given. It was not returned.
5. While Sean Callagy and Jazz Vesuvio were building, Bailin was copying. While they were negotiating the operating agreement in good faith, he was stalling, running it through his attorney, rejecting agreed terms, and buying time. While they were asking for basic financial records of the company they co-owned and co-funded, he was invoking compliance authority to keep them blind. And while he was doing all of that, he was secretly building a competing registered investment adviser, Personal Wealth Strategies, LLC, using the same clients, the same vendors, and the same technology infrastructure he had absorbed as IWS's Managing Partner.
6. On September 23, 2026, Bailin sent a single email announcing that he had already transferred IWS's client base, the advisory agreements he controlled as CCO, the accounts whose revenue flowed through IWS's operations, to Personal Wealth Strategies. He set a negative consent deadline of October 23, 2026. **Exhibit B** He simultaneously locked IWS's investment adviser representative Justin Rice out of every system used to service those clients. On October 14, 2026, he fired Rice entirely.
7. This Complaint asserts sixteen counts against Bailin individually and through his entity Bailin Wealth Strategies, LLC, including breach of the fiduciary duties of loyalty, care, and candor; usurpation of corporate opportunity; breach of oral operating agreement; violation of the Investment Advisers Act of 1940; conversion; violation of member inspection rights; breach of the covenant of good faith and fair dealing; wrongful interference with IWS's employment relationships; unjust enrichment; accounting and constructive trust; violation of the New Jersey Computer

Related Offenses Act; promissory estoppel; tortious interference with prospective economic advantage; and fraud.

8. IWS seeks the following relief:

   a) **Emergency injunctive relief** immediately enjoining the October 23, 2026 negative consent client transition and any further transfer of IWS's advisory relationships, contracts, or assets under management to Personal Wealth Strategies or any other entity;

   b) **Immediate restoration** of Justin Rice's access to all IWS operational systems;

   c) **Immediate access** to all IWS financial records and a full accounting of the $130,000 advanced by Callagy Enterprises, LLC;

   d) **Disgorgement** of all profits derived from Bailin's wrongful diversion of IWS's client relationships and business opportunities;

   e) **Imposition of a constructive trust** over all wrongfully diverted assets pending final resolution;

   f) **Attorneys' fees and costs**, including fee-shifting for intentional fiduciary misconduct; and

   g) **Such other and further relief** as this Court deems just and proper.

9. David Bailin was given everything. This Complaint is the beginning of the process by which he is held accountable for what he did with it.

**PARTIES**

10. Plaintiff Integrous Wealth Strategies, LLC ("IWS") is a limited liability company organized and existing under the laws of the State of New Jersey, with its principal place of business at 2277 Route 33, Suite 415, Hamilton, New Jersey 08690. IWS is registered with the Securities and Exchange Commission as a registered investment adviser and operates a dual-channel business as an independent RIA and through its

broker-dealer relationship with Purshe Kaplan Sterling Investments, a FINRA/SIPC member firm. IWS achieved SEC registration effective May 26, 2026.

11. Defendant David L. Bailin ("Bailin") is an individual who, upon information and belief, resides in the State of New JerseyI. At all times relevant to this Complaint, Bailin served as the Managing Partner and Chief Compliance Officer of IWS and held a twenty percent (20%) membership interest in IWS through his wholly-owned entity, Defendant Bailin Wealth Strategies, LLC. Bailin is a licensed financial adviser holding the designations of Accredited Investment Fiduciary (AIF®), Chartered Financial Consultant (ChFC®), Chartered Life Underwriter (CLU®), and Certified in Long-Term Care (CLTC®).

12. Defendant Bailin Wealth Strategies, LLC ("BWS") is a limited liability company organized and existing under the laws of the State of Florida, owned equally by David L. Bailin and Nancy Bailin. BWS holds the twenty percent (20%) membership interest in IWS attributable to David Bailin. At all times relevant to this Complaint, BWS acted by and through David Bailin, who exercised full operational control over BWS and its membership interest in IWS.

13. Non-party Sean Callagy is an attorney and founding member of IWS. Callagy Enterprises, LLC, an entity through which Mr. Callagy holds his interests, holds a forty percent (40%) membership interest in IWS. Callagy Enterprises, LLC advanced $130,000 to IWS on June 30, 2026, as part of a $200,000 credit facility established to fund IWS operations.

14. Non-party Jazz Vesuvio is a founding member of IWS and holds a forty percent (40%) membership interest in IWS. Jazz Vesuvio is the spouse of Michael Vesuvio, who serves as a principal contact and operational advisor to IWS.

15. Non-party Justin Rice is a licensed investment adviser representative who was employed by IWS as a financial adviser at all times relevant to this Complaint. On October 14, 2026, Bailin terminated Rice's employment. Rice's wrongful lockout and termination are among the acts of misconduct alleged herein.

## JURISDICTION AND VENUE

16. This Court has subject matter jurisdiction over this action pursuant to N.J. Ct. R. 4:3-1, which vests jurisdiction over actions involving the internal affairs of a limited liability company, breaches of fiduciary duty by a managing member, claims for equitable relief including injunction and accounting, and the imposition of constructive trust, in the Chancery Division of the Superior Court of New Jersey.
17. This Court has personal jurisdiction over Defendant David L. Bailin because, at all times relevant to this Complaint, Bailin conducted business in the State of New Jersey, served as the Managing Partner and Chief Compliance Officer of a New Jersey limited liability company with its principal place of business in New Jersey, maintained an office in Hamilton, New Jersey, and directed, supervised, and executed the wrongful conduct alleged herein from within the State of New Jersey.
18. This Court has personal jurisdiction over Defendant Bailin Wealth Strategies, LLC because, at all times relevant to this Complaint, BWS held a membership interest in a New Jersey limited liability company, participated in the management and operation of that company through its principal David L. Bailin, and derived substantial benefit from its activities and investments within the State of New Jersey.
19. Venue is proper in Mercer County pursuant to N.J. Ct. R. 4:3-2 because IWS's principal place of business is located at 2277 Route 33, Suite 415, Hamilton, New

Jersey 08690, which is situated within Mercer County, and because a substantial portion of the events and omissions giving rise to this action occurred within Mercer County.

20. This action is properly brought in the Chancery Division because Plaintiff seeks equitable relief, including emergency injunctive relief to prevent the irreversible transfer of IWS's client relationships and business opportunities, an accounting, and the imposition of a constructive trust over assets wrongfully diverted by Defendants.

## STATEMENT OF FACTS

### The Vision – What IWS Was and How It Was Built

21. Integrous Wealth Strategies, LLC was not David Bailin's idea. It was conceived and driven by Sean Callagy, a New Jersey attorney and founding member, in partnership with Michael and Jazz Vesuvio, as a vehicle to build a fully scaled, SEC-registered investment advisory firm with the infrastructure, relationships, and capital that Bailin's boutique practice had never had access to on its own.

22. At the time of IWS's formation, Bailin was operating a small advisory practice known as Personal Wealth Strategies out of Hamilton, New Jersey, run by Bailin and his wife, Nancy Bailin. The practice was modest in scale. The opportunity IWS represented, a new RIA, a new broker-dealer relationship, institutional infrastructure, and the financial backing of the Callagy and Vesuvio organizations, was transformational for Bailin professionally and economically.

23. The initial introduction between the Callagy organization and Bailin occurred in February 2026. From the outset, Bailin understood the nature of the opportunity being extended to him. In a February 12, 2026 email, Bailin identified the key legal issues that needed to be resolved before launch, including the ultimate ownership structure of the RIA, a shareholders' agreement protecting minority interests, and an operating

agreement governing his role as Managing Partner. He confirmed May 26, 2026 as the target go-live date. He wrote: "we would not be moving forward if we didn't all trust each other." The trust he invoked was real. He was trusted completely. The money, the infrastructure, and the platform were made available to him in full reliance on that trust. **Exhibit A**

24. The founding members agreed to the following structure: Callagy Enterprises, LLC, Sean Callagy's entity, would hold a forty percent (40%) membership interest; Jazz Vesuvio would hold a forty percent (40%) membership interest; and Bailin Wealth Strategies, LLC, a Florida limited liability company owned equally by David Bailin and Nancy Bailin, would hold a twenty percent (20%) membership interest.

25. In exchange for his equity position and the platform IWS provided, Bailin agreed to: close his prior practice; bring his existing client book (the "Legacy Book") into IWS; serve as IWS's Managing Partner and Chief Compliance Officer; commit to a minimum two-year tenure before any contemplated retirement; and build IWS's advisory business alongside his co-members.

26. The founding members further agreed verbally that Bailin's pre-existing Legacy Book would remain a personal asset he could sell upon a lawful retirement, at a fair market value to be determined by an independent third party. This arrangement was specific: it applied upon retirement, to identified pre-existing client relationships, and it did not authorize a competing practice, current solicitation of IWS clients, or use of IWS's resources. What remained under active negotiation, and was never resolved, included the Schedule D cost baseline governing Bailin's payout-renegotiation rights, the applicable payout percentage, the precise limits of Bailin's managerial authority, and whether Bailin could maintain a separate practice upon or after retirement.

27. IWS's SEC registration was processed through Dinsmore Compliance Services, with Kevin Woodard serving as compliance consultant. Ownership of IWS was formally disclosed to the SEC effective May 26, 2026, the date on which Bailin, Callagy, and the Vesuvios became the registered owners of record. IWS also established a broker-dealer relationship with Purshe Kaplan Sterling Investments ("PKS"), a FINRA/SIPC member firm, and retained Justin Rice as an investment adviser representative. The 120-day window required for IWS to move $100,000,000 in assets under management to preserve its SEC registration began on June 1, 2026.

28. To make the vision a reality, Callagy Enterprises, LLC established a $200,000 credit facility in favor of IWS and advanced $130,000 to IWS on June 30, 2026. David Bailin confirmed receipt of the wire the same day. The advance was not a casual transfer. It was extended on the understanding that it would be documented as a formal loan instrument with agreed repayment terms, interest, and security provisions. Tyler Callagy, Esq. was engaged to draft the loan agreement and collected intake information for that purpose. As of September 2026, three months after the wire was confirmed received by Bailin, no loan agreement had been executed. Bailin was aware that the instrument was being drafted, was aware of the outstanding balance, and took no steps to formalize or repay the obligation. No accounting of how those funds were applied has been provided to IWS or its members to this date. **Exhibit C**

29. The May 26, 2026 launch was a coordinated, irrevocable event. On that date, all members gave notice at their respective prior firms and executed the ownership transfer documents for IWS through Dinsmore Compliance Services. The Tax ID for IWS was obtained and registered under David Bailin's name and address. Bailin Wealth Strategies, LLC was disclosed to the SEC as the entity holding Bailin's 20% interest, with David and Nancy Bailin listed as its equal owners. Callagy Law was

disclosed as an affiliated entity given Sean Callagy's 40% interest. Kevin Woodard of Dinsmore Compliance Services confirmed the SEC registration was effective and all parties were filed. There was no turning back. Everyone had burned their bridge to their prior firms and committed fully to IWS. Everyone, that is, except David Bailin, who, on information and belief, never intended to stay.

30. Critically, Bailin controlled the IWS registration process from the inside. The Tax ID for IWS was obtained under his name. He had access to every disclosure, every filing, and every operational decision made during the formation period. The same access that allowed him to build IWS was the access he would later use to dismantle it.

31. From the earliest days of the relationship, Bailin positioned himself as the operational center of IWS. In a February 18, 2026 email to Tyler Callagy and Michael Vesuvio, Bailin outlined his expectations for the Managing Partner role in detail, including spending authority up to $20,000 without partner approval, control over hiring and firing of non-producer employees, termination protection for three years, and, critically, his insistence that "ownership of my legacy business will remain mine and not that of the RIA." Bailin also wrote: "we would not be moving forward if we didn't all trust each other."

32. That trust was given. It was not returned.

**<u>The Negotiations – Bailin's Pattern of Bad Faith Emerges</u>**

33. From the moment IWS was formed, Tyler Callagy, Esq., associate attorney at Callagy Law and the primary draftsman of the operating agreement, worked to reduce the members' verbal agreements into a signed written document.

34. What followed was not a good-faith negotiation. It was a sustained, methodical campaign of delay designed to run out the clock while Bailin built his exit.

35. Draft after draft was sent to Bailin and his counsel. Term after term was verbally agreed upon over the phone, only to be rejected in writing by Bailin's attorney. The cycle repeated itself a third time, and then a fourth.

36. Each time, Bailin's position shifted, new demands, new objections, new schedules that needed to be produced before review could proceed, while the operating agreement remained unsigned and IWS continued to operate in a legal vacuum that Bailin alone exploited.

37. In a March 4, 2026 email to Michael Vesuvio, Bailin raised operational matters including broker-dealer selection, technology expenses, and payroll structure for Justin Rice, whose $165,000 annual salary Bailin proposed as a basis for adjusting his own payout from 62% to 53% of Legacy Book revenue. The email reflected a man engaged in the details of building IWS while, on information and belief, simultaneously building its replacement.

38. The March 4, 2026 email also revealed the financial architecture of IWS's client base in detail. The vast majority of Bailin's team's investment advisory business was managed through Focus Partners Advisor Services ("FPAS"), a third-party asset management platform ("TAMP"). Bailin had negotiated a bi-party agreement with FPAS under which the TAMP's fees were billed directly to IWS, not to individual clients, in exchange for breakpoint pricing that became more favorable as IWS's total assets under management grew.

39. Under this arrangement, IWS would raise its client-facing fees to cover the TAMP costs formerly billed to clients, and FPAS would bill IWS directly for its services. The result was that IWS, not Bailin personally, was the contracting party with FPAS, the entity responsible for TAMP fees, and the entity whose growing AUM would generate the breakpoint benefits. The client relationships, the advisory contracts, and

the fee revenue flowing from those relationships were IWS's assets. They were not Bailin's personal property to transfer at will.

40. The operating agreement negotiations escalated in July 2026 when Bailin submitted what he characterized as the required "schedules" to the agreement.

41. What he actually submitted for Schedule D, the document that would govern his payout-renegotiation rights for the life of the deal, was not, as required, an itemized breakdown of IWS's costs attributable to servicing the Legacy Book. It was the entire 2025 income statement of Personal Wealth Strategies, his prior practice, reflecting gross revenue of approximately $2,150,000, owner compensation, TAMP fees, and overhead, with an unauthorized inflation adjustment added by Bailin himself.

42. As Tyler Callagy documented in a confidential July 20, 2026 internal briefing: "It's PWS's historical numbers, not Integrous's cost of servicing the book." That briefing further noted that whatever number was locked in for Schedule D would govern "whether David can later force a renegotiation of his payout... for the life of the deal." Bailin knew this. He submitted numbers designed to serve himself.

43. In that same submission, Bailin proposed installing himself as IWS's registered agent, giving him control over all legal service and official notices to the company.

44. As Tyler Callagy's briefing observed, this would hand Bailin "an operational choke point if he's ever removed or in dispute." The proposal was rejected.

45. By late summer 2026, the pattern was unmistakable. Every agreed term became a new dispute when reduced to writing. Every completed draft became the occasion for a new demand. Every schedule submission was an opportunity to extract additional economic advantage. And through it all, on information and belief, Bailin was not negotiating toward a final agreement. He was buying time.

46. Tyler Callagy prepared and transmitted no fewer than four successive drafts of the operating agreement between February and September 2026.

47. Each draft incorporated the terms verbally agreed upon between the members during prior phone calls.

48. Among the terms verbally agreed upon and subsequently repudiated in writing were: the 40/40/20 ownership structure and its governance implications; the two-year commitment before retirement; the mechanism for determining the fair market value of the Legacy Book at retirement; the scope of Bailin's spending authority as Managing Partner; and the members' rights to financial information and governance participation.

49. Each of these terms appeared in successive drafts in forms Bailin had approved on calls. Each was rejected when reduced to writing.

50. The inference from this pattern is not subtle. A party who verbally agrees to terms and then rejects them in writing, repeatedly, across multiple drafts, over multiple months, without ever providing a substantive counterproposal, is not negotiating. He is creating the appearance of negotiation while preserving the freedom to act without legal constraint. That is precisely what Bailin did.

51. Every week the operating agreement remained unsigned was another week in which Bailin operated with maximum flexibility and minimum accountability while his co-members remained bound by the commitments they had made in good faith.

**<u>The Obstruction – Bailin Weaponizes Compliance</u>**

52. While the operating agreement negotiations ground forward, Bailin used his position as IWS's Chief Compliance Officer to systematically deny his co-members access to the company's financial records.

53. On July 3, 2026, Jazz Vesuvio, acting in her capacity as a 40% member of IWS, sent Bailin a detailed request for financial information, including a grid of expected revenue sources, expense breakdowns, and payroll detail. The request was specific, reasonable, and entirely consistent with the members' rights under both the verbal operating agreement and the New Jersey LLC Act.

54. Bailin did not provide the information. Instead, on July 10, 2026, he sent a written response invoking, in circular and self-serving fashion, the confidentiality provisions of the very operating agreement he had refused to execute: "per our Operating Agreement, we have established a Manager-Managed structure to the corporation... The Compliance Manual governing the operation of the RIA has very strict guidelines about how financial data is to be utilized... I take the obligation to follow all rules and procedures very seriously, as I alone, carry liability for our actions."

55. On July 8, 2026, Brian Finn, a financial advisor assisting the Vesuvio organization, made an additional specific request: a detailed accounting of two recent disbursements from IWS totaling $80,000. Bailin refused, instructing Finn to refrain from requesting information because he was not a member: "IWS is a company, and therefore has to keep its records confidential." **Exhibit E**

56. <u>**No accounting of the $80,000 disbursements has been provided to date.**</u>

57. Michael Vesuvio, responding through Jazz on July 10, 2026, was direct: "your below position is not correct. It would be correct if we are receiving client account data. We are asking for normal financial information only, not client account data." Bailin did not relent. **Exhibit E**

58. The pattern of obstruction was not limited to a single request. Between July and September 2026, IWS's members made no fewer than three separate, written requests for financial information covering materially different categories of records: revenue

projections and actual performance, expense breakdowns and payroll detail, and a specific accounting of identified disbursements. Each request was denied. Each denial was dressed in the language of compliance. None was accompanied by a legitimate regulatory citation or a specific compliance rule justifying the refusal.

59. The financial records Bailin withheld were not peripheral to IWS's operations. They were its core operating data, the records that would have revealed the company's actual revenue performance, the disposition of the $130,000 advanced by Callagy Enterprises, LLC, and, on information and belief, the financial activity Bailin was conducting through IWS's accounts in the months before he announced the client transfer. IWS expects that discovery of these records will establish that Bailin's obstruction was not coincidental. He was concealing information that would have exposed his competing enterprise and his diversion of company resources.

60. N.J.S.A. 42:2C-40 provides that a member of a New Jersey LLC is entitled to inspect and copy the company's books and records upon demand stating with reasonable particularity the records sought and the purpose, and that the LLC must respond within ten days. Bailin's refusal to honor these requests was not a compliance decision. It was a violation of the statute he claimed to be enforcing.

61. In a July 10, 2026 message to Tyler Callagy, Michael Vesuvio put it plainly: "I am concerned already with David and his difficult new posturing and attitude." The concern was well-founded. Bailin was not following rules. He was using rules as a weapon, concealing the financial condition of a company he was simultaneously preparing to strip.

**<u>The Secret – Bailin Builds A Competing Company (Personal Wealth Strategies)</u>**

62. At a time that has not yet been fully disclosed and which IWS expects to establish through discovery, David Bailin, while serving as IWS's Managing Partner and Chief

Compliance Officer, while drawing compensation from IWS, while negotiating the operating agreement in purported good faith, and while blocking his co-members' access to IWS's financial records, secretly formed, registered, and began operating Personal Wealth Strategies, LLC ("PWS"), a directly competing registered investment adviser.

63. On information and belief, Bailin used his position as Managing Partner of IWS to observe, absorb, and replicate the operational infrastructure, vendor relationships, technology stack, and client servicing model that IWS had built. He did so without disclosure to, or authorization from, his co-members.

64. Bailin's intent and preparation are confirmed by the record he himself created. As early as July 8, 2026, while he was simultaneously blocking access to IWS's financial records and stalling the operating agreement negotiations, Bailin's email signature block contained a link to www.personalwealthstrategies.com: the website of the competing firm he was already operating. He was serving as IWS's CCO and Managing Partner while marketing his competing practice in his own email footer. He did not disclose this to any of his co-members.

65. At no point did Bailin inform Sean Callagy, Jazz Vesuvio, or any other member of IWS that he had formed or was operating a competing registered investment adviser. At no point did he seek or obtain authorization under N.J.S.A. 42:2C-39 or otherwise. His co-members learned of the competing firm only when Bailin announced, after the fact, that he had already transferred IWS's clients into it.

66. As IWS's Chief Compliance Officer, Bailin bore specific regulatory obligations that went beyond his duties as a member and Managing Partner. An investment adviser registered with the SEC is a fiduciary to its clients. Its CCO is the person responsible

for ensuring the firm's compliance with the Investment Advisers Act of 1940 and all applicable regulations.

67. Bailin held himself out to clients, to regulators, and to his co-members as the person who, in his own words, "alone, carry liability for our actions." He invoked that responsibility repeatedly as a basis for his authority within IWS. He used it to block financial records. He used it to justify operational control. And then, when the time came, he ignored it entirely, executing an unauthorized client transfer without affirmative client consent, in direct violation of Section 205 of the Investment Advisers Act of 1940, 15 U.S.C. § 80b-15, which prohibits the assignment of an investment advisory contract without the client's affirmative consent.

68. The man who claimed sole responsibility for IWS's compliance became its most significant compliance risk.

69. Among a CCO's most fundamental obligations under the Advisers Act is the duty to ensure that the firm's advisory contracts are not assigned without client consent. This obligation exists precisely because advisory relationships are personal, clients choose their adviser and have a right to decide whether to follow that adviser to a new firm.

70. The negative consent process Bailin implemented, announcing a transfer and deeming silent clients to have consented, is not a recognized method of obtaining client consent under the Advisers Act. It is a method of circumventing client consent. Bailin, as CCO, knew this. He executed it anyway.

71. The CCO's compliance authority at IWS was not a shared responsibility. Bailin had established, in his own communications, that he "alone, carry liability for our actions." He used that singular authority to block his co-members' access to financial records. He used it to control the flow of information within the company. And he used it, or rather, he discarded it, when the time came to execute a client transfer that

no competent compliance officer could have approved. The man who invoked compliance as a shield against his co-members abandoned it as an inconvenience when it stood between him and his exit.

**<u>The Strike – Bailin Executes The Unauthorized Client Transfer</u>**

72. On September 23, 2026, David Bailin sent an email to Jazz Vesuvio and Sean Callagy, copying Michael Vesuvio, Nancy Bailin, and Mark Kowalsky, Esq. of Taft Stettinius & Hollister LLP, with the subject line "Assignment of Bailin Clients." The email stated, in its entirety on the operative point: "I communicated to Mike and Jazz that we have assigned our client base out of Integrous Wealth Strategies and into a new RIA." **Exhibit B**

73. Bailin, and Bailin alone, controlled the advisory agreements, directed their transfer, and positioned himself to receive the resulting fee revenue through PWS.

74. The transfer was executed in the past tense, already done, without a member vote, without member consent, without authorization from IWS's governance structure, without the affirmative client consent required by Section 205 of the Investment Advisers Act of 1940, 15 U.S.C. § 80b-15, and without any acknowledgment that what had been done was wrong.

75. Nancy Bailin was copied on the September 23, 2026 email. As the co-equal owner of Bailin Wealth Strategies, LLC, the entity holding the Bailins' 20% membership interest in IWS, Nancy Bailin was present for and aware of the transfer at the moment it was announced. Bailin Wealth Strategies, LLC, acting through David Bailin, executed the conduct described herein. Its participation in the diversion of IWS's client relationships and the breach of the obligations owed by its principal renders it jointly and severally liable for the damages alleged herein.

76. Bailin's September 23, 2026 email further announced a negative consent process: any IWS client who did not affirmatively object before October 23, 2026 would be deemed to have consented to the transfer of their advisory relationship from IWS to PWS.

77. The October 23 deadline, thirty days after the announcement of an already-completed transfer, was not a warning. It was a deadline designed to make the theft permanent.

78. Bailin transmitted written notice directly to IWS clients confirming the October 23, 2026 transfer date and the negative consent mechanism. That notice stated, in relevant part: "Your Agreement will be assigned from Integrous Wealth Strategies to Personal Wealth Strategies effective October 23, 2026... On October 23, 2026, your account will automatically move to Personal Wealth Strategies. There is no action required on your part unless you do not want to have your account assigned." **Exhibit F**

79. Bailin also offered, in the same email, to sell his twenty percent (20%) ownership stake in IWS if the parties could reach an acceptable agreement, and suggested that his counsel Kowalsky handle further discussions. He expressed a willingness to continue in his role as Managing Partner in the interim, a proposal that, given the foregoing, defies comprehension.

80. On the same day, September 23, 2026, Bailin unilaterally revoked Justin Rice's access to every operational system used to service IWS's clients.

81. Without prior notice. Without a documented compliance basis. Without any communication to Rice explaining the action.

82. Rice was left with access to a single system: a Personal Wealth Strategies email account. With that single exception, he was locked out of every platform through which IWS conducted its advisory business. The practical consequence was total:

a) **Redtail CRM**: Rice could not access any client contact information, relationship history, account notes, or compliance records. He had no way to identify which clients needed attention, which accounts had pending transactions, or which clients had been contacted regarding the proposed transfer.

b) **Schwab**: Rice could not view, manage, or execute any transactions in client custodial accounts. He could not respond to client inquiries about their portfolios or take any action to protect client assets.

c) **Envestnet**: Rice could not access or manage the investment management platform through which client assets were allocated and monitored.

d) **Focus Partners Advisor Services**: Rice could not access the TAMP through which the majority of Bailin's team's advisory business was managed, including the bi-party arrangement under which IWS was the contracting party.

e) **Holistiplan and MoneyGuide**: Rice could not prepare or access any client financial plans or tax analyses.

f) **IWS email**: Rice could not communicate with clients, custodians, vendors, or regulators through any official IWS channel.

83. Rice was, in every operational sense, no longer an employee of IWS. He retained the title without any of the access necessary to perform the role. On the same day Bailin announced the completed transfer of IWS's client base to PWS, he ensured that IWS had no one who could respond.

84. Justin Rice was not a peripheral employee. He was IWS's primary investment adviser representative, the person responsible for the day-to-day servicing of the client relationships that constituted IWS's operating business. He maintained client records,

managed account activity, communicated with clients regarding their portfolios, and served as the primary point of contact for the advisory relationships Bailin was simultaneously transferring to PWS. His lockout was not a personnel decision. It was a strategic act.

85. With Rice locked out of every system on September 23, 2026, IWS had no operational capacity to contact its clients, access their records, respond to client inquiries, or take any action to retain the client relationships Bailin had announced were being transferred. IWS was, in effect, operationally blind at the precise moment Bailin's transfer announcement began reaching clients. This was not an accident of timing. It was the architecture of the scheme.

86. The harm from Rice's lockout was compounded by the regulatory dimension. Rice, as a licensed investment adviser representative, had regulatory obligations to IWS's clients, obligations that survived his lockout and that he could not discharge without access to the systems Bailin had disabled. Bailin, as IWS's CCO, was responsible for ensuring the firm's investment adviser representatives could meet their regulatory obligations.

87. By locking Rice out, Bailin not only sabotaged IWS's operational capacity, he created a regulatory risk for the clients he was purporting to serve.

88. Thus, on the same day that Bailin announced the completed transfer of IWS's client base to PWS, he ensured that IWS had no operational capacity to respond.

89. The simultaneity of these two acts, the announcement of the completed client transfer and the operational neutralization of the employee most directly responsible for servicing those clients, was not coincidence. It was coordination. It was the final step in a plan that had been months in the making.

90. Upon information and belief, Bailin's efforts to divert IWS's business to his competing enterprise extend beyond its client relationships, advisory agreements, and associated revenue. Plaintiff has reason to believe that Bailin is also attempting to transition certain members of IWS's existing workforce to PWS, including personnel who participated in the establishment and operation of IWS and who possess valuable experience, institutional knowledge, and existing relationships with IWS's clients. These individuals provide essential financial planning, administrative, and client servicing functions necessary to the continued operation of Plaintiff's business.

91. Plaintiff further alleges, upon information and belief, that these anticipated personnel transitions are part of Bailin's broader effort to redirect the operations of IWS to PWS. The loss of such personnel, particularly when considered alongside Bailin's alleged diversion of advisory relationships, restriction of operational access, and termination of Plaintiff's investment adviser representative, threatens to deprive IWS of the workforce and institutional knowledge necessary to maintain its operations. Such conduct, if established, would further demonstrate Bailin's alleged efforts to benefit his competing enterprise at Plaintiff's expense and would compound the substantial and irreparable harm Plaintiff faces absent immediate judicial intervention.

**The Escalation - October 2026**

92. Following the September 23, 2026 announcement, Bailin did not pause. He escalated.

93. On October 6, 2026, Bailin confronted Justin Rice with an ultimatum: sign two new agreements, an acknowledgment that Rice's 2018 non-solicitation agreement with Bailin personally carried over to Personal Wealth Strategies, LLC, and a new agreement prohibiting Rice from engaging in any outside business activities, or be terminated.

94. Rice, understanding that neither agreement had a valid legal basis and that signing would harm his interests and those of IWS's clients, declined.

**95. <u>On October 14, 2026, the same day IWS's counsel transmitted a formal demand letter to Kowalsky, Bailin fired Justin Rice.</u>**

96. The termination was not for cause. It was retaliation, and it was the final act of a systematic effort to dismantle IWS's operational capacity before the October 23, 2026 client transition deadline.

97. Also on October 14, 2026, Kowalsky transmitted a cease and desist letter to Rice on Bailin's behalf, accusing Rice of changing account credentials to conceal activity and using an unmonitored email address. These allegations are false. **Exhibit D**

98. Rice was locked out of every IWS system on September 23, 2026, the same day Bailin announced the client transfer. Any activity Rice undertook after that date occurred after Bailin had already revoked his access to IWS's systems. The chronology refutes the accusation.

99. The October 23, 2026 negative consent deadline looms. Every day that passes without judicial intervention is another day in which IWS's clients are moved, without affirmative consent, in violation of federal law, and pursuant to a transfer that was never authorized, into a competing firm that Bailin secretly built while managing the company he was betraying.

**<u>Bailin's Anticipated Defense and Why It Fails</u>**

100. Bailin will likely argue that the verbal understanding regarding the Legacy Book authorized everything he has done. It did not.

101. That arrangement was specific, limited, and conditioned. It applied upon retirement. It applied to identified pre-existing client relationships. It did not authorize a present transfer of those relationships to a competing firm during Bailin's ongoing

tenure as Managing Partner and CCO of IWS. It did not authorize the solicitation of IWS clients for PWS while Bailin continued to collect compensation from and exercise control over IWS. It did not authorize the use of IWS's operational infrastructure to execute a transfer. And it plainly did not encompass a single client relationship developed through IWS after May 26, 2026.

102. Even if the Legacy Book arrangement is enforceable exactly as Bailin characterizes it, a proposition IWS does not concede, it resolves nothing about the separate and independent misconduct described in this Complaint. The obstruction of financial transparency. The lockout of Justin Rice. The breach of the duty of candor. The bad faith operating agreement negotiations. The Schedule D manipulation. The use of IWS's resources, time, and infrastructure to build a competing firm. These violations exist and are actionable regardless of how the Legacy Book question is ultimately resolved. Bailin's anticipated defense to one issue is not a defense to any of the others.

103. Bailin's own words foreclose his primary defense. In his September 23, 2026 email, he stated that he had "assigned our client base out of Integrous Wealth Strategies and into a new RIA." Present tense action. Taken during his ongoing tenure. Not upon retirement. Not through the process the members had agreed upon. Not at fair market value determined by an independent third party. He was not retiring. He was competing. He was not selling the Legacy Book through the mechanism the oral agreement contemplated. He was transferring it unilaterally, without consent, without process, and without any of the conditions under which the Legacy Book arrangement was supposed to operate. The verbal understanding he will invoke as his defense describes a different transaction entirely.

104. Moreover, Bailin cannot escape the consequences of the manner in which he executed his departure.

105. Even a fiduciary who has a legitimate right to compete after departure must transition honestly, transparently, and in accordance with his ongoing obligations to the company and its clients. Bailin did none of these things. He did not give notice. He did not seek consent. He did not follow the process the members had agreed upon. He announced a completed transfer. He locked out his co-members' employee. He invoked counsel. He set a unilateral deadline. Every step of his exit was designed to maximize damage to IWS and minimize his own legal exposure.

106. That is not the exercise of a legitimate contractual right. That is a breach.

## COUNT I

## BREACH OF FIDUCIARY DUTY OF LOYALTY

(Against All Defendants)

107. Plaintiff repeats and realleges each of the preceding paragraphs as if fully set forth herein.

108. At all times relevant to this Complaint, IWS was a manager-managed limited liability company organized under the laws of the State of New Jersey. Defendant David L. Bailin served as IWS's Managing Partner and Chief Compliance Officer and held his membership interest through Defendant Bailin Wealth Strategies, LLC.

109. Under the New Jersey Revised Uniform Limited Liability Company Act, N.J.S.A. 42:2C-39(b), a manager of a manager-managed LLC owes a duty of loyalty to the company and its members that includes: (a) accounting for and holding as trustee for the LLC any property, profit, or benefit derived in conducting the LLC's business or from use of the LLC's property, including the appropriation of an LLC opportunity; (b) refraining from dealing with the LLC in the conduct of the LLC's activities and affairs as or on behalf of a person having an interest adverse to the LLC;

and (c) refraining from competing with the LLC in the conduct of the LLC's activities and affairs before the dissolution of the LLC.

110. The duty of loyalty imposed by N.J.S.A. 42:2C-39 cannot be eliminated by an operating agreement, signed or unsigned. N.J.S.A. 42:2C-11(g)(1). No waiver of the duty of loyalty is effective absent clear, unequivocal, and decisive language authorizing the specific conflicting conduct. No such authorization was ever given here.

111. Bailin breached his duty of loyalty to IWS in each of the following independently actionable respects:

a) He secretly formed Personal Wealth Strategies, LLC, a directly competing registered investment adviser, while serving as IWS's Managing Partner and CCO, without disclosure to or authorization from IWS or its members;

b) He diverted IWS's client relationships, advisory contracts, assets under management, and business opportunities to PWS — a competing entity he owned and controlled — without authorization, without member consent, and without compensation to IWS;

c) He used his position as Managing Partner to observe, absorb, and replicate IWS's operational infrastructure, vendor relationships, technology stack, and client servicing model for the benefit of PWS;

d) He unilaterally locked Justin Rice out of every IWS operational system on September 23, 2026, disabling IWS's ability to retain and service its client base on the same day he announced the completed transfer of that base to his competing firm; and

e) He used the financial records, client relationships, compliance infrastructure, and institutional resources of IWS, built and funded by his co-members, to establish, operate, and grow a competing enterprise for his own exclusive benefit.

112. Moreover, upon information and belief, Bailin's alleged misconduct extends beyond the diversion of Plaintiff's client relationships, advisory agreements, and business opportunities. Plaintiff has reason to believe that Bailin is also attempting to transition certain members of IWS's existing workforce to his competing enterprise, PWS, including personnel possessing valuable institutional knowledge, client relationships, and experience essential to Plaintiff's operations. When considered alongside Bailin's alleged interference with Plaintiff's operational infrastructure and diversion of its advisory business, these circumstances further support Plaintiff's contention that Bailin is engaged in a broader effort to dismantle IWS and redirect its business operations for his own economic benefit. Such conduct, if established, would further support Plaintiff's claims of disloyalty and wrongful interference and compound the substantial harm resulting from Defendants' alleged misconduct.

113. As a direct and proximate result of Bailin's breach of his duty of loyalty, IWS has suffered damages including the loss of client relationships, advisory contracts, assets under management, fee revenue, goodwill, and business opportunities, in an amount to be determined at trial but believed to be substantial, together with all profits wrongfully obtained by Defendants through their disloyal conduct, which are subject to disgorgement.

## COUNT II

## BREACH OF FIDUCIARY DUTY OF CARE

(Against All Defendants)

114. Plaintiff repeats and realleges each of the preceding paragraphs as if fully set forth herein.

115. Under N.J.S.A. 42:2C-39(a), a manager of a manager-managed LLC owes a duty of care in the conduct and winding up of the LLC's activities and affairs to act in a manner that a person in a like position would reasonably believe appropriate under similar circumstances.

116. As IWS's Managing Partner and Chief Compliance Officer, Bailin owed IWS a duty to manage its operations in the best interest of the company and its members, to protect and preserve its client relationships and business opportunities, to maintain regulatory compliance, to ensure continuity of client service, and to act as a reasonable and prudent fiduciary in every aspect of his management role.

117. Bailin breached his duty of care in each of the following independently actionable respects:

a) He transferred IWS's client relationships to a competing firm without client consent, exposing IWS and its members to regulatory liability under the Investment Advisers Act of 1940;

b) He announced a negative consent process that does not satisfy the affirmative consent requirements of 15 U.S.C. § 80b-15, placing IWS's SEC registration and regulatory standing at risk;

c) Bailin transmitted written notice directly to IWS clients confirming the October 23, 2026 transfer date and the negative consent mechanism. That notice stated, in relevant part: "Your Agreement will be assigned from Integrous Wealth Strategies to Personal Wealth Strategies effective October 23, 2026... On October 23, 2026, your account will automatically move to Personal Wealth Strategies. There is no

action required on your part unless you do not want to have your account assigned." **Exhibit F**

Attached is the Assignment Letter I sent to you last week. I have added the effective dates to provide clarity.

The letter states that your Agreement will be assigned from Integrous Wealth Strategies to Personal Wealth Strategies effective October 23, 2026. Until that time, you may continue to see correspondence from us under the Integrous Wealth Strategies name. On October 23, 2026, your account will automatically move to Personal Wealth Strategies. There is no action required on your part unless you do not want to have your account assigned. The @personalwealthstrategies.com email domain is already set up, and you may begin using it immediately.

d) He locked IWS's investment adviser representative out of every client servicing system, leaving IWS operationally unable to respond to the client transfer he had simultaneously announced;

e) He refused to provide financial records to IWS's members despite repeated requests, depriving the company's owners of the information necessary to make informed governance decisions; and

f) He managed IWS's operations not in the company's interest but in service of his own exit strategy, subordinating IWS's regulatory, financial, and operational wellbeing to his personal objectives.

118. Moreover, upon information and belief, Bailin's alleged misconduct extends beyond the diversion of Plaintiff's client relationships, advisory agreements, and business opportunities. Plaintiff has reason to believe that Bailin is also attempting to transition certain members of IWS's existing workforce to his competing enterprise, PWS, including personnel possessing valuable institutional knowledge, client relationships, and experience essential to Plaintiff's operations. When considered alongside Bailin's alleged interference with Plaintiff's operational infrastructure and diversion of its advisory business, these circumstances further support Plaintiff's contention that Bailin is engaged in a broader effort to dismantle IWS and redirect its business operations for his own economic benefit. Such conduct, if established, would

further support Plaintiff's claims of disloyalty and wrongful interference and compound the substantial harm resulting from Defendants' alleged misconduct.

119. As a direct and proximate result of Bailin's breach of his duty of care, IWS has suffered damages in an amount to be determined at trial, together with all consequential and incidental damages flowing from his failure to manage IWS's affairs as a reasonable fiduciary.

**COUNT III**

**BREACH OF FIDUCIARY DUTY OF CANDOR**
(Against All Defendants)

120. Plaintiff repeats and realleges each of the preceding paragraphs as if fully set forth herein.

121. A fiduciary owes his principals an affirmative duty of candor, the obligation to communicate all material information fully, fairly, and candidly. This duty is independent of and cumulative to the duties of loyalty and care.

122. As IWS's Managing Partner and CCO, the person whom IWS's other members entrusted with operational control and compliance authority, Bailin owed IWS and its members a duty to disclose all material information bearing on the company's operations, financial condition, and Bailin's own activities and conflicts.

123. Bailin breached his duty of candor in each of the following independently actionable respects:

a) He concealed the formation and operation of Personal Wealth Strategies, LLC from IWS and its members throughout the entire period during which he was simultaneously managing IWS and building its replacement;

b) He failed to disclose his intent to transfer IWS's client relationships to PWS until after the transfer had already been executed;

c) He invoked compliance authority and the confidentiality provisions of an unsigned operating agreement to actively conceal IWS's financial condition from his co-members, rather than to fulfill a legitimate regulatory obligation; and

d) He presented himself to IWS's clients, regulators, co-members, and counterparties as IWS's committed Managing Partner and CCO while concealing a plan of departure and client diversion that he had already set in motion.

124. As a direct and proximate result of Bailin's breach of his duty of candor, IWS was deprived of the information necessary to protect its interests, was unable to take timely defensive action, and suffered damages in an amount to be determined at trial.

**COUNT IV**

**USURPATION OF CORPORATE OPPORTUNITY**

(Against All Defendants)

125. Plaintiff repeats and realleges each of the preceding paragraphs as if fully set forth herein.

126. Under N.J.S.A. 42:2C-39(b)(1)(a) and the common law corporate opportunity doctrine as applied to New Jersey LLCs, a manager may not appropriate for himself a business opportunity that is financially available to the company, in line with its business, and practically advantageous to it.

127. A fiduciary who takes such an opportunity for his own benefit must account for and hold in trust for the company all profits derived therefrom.

128. The advisory relationships, client accounts, assets under management, fee revenue, goodwill, and business opportunities associated with IWS's client base were corporate opportunities of IWS.

129. They were developed within IWS, serviced through IWS's infrastructure, funded through IWS's capital, and managed by IWS's personnel. They belonged to IWS, not to Bailin personally.

130. Bailin, in his capacity as Managing Partner and using the resources, relationships, and information available to him only by virtue of his position, diverted these corporate opportunities to PWS for his own exclusive benefit without disclosure to or authorization from IWS or its members.

131. Bailin further usurped IWS's corporate opportunity to grow its advisory business by replicating IWS's entire operational model in a directly competing enterprise, built on IWS's time, at IWS's expense, and using knowledge available to him only by virtue of his position as Managing Partner.

132. Specifically, on information and belief, Bailin replicated or misappropriated the following IWS assets and opportunities:

a) **Vendor relationships**: including IWS's relationship with Focus Partners Advisor Services and the bi-party TAMP arrangement negotiated on IWS's behalf, which provided breakpoint pricing available only because of IWS's aggregate assets under management;

b) **Technology infrastructure**: including the specific software platforms, integrations, and workflow architecture that IWS had assembled and that Bailin had observed, used, and directed as Managing Partner;

c) **Client servicing architecture**: including the processes, workflows, and compliance procedures developed within IWS for servicing the client relationships Bailin subsequently transferred;

d) **Broker-dealer relationships**: including relationships developed through IWS's connection with Purshe Kaplan Sterling Investments; and

e) **Institutional knowledge**: including pricing, client preferences, account structures, and business development strategies observed and absorbed by Bailin in his capacity as IWS's most senior officer.

133. As a direct and proximate result of Bailin's usurpation of IWS's corporate opportunities, IWS has suffered damages in an amount to be determined at trial and is entitled to an accounting and disgorgement of all profits Defendants derived from the wrongfully appropriated opportunities.

## COUNT V

## BREACH OF ORAL OPERATING AGREEMENT

(Against All Defendants)

134. Plaintiff repeats and realleges each of the preceding paragraphs as if fully set forth herein.

135. Under N.J.S.A. 42:2C-2, an operating agreement of a New Jersey LLC may be written, oral, implied, or any combination thereof.

136. Every person who becomes a member is deemed to assent to the operating agreement as it exists at the time of their admission. N.J.S.A. 42:2C-12(b).

137. The founding members of IWS entered into a binding oral operating agreement governing the foundational terms of their relationship, including the 40/40/20 ownership structure, Bailin's role as Managing Partner and CCO, Bailin's two-year commitment to the company, the Legacy Book arrangement applicable upon a lawful retirement only, the credit facility extended by Callagy Enterprises, LLC, and the members' rights to financial information and governance participation.

138. Bailin materially breached the oral operating agreement in each of the following independently actionable respects:

a) He abandoned his commitment to serve as Managing Partner and CCO for a minimum two-year period by initiating a unilateral departure before the expiration of that term;

b) He transferred client relationships out of IWS before any retirement and without the specific conditions of the Legacy Book arrangement having been satisfied;

c) He denied co-members their agreed rights to financial information and governance participation; and

d) He competed directly with IWS during the term of his membership, in direct contravention of the agreement under which he was admitted.

139. Bailin may not selectively invoke the provisions of any draft written operating agreement that favor him while simultaneously rejecting the oral agreements he does not wish to honor.

140. The unsigned written draft does not create a legal vacuum, it creates a negotiating history from which the actual agreement of the parties may be determined.

141. As a direct and proximate result of Bailin's breach of the oral operating agreement, IWS has suffered damages in an amount to be determined at trial.

**COUNT VI**

**CONVERSION AND MISAPPROPRIATION OF IWS ASSETS**
(Against All Defendants)

142. Plaintiff repeats and realleges each of the preceding paragraphs as if fully set forth herein.

143. IWS's client relationships, advisory contracts, client data, financial records, proprietary workflows, confidential pricing, and institutional goodwill constitute the property of IWS. They were developed within IWS, funded by IWS's members, maintained through IWS's infrastructure, and serviced by IWS's personnel.

144. Conversion under New Jersey law requires an intentional exercise of dominion or control over another's property in a manner inconsistent with the owner's rights.

145. Bailin exercised exactly that dominion: he transferred IWS's client advisory relationships to his competing firm, denied IWS access to its own financial records, locked IWS's personnel out of the systems necessary to service IWS's clients, and asserted personal ownership over assets that belonged to IWS.

146. Specifically, Bailin converted and misappropriated the following IWS assets: a. IWS's client advisory relationships and associated advisory contracts; b. The client data, relationship histories, and account information contained in Redtail CRM and IWS's other operational systems; c. The fee revenue and assets under management associated with IWS's client base; d. IWS's institutional goodwill and advisory business; and e. The operational infrastructure, including vendor relationships, technology arrangements, and platform integrations, developed and maintained by IWS.

147. Bailin's conversion was intentional, deliberate, and executed in concert with Bailin Wealth Strategies, LLC. It was not an error of judgment. It was a plan.

148. As a direct and proximate result of Defendants' conversion and misappropriation of IWS's assets, IWS has suffered damages in an amount to be determined at trial, together with punitive damages warranted by the intentional and egregious nature of Defendants' conduct.

## COUNT VII

## VIOLATION OF MEMBER INSPECTION RIGHTS N.J.S.A. 42:2C-40

(Against All Defendants)

149. Plaintiff repeats and realleges each of the preceding paragraphs as if fully set forth herein.

150. N.J.S.A. 42:2C-40 grants members of a New Jersey LLC the right to inspect and copy the company's books and records.

151. A member need only make a written demand stating with reasonable particularity the records sought and the purpose. The LLC must respond to that demand within ten (10) days.

152. IWS's members made repeated, specific, written requests for IWS's financial records, including revenue records, expense breakdowns, payroll detail, vendor agreements, and an accounting of specific disbursements, beginning in July 2026.

153. These requests were made in writing and identified the specific information sought with reasonable particularity.

154. Bailin refused every request. He did so by invoking, in circular and self-serving fashion, the confidentiality provisions of an unsigned operating agreement and the compliance manual that he alone controlled, not to protect legitimate confidential information, but to conceal the financial condition of a company he was simultaneously preparing to strip.

155. Bailin's refusal to comply with IWS's members' inspection rights was not a legitimate exercise of compliance authority. It was a deliberate obstruction designed to keep his co-members blind to his misconduct.

156. As a direct and proximate result of Bailin's violation of N.J.S.A. 42:2C-40, IWS's members were deprived of material financial information, were unable to take timely protective action, and IWS suffered damages in an amount to be determined at trial.

## COUNT VIII

## BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

(Against All Defendants)

157. Plaintiff repeats and realleges each of the preceding paragraphs as if fully set forth herein.

158. Every contract, including the oral operating agreement governing the relationship between IWS's founding members, contains an implied covenant of good faith and fair dealing. N.J.S.A. 42:2C-11.

159. That covenant requires each party to act in a manner consistent with the reasonable expectations of the other parties and prohibits conduct that, while perhaps technically within the letter of the agreement, frustrates its purpose or destroys the other party's reasonable expectations.

160. Bailin breached the covenant of good faith and fair dealing in each of the following independently actionable respects:

a) He engaged in bad faith negotiations of the operating agreement, verbally agreeing to terms and then rejecting them in writing, cycling through multiple drafts, and creating new obstacles at each stage, not to reach a fair agreement, but to buy time while he built PWS;

b) He submitted Schedule D data designed to manipulate his own payout-renegotiation rights for the life of the deal, substituting PWS's historical income statement for the IWS cost baseline the parties had agreed Schedule D would reflect;

c) He invoked compliance authority and the unsigned operating agreement to deny his co-members' reasonable and legitimate requests for financial information; and

d) He accepted the financial backing, operational support, and institutional resources extended by his co-members in good faith reliance on his commitment to IWS, while simultaneously planning and executing a competing enterprise that would strip IWS of the very value those resources had created.

161. As a direct and proximate result of Bailin's breach of the covenant of good faith and fair dealing, IWS has suffered damages in an amount to be determined at trial.

**COUNT IX**

**WRONGFUL INTERFERENCE WITH IWS'S EMPLOYMENT RELATIONSHIPS AND BUSINESS OPERATIONS**
(Against All Defendants)

162. Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs as though fully set forth herein.

163. IWS maintained established employment and business relationships with its personnel, including Justin Rice, who served as a licensed investment adviser representative responsible for servicing IWS's client relationships.

164. Bailin intentionally and without legitimate justification interfered with those relationships and with IWS's business operations in each of the following independently actionable respects:

a) On September 23, 2026, he unilaterally locked Justin Rice out of every IWS operational system, Redtail CRM, Schwab, Envestnet, Focus Partners, Holistiplan, MoneyGuide, and IWS email.

b) He did so without prior notice, without a documented compliance basis, and without any communication to Rice explaining the action.

c) On October 6, 2026, he presented Rice with an ultimatum to sign agreements designed to protect Bailin's competitive exit at IWS's expense, and threatened termination when Rice declined;

d) On October 14, 2026, he fired Rice in retaliation for Rice's refusal to sign those agreements, eliminating IWS's primary client-servicing capacity on the eve of the October 23 client transition deadline; and

e) Through counsel, he transmitted a cease and desist letter to Rice containing allegations that are refuted by the chronology of Bailin's own conduct, allegations designed to neutralize Rice legally at the same time Bailin was moving IWS's clients out of the company.

165. The coordination of these acts, the lockout, the ultimatum, the termination, and the legal threat, with the September 23 client transfer announcement was not coincidental. It was a deliberate strategy to dismantle IWS's operational capacity and prevent it from retaining its client base.

166. As a direct and proximate result of Bailin's wrongful interference with IWS's employment relationships and business operations, IWS has suffered damages in an amount to be determined at trial, including the loss of Justin Rice's services during the critical period of the client transition and the resulting inability to retain the client relationships Bailin was simultaneously transferring to his competing firm.

**COUNT X**

**UNJUST ENRICHMENT**
(Against All Defendants)

167. Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs as though fully set forth herein.

168. Defendants have been unjustly enriched at IWS's expense. Bailin received the full benefit of IWS's platform, infrastructure, capital, relationships, and institutional support, all provided in good faith reliance on his commitment to the enterprise — while simultaneously building a competing firm designed to capture those benefits for himself.

169. Specifically, Defendants were unjustly enriched through:

a) The $130,000 advanced by Callagy Enterprises, LLC to IWS on June 30, 2026, the proceeds of which supported the operations and client base Bailin subsequently transferred to PWS;

b) The advisory fee revenue generated through IWS's infrastructure, client relationships, and institutional arrangements — including the FPAS TAMP breakpoint pricing negotiated on IWS's behalf — that Bailin diverted to PWS;

c) The operational infrastructure, vendor relationships, technology arrangements, and client servicing model developed through IWS's resources that Bailin replicated in PWS; and

d) The value of IWS's client relationships and goodwill, built and maintained through the collective efforts and resources of all members, that Bailin appropriated for his exclusive benefit.

170. It would be against equity and good conscience to permit Defendants to retain the benefits of their conduct. IWS is entitled to restitution of all amounts by which Defendants have been unjustly enriched at IWS's expense.

**COUNT XI**

**ACCOUNTING AND IMPOSITION OF CONSTRUCTIVE TRUST**
(Against All Defendants)

171. Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs as though fully set forth herein.

172. IWS is entitled to a full and complete accounting of: (a) all revenues, fees, and proceeds received by Defendants from client relationships transferred from IWS to PWS; (b) all revenues, fees, and assets under management currently held by or attributed to PWS that derived from IWS's client base, advisory contracts, or business

opportunities; (c) all advances and disbursements of IWS funds, including the $130,000 advanced by Callagy Enterprises, LLC, and the $80,000 in disbursements for which no accounting has been provided; and (d) all compensation, benefits, or other value received by Bailin from IWS during the period in which he was secretly building and operating PWS.

173. IWS has no adequate remedy at law without such an accounting because Defendants have sole possession, custody, and control of the financial records reflecting all transactions conducted with IWS's property and client relationships.

174. A constructive trust should be imposed over all assets, revenues, client relationships, advisory contracts, and business opportunities wrongfully diverted by Defendants from IWS, to be held for the benefit of IWS pending final resolution of this action.

175. As IWS's fiduciary, Bailin holds all property, profits, and benefits derived from his breach of duty as constructive trustee for IWS. N.J.S.A. 42:2C-39(b)(1). The Court should order the immediate transfer of all such assets to IWS.

## COUNT XII

## VIOLATION OF THE NEW JERSEY COMPUTER RELATED OFFENSES ACT N.J.S.A. 2A:38A-1 et seq.

(Against All Defendants)

176. Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs as though fully set forth herein.

177. The New Jersey Computer Related Offenses Act, N.J.S.A. 2A:38A-1 et seq., prohibits any person from knowingly and without authorization accessing, altering, destroying, damaging, copying, or interfering with a computer system, computer network, computer software, computer program, or data.

178. IWS maintained protected computer systems, networks, and data, including Redtail CRM, Schwab, Envestnet, Focus Partners, Holistiplan, MoneyGuide, and the IWS email system, containing confidential client records, financial data, proprietary business information, and compliance records constituting IWS's operational infrastructure.

179. On September 23, 2026, Bailin, acting in his capacity as Managing Partner and CCO but without authorization from IWS or its members, unilaterally revoked Justin Rice's access to every IWS operational system and, on information and belief, accessed, altered, copied, or interfered with IWS's computer systems and data in connection with the unauthorized transfer of IWS's client relationships to PWS.

180. On information and belief, Bailin copied, transferred, or caused to be transferred IWS's client data, account records, and proprietary business information to PWS's systems without authorization from IWS.

181. Bailin's conduct constitutes a violation of N.J.S.A. 2A:38A-1 et seq. and has caused IWS damages in an amount to be determined at trial, together with all remedies available under the Act.

## COUNT XIII

## PROMISSORY ESTOPPEL

(Pled in the Alternative to Count V)
(Against All Defendants)

182. Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs as though fully set forth herein.

183. This Count is pled in the alternative to Count V (Breach of Oral Operating Agreement) in the event that the Court determines that the oral agreements between the founding members of IWS do not constitute an enforceable operating agreement.

184. Bailin made clear and definite promises to IWS and its founding members, including: his commitment to serve as Managing Partner and CCO for a minimum two-year period; his commitment to bring his client book into IWS and build the enterprise alongside his co-members; his commitment to operate IWS in compliance with its governing statutes and regulations; and his commitment to negotiate the operating agreement in good faith.

185. IWS and its founding members reasonably relied on those promises. In reliance on Bailin's commitments, they: closed out his prior practice and transitioned his client book into IWS; installed him as Managing Partner and CCO with full operational authority; extended $130,000 in funding to support IWS's operations; and devoted substantial time, resources, and relationships to building an enterprise around Bailin's participation.

186. Injustice can only be avoided by enforcement of Bailin's promises. His reliance on the absence of a signed written agreement to escape the consequences of commitments that induced his co-members to extend trust, money, and resources to him would be unconscionable.

187. As a direct and proximate result of Bailin's breach of his promises, IWS has suffered damages in an amount to be determined at trial.

## COUNT XIV

## TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

(Pled in the Alternative to Count V)
(Against All Defendants)

188. Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs as though fully set forth herein.

189. IWS had a reasonable expectation of economic advantage through its client relationships, advisory contracts, assets under management, and the ongoing business of its advisory practice.

190. Bailin, with knowledge of IWS's existing and prospective client relationships and business opportunities, intentionally and without justification interfered with those relationships and opportunities by: transferring IWS's client base to his competing firm PWS without authorization; implementing a negative consent process designed to make the transfer permanent before IWS could respond; and locking IWS's investment adviser representative out of every system necessary to service and retain those clients.

191. Bailin's interference was intentional, malicious, and without legitimate justification. His actions were not taken in furtherance of any lawful competitive activity — they were taken while he remained IWS's Managing Partner and CCO, in direct breach of the fiduciary obligations that prohibited him from competing with IWS.

192. As a direct and proximate result of Bailin's tortious interference, IWS has suffered damages in an amount to be determined at trial, including the loss of client relationships, advisory contracts, and the going-concern value of its advisory business.

## COUNT XV

## FRAUD

(Against All Defendants)

193. Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs as though fully set forth herein.

194. Fraud in New Jersey requires: (1) a material misrepresentation of fact; (2) knowledge of its falsity; (3) intent to induce reliance; (4) justifiable reliance; and (5) resulting damages.

195. Bailin made the following material misrepresentations to IWS and its founding members:

a) He represented that he was negotiating the operating agreement in good faith, when in fact he was stalling the negotiations while secretly building a competing firm;

b) He represented that he was operating as IWS's committed Managing Partner and CCO, when in fact he had already decided to depart and transfer IWS's client base to his competing firm;

c) He invoked compliance authority and the confidentiality provisions of the unsigned operating agreement as legitimate regulatory grounds for withholding financial information, when in fact he was concealing the financial condition of a company he was preparing to strip; and

d) He submitted PWS's historical income statement as IWS's Schedule D cost baseline, misrepresenting it as the basis for calculating IWS's costs of servicing the Legacy Book, when in fact it was designed to manipulate his own payout-renegotiation rights.

196. Each of these misrepresentations was made with knowledge of its falsity and with the intent to induce IWS's founding members to continue providing Bailin with access to IWS's resources, client relationships, and institutional infrastructure while he completed his competing enterprise.

197. IWS and its founding members justifiably relied on Bailin's misrepresentations by continuing to fund IWS's operations, continuing to negotiate the operating agreement in good faith, and failing to take timely protective action.

198. As a direct and proximate result of Bailin's fraud, IWS has suffered damages in an amount to be determined at trial, together with punitive damages warranted by the intentional and egregious nature of Bailin's conduct.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment as follows:

A. On Count I, awarding compensatory damages for breach of fiduciary duty of loyalty in an amount to be determined at trial, together with disgorgement of all profits derived from Defendants' disloyal conduct and an award of attorneys' fees and costs;

B. On Count II, awarding compensatory damages for breach of fiduciary duty of care in an amount to be determined at trial;

C. On Count III, awarding compensatory damages for breach of fiduciary duty of candor in an amount to be determined at trial;

D. On Count IV, awarding compensatory damages for usurpation of corporate opportunity in an amount to be determined at trial, together with disgorgement of all profits derived from the wrongfully appropriated opportunities and imposition of a constructive trust over all such profits pending accounting;

E. On Count V, awarding compensatory damages for breach of the oral operating agreement in an amount to be determined at trial;

F. On Count VI, awarding compensatory and punitive damages for conversion and misappropriation of IWS's assets in an amount to be determined at trial;

G. On Count VII, awarding compensatory damages for violation of N.J.S.A. 42:2C-40 and ordering Defendants to provide immediate access to all IWS financial records;

H. On Count VIII, awarding compensatory damages for breach of the covenant of good faith and fair dealing in an amount to be determined at trial;

I. On Count IX, awarding compensatory damages for wrongful interference with IWS's employment relationships and business operations in an amount to be determined at trial;

J. On Count X, ordering disgorgement and restitution of all amounts by which Defendants have been unjustly enriched at IWS's expense;

K. On Count XI, ordering a full accounting of all revenues, fees, assets, and proceeds derived from IWS's client relationships and business opportunities, and imposing a constructive trust over all wrongfully diverted assets pending final resolution of this action;

L. On Count XII, awarding compensatory damages for violation of the New Jersey Computer Related Offenses Act, N.J.S.A. 2A:38A-1 et seq., in an amount to be determined at trial, together with all remedies available under the Act;

M. On Count XIII, awarding compensatory damages for promissory estoppel in an amount to be determined at trial;

N. On Count XIV, awarding compensatory damages for tortious interference with prospective economic advantage in an amount to be determined at trial, including the loss of client relationships, advisory contracts, and the going-concern value of IWS's advisory business; and

O. On Count XV, awarding compensatory and punitive damages for fraud in an amount to be determined at trial, together with punitive damages warranted by the intentional and egregious nature of Defendants' conduct;

P. On all counts, granting emergency preliminary and permanent injunctive relief:

a. immediately enjoining Defendants from transferring, assigning, soliciting, or redirecting any IWS client relationships, advisory contracts, assets under management, fees, or business opportunities to Personal Wealth Strategies, LLC or any other entity;

b. immediately suspending the October 23, 2026 negative consent client transition process;

c. immediately restoring Justin Rice's full access to all IWS operational systems;

d. immediately compelling production of all IWS financial records; and

e. immediately preserving all documents, communications, and records relating to IWS, PWS, and all matters alleged herein;

Q. With respect to the Order to Show Cause, IWS specifically requests that the Court enter a proposed form of order addressing the following:

a. **Forensic Preservation:** Requiring Defendants to immediately preserve all relevant communications, CRM records, account-transition logs, electronic devices, vendor communications, and financial records, without unnecessarily exposing protected client information, and prohibiting the destruction, alteration, or transfer of any such records pending final resolution of this action;

b. **Independent Accounting:** Requiring Defendants to provide a confidential schedule identifying all affected advisory contracts, account transfers, notice dates, consent records, and all fees redirected to or received by Personal Wealth Strategies, LLC in connection with the unauthorized client transfer;

c. **Financial Protections:** Requiring Defendants to preserve specifically identifiable disputed proceeds or provide a full accounting of their disposition, subject to applicable injunction and asset-restraint standards;

d. **Operational Continuity:** Requiring Defendants to restore appropriate company access to IWS's authorized personnel or, in the alternative, appointing a neutral administrator to ensure continuity of client service and regulatory compliance pending resolution;

e. **Status Quo Protections:** Temporarily prohibiting further unauthorized corporate assignments, destruction of records, or transfers of disputed company assets or client relationships;

f. **Expedited Discovery:** Authorizing appropriately limited third-party discovery from custodians, software providers, CRM vendors, and relevant contracting entities including Focus Partners Advisor Services and Purshe Kaplan Sterling Investments; and

g. **Confidentiality Safeguards:** Requiring appropriate restrictions on the disclosure of client financial and personal information in connection with any court-ordered accounting or production.

R. On all counts, awarding IWS its reasonable attorneys' fees and costs, including the fee-shifting remedy available upon proof of intentional fiduciary misconduct; and

S. Granting such other and further relief as this Court deems just and proper.

**CALLAGY LAW, P.C.**

**Michael J. Smikun, Esq.**
Attorneys for Integrous Wealth Strategies, LLC
Michael J. Smikun, Esq.
Mack-Cali Centre II
650 From Road, Suite 240
Paramus, NJ 07652
Tel. (201) 261-1700
Fax. (201) 261-8404
Email: msmikun@callagylaw.com
*Attorney for Plaintiff*

Docusign Envelope ID: 024EAC17-BBFC-8C46-825B-ADDB2A7B6832


# VERIFICATION

STATE OF NEW JERSEY

COUNTY OF BERGEN

I, Sean Callagy, affirm this 22nd day of October, 2026, under penalty of perjury under the laws of the State of New Jersey, that:

1. I am an indirect owner and duly authorized representative of Plaintiff Integrous Wealth Strategies, LLC ("Plaintiff" or "IWS"), a New Jersey limited liability company, and am authorized to make this Verification on its behalf.
2. I have read the foregoing Verified Complaint and am familiar with its contents.
3. The allegations contained in the Verified Complaint are true to the best of my personal knowledge, except as to those matters alleged upon information and belief, and as to those matters, I believe them to be true.
4. I understand that this Verification is being submitted in connection with an action pending before the Superior Court of New Jersey, Chancery Division, Bergen County, and may be relied upon by the Court in connection with Plaintiff's application for an Order to Show Cause with Temporary Restraints.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Signed by:
Sean Callagy
492BA211766A417...

Sean Callagy
Authorized Representative of
Integrous Wealth Strategies, LLC
Dated: November 17, 2026